# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
_____x
GUY WARLOP,                              )
                                         )
              PLAINTIFF,                  )
                                         )     Civ. Action No.
                                         )     1:05-cv-12058-PBS
        vs.                              )
                                         )
JO LERNOUT, PO HAUSPIE, GASTON BASTIAENS, )
NICO WILLAERT, CARL DAMMEKENS,           )
ELLEN SPOOREN, FRANCIS VANDERHOYDONCK,    )
ERWIN VANDENDRIESSCHE, DIRK CAUWELIER,     )
MARC G.H. DE PAUW, KLYNVELD PEAT MARWICK  )     JURY TRIAL
GOERDELER BEDRIJFSREVISOREN, KPMG LLP,    )     DEMANDED
DEXIA, S.A., DEXIA BANK BELGIUM (formerly known as )
ARTESIA BANKING CORP., S.A.),            )
                                         )
              DEFENDANTS.                 )
_____x
```

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Guy Warlop, Luc Vangansbeke, and Reginald Pauwels ("Lead Plaintiffs"), on

behalf of themselves and all investors in Lernout & Hauspie Speech Products, N.V. ("L&H" or the

"Company") who purchased on the EASDAQ stock exchange during the period April 28, 1998

through November 8, 2000 (the "Class Period") bring this action against defendants for securities

fraud. Lead Plaintiffs' allegations, set forth herein, allege the following upon information and belief,

except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal

knowledge. Lead Plaintiffs' information and belief are based upon, among other things, their

investigation, through their counsel, including without limitation, publicly available relevant

information, in order to obtain information necessary to plead Lead Plaintiffs' claims with

particularity. The nature and scope of Lead Plaintiffs' Counsel's investigation and analysis included

reviewing and analyzing: (a) L&H's filings with the SEC during the relevant time period including, but not limited to, the Company's Annual Reports on Form 20-F and/or 10-K for fiscal years 1997 through 1999; (b) the Company's press releases and other publicly disseminated statements made by the Company during the relevant time period; (c) reports, articles, and discussions concerning the Company and the subject matter of this Complaint contained in the print and electronic media and computer databases; (d) reports of securities analysts and investor advisory services; (e) the November 20, 2000 Audit Committee Report of the Board of Directors; and (f) information obtained from the public filings in *In re Lernout & Hauspie Securities Litigation*, Civil Action No. 00-CV-11589 (PBS) (D. Mass) (hereinafter referred to as the "L&H Action") and *Quaak, et al. v. Dexia, S.A., et al.*, Civil Action No. 03-CV-11566 (PBS) (D. Mass) (the "Dexia Action").  Except as alleged in this Complaint, the underlying information relating to defendants' misconduct and the particulars thereof are not available to Lead Plaintiffs and the public, and lie exclusively within the possession and control of defendants and insiders of L&H, thus preventing Lead Plaintiffs from further detailing defendants' misconduct.

## I.   <u>INTRODUCTION</u>

1.      This case involves a massive accounting fraud in which defendants caused L&H to overstate its publicly reported revenues from its first quarter of fiscal year 1998 through its first two quarters of fiscal year 2000, by an incredible 64% B or a total of $377 million.  As a result of this fraudulent accounting, the Company's financial statements for 1998, 1999 and the first two quarters of 2000 have been completely restated.

2.      During the Class Period, L&H, headquartered in Ieper, Belgium and Burlington, Massachusetts, became a European high-tech success story, having grown into an international cutting edge high-tech software powerhouse.  L&H had 143 million shares of common stock

outstanding as of August 2000 and its stock price hit a high of $65 per share on March 14, 2000, giving the Company a market capitalization of almost $9.3 billion at its peak.  The chart below depicts the massive artificial inflation of L&H's publicly reported revenues and earnings during the Class Period:



(000s)

| | 98 Q1 | 98 Q2 | 98 Q3 | 98 Q4 | 99 Q1 | 99 Q2 | 99 Q3 | 99 Q4 | 00 Q1 | 00 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| Reported | $35,065 | $44,991 | $54,860 | $76,676 | $70,708 | $76,015 | $87,473 | $110,041 | $110,694 | $154,906 |
| Restated | $33,065 | $44,191 | $44,260 | $62,176 | $46,008 | $32,315 | $46,773 | $44,441 | $52,294 | $94,206 |

3.      According to L&H's outside counsel, Lanny Davis, in a December 19, 2000 interview on *CNNfn,* the accounting irregularities at L&H "began at the top of the company with a culture that pressured individuals to prematurely recognize revenue, to engage in backdating of contracts or swapping of contracts with customers that couldn't afford to pay, in other words, creating revenues freely where none should have been recognized."

4.      At the direction of its Senior Officers (as identified herein), at both its Burlington, Massachusetts and Belgium headquarters, L&H engaged in numerous illegal accounting irregularities ranging from back-dating contracts to prematurely recording revenue, to swapping goods with customers and recording the swap as revenue, to recording revenue even when the sales

contract was not yet negotiated or signed, to giving customers side-agreements and the right to return the product.

5.      At its Korean subsidiary, L&H engaged in egregious accounting irregularities, including the recognition of entirely fictitious revenue amounting to approximately $189 million. All of the revenue L&H publicly reported from its Korean subsidiary, from the third-quarter of 1999 through the first two quarters of 2000, has been completely reversed and eliminated.

6.      In addition, L&H, along with Artesia Banking Corporation, S.A., the Flanders Language Valley Fund ("FLV Fund") and Mercator and Noordstar NV ("Mercator"), an Antwerp insurance company, set up 30 so-called Language Development Companies ("LDCs") and Cross-Language Development Companies ("CLDCs") which allegedly licensed millions of dollars worth of software from L&H.  L&H recorded all the purported revenue it received from the LDCs and CLDCs.  However, this revenue recordation was entirely improper because both FLV and Mercator were related parties to L&H and major L&H stockholders.  The purpose of establishing the LDCs and CLDCs was to "pump up" L&H's publicly reported revenues and benefit L&H's major shareholders Β FLV, Mercator and the Senior Officers.

7.      The fraud at L&H began to unravel when Boston-based investigative reporters at The Wall Street Journal began to investigate L&H's skyrocketing sales in both Korea and Singapore. Prior to fiscal year 2000, since L&H did not file Form 10-Ks with the United States Securities and Exchange Commission (the "SEC"), it was not required to break-down its sales by geographic region.  After acquiring two American companies in early 2000, however, L&H was obligated to comply with SEC reporting requirements.  Those filings showed an astounding surge in sales in Korea and Singapore.  After its extensive investigation, The Wall Street Journal published a story questioning the millions of dollars of revenues publicly reported by L&H in Korea.

8.      The L&H Senior Officers vehemently denied <u>The Wall Street Journal</u> story and commissioned its auditors, KPMG, to audit L&H's Korean sales.  L&H's Audit Committee retained two law firms, Bryan Cave LLP and Loeff Claeys Verbeke, who retained Arthur Andersen LLP, to conduct an investigation into L&H's accounting practices.  At or about the same time, the SEC commenced a formal investigation into L&H's accounting practices.

9.      As a result of the Audit Committee investigation, on November 8, 2000 the Company announced that it had uncovered accounting "errors and irregularities" and would be required to restate its 1998, 1999 and first two quarters of 2000 financial results.  A few weeks later, the report of the Audit Committee (the "Audit Committee Report") was publicly released (with redactions of the identity of L&H customers and employees involved in the irregularities) which detailed numerous violations of recording revenue in violation of both U.S. generally accepted accounting principles  ("GAAP") and L&H's own Company accounting policies.  In addition, the Audit Committee Report suggested that the Board consider disciplinary action against defendants Jo Lernout ("Lernout"), Pol Hauspie ("Hauspie"), Gaston Bastiaens ("Bastiaens") and Nico Willaert ("Willaert").

10.     L&H could not have perpetrated this massive accounting fraud without Artesia's knowledge and collaboration. Artesia helped to set up and finance the LDC/CLDCs, and knowingly provided L&H with loans, through its principal officers, which L&H then used to book fictitious revenue from these shell companies. Accordingly, at its core, this part of the fraudulent scheme consisted of L&H booking as revenue the cash it obtained from Artesia's loans, even though these loans would ultimately have to be repaid.  In other words, L&H, with Artesia's full knowledge, was essentially transferring cash from one pocket to another, and booking that transfer as revenue.

11.     Because the LDCs and CLDCs had no economic substance, Artesia would not

directly lend to them the millions of dollars they needed to "pay" L&H for licensing fees without guarantees from L&H's principal officers, Jo Lernout, Pol Hauspie, and Nico Willaert. However, Artesia officials knew that if Lernout, Hauspie and Willaert personally guaranteed the bank loans, L&H could not recognize revenue from these LDC and CLDC transactions. So, Artesia devised a scheme to camouflage these guarantees through the use of "credit default swaps." Artesia employed these swaps as an excuse for lending the LDCs and CLDCs the millions of dollars that they intended to funnel to L&H, without disclosing that the ultimate guarantors of the loans were Lernout, Hauspie, and Willaert. The LDCs and CLDCs then used the funds from these loans to pay L&H for millions of dollars of purported software license fees, allowing L&H to generate fictitious revenue on these transactions which L&H then recognized as real revenue.

12.     In return for its knowing participation in this fraud, Artesia was able to continue to receive lucrative banking fees from L&H, while providing L&H's major shareholders, including Lernout, Hauspie, and others, with substantial wealth through their fraudulently inflated L&H stock. In addition, Artesia charged substantial interest rates and fees in connection with the promise that L&H would find unsuspecting investors who would provide funds to repay Artesia's loans, in effect, guaranteeing Artesia a profit on these transactions.

13.     Ultimately, a substantial portion of Artesia's loans were repaid with funds obtained by L&H from unsuspecting investors. Artesia and L&H thereby consummated a classic Ponzi scheme in which Artesia provided the initial funding of the LDCs and CLDCs to create the illusion that these shell companies had actual investors and money in order to lure new investors to fund the LDCs and CLDCs, at which point Artesia was paid back.

14.     Following the disclosures of L&H's Audit Committee and others, L&H ultimately filed for bankruptcy protection, its stock price becoming virtually worthless (trading at under ten

cents per share).  In 2001, defendants Lernout, Hauspie, and Willaert were imprisoned in Belgium during a Belgian criminal investigation of falsification of documents and stock manipulation.  Defendant Bastiaens was arrested at his home in Winchester, Massachusetts on a Belgian warrant accusing him of fraud, stock market manipulation, and insider trading.  All currently await possible prosecution in Belgian courts**.**  Ju-Chul Seo, former President of L&H's Korean subsidiary, reportedly fled Korea during a phony "abduction" and is reported to be hiding somewhere in mainland China, living off a hidden stockpile of money of anywhere from $25 million to $100 million.

15.     On October 10, 2002, the SEC announced the filing of a civil injunctive action in United States District Court for the District of Columbia against L&H, alleging that, from 1996 through the second quarter of 2000, while its common stock was listed on NASDAQ and EASDAQ, L&H engaged in a variety of fraudulent schemes to inflate its reported revenue and income.  On February 28, 2003, Judge Paul Friedman of the United States District Court for the District of Columbia entered a permanent injunction against L&H.  The court's Order permanently enjoined L&H from violating the anti-fraud, reporting, books and records and internal controls provisions of the federal securities laws.

16.     In a related matter, on March 4, 2003, L&H consented to the entry of an SEC order revoking the registration of its common stock. In its Order, the SEC found that L&H included materially false and misleading information in its financial statements and its Annual Reports on Form 20-F and Form 10-K for the calendar years ended December 31, 1996, 1997, 1998 and 1999, and in its Quarterly Reports on Form 6-K or Form 10-Q for the first two quarters of 2000. The Commission also found that Lernout & Hauspie failed to file annual or quarterly reports for any fiscal period subsequent to its fiscal quarter ending June 30, 2000.

17.    L&H's reported financial health was based on accounting gimmicks and trickery to create the appearance of a financially successful company.  In truth, however, L&H was nothing more than an illusion of financial prosperity, created by various certain officers and directors of L&H, the Company's outside auditors and entities contributing to the routine "cooking of the books" at L&H.

## II.    JURISDICTION AND VENUE

18.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C.§§ 78j(b) and 78t, and the rules and regulations promulgated there under, including Securities Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5.  Jurisdiction is based upon Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19.    Venue is proper in this District under Section 27 of the 1934 Act, 15 U.S.C. §78aa, and Section 1391(b) of the Judicial Code, 28 U.S.C. §1391(b).  L&H maintained its United States offices and one of it two headquarters in this District.  KPMG LLP has an office in this District. Further, the wrongs alleged herein occurred in substantial part in this District, including the preparation and dissemination to the investing public of false and misleading information.

20.    In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities exchanges.

21.    Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims for L&H securities traded on both U.S. markets and/or purchased in the U.S. and in European markets.  This Court has subject matter jurisdiction over foreign members of the class because the defendants' fraudulent conduct has an impact upon the United States' markets and upon United States investors,

including United States investors who purchased L&H securities on EASDAQ.  The interests of all investors were adversely affected by the defendants' misconduct.  Defendants' fraudulent conduct, including that which was performed in the United States, artificially inflated the price of the Company's securities during the Class Period and affected the integrity of the prices paid for L&H securities in the United States and on other markets and in other countries around the world.

22.    This Court may also properly exercise subject matter jurisdiction under the "conduct test," articulated by the Second Circuit (and other courts), which provides that a federal court has subject matter jurisdiction if (a) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (b) these activities or culpable failures to act within the United States "directly caused" the claimed losses.  The facts alleged herein show that substantial activity in furtherance of the defendants' fraud occurred within the United States and damaged members of the Class worldwide.

23.    Defendants' fraud-related conduct in the U.S. was part of a single fraudulent scheme spanning the U.S., Belgium, and other countries around the world.  The domestic conduct was instrumental in causing the losses of Lead Plaintiffs and the other members of the Class.

### III.    THE PARTIES

24.    Lead Plaintiffs Guy Warlop, Luc Vangansbeke, and Reginald Pauwels purchased L&H common stock on the EASDAQ stock market during the Class Period and were damaged thereby.  Lead Plaintiffs' signed certification forms pursuant to the PSLRA are attached hereto.

**DEFENDANTS**

**The Company**

25.    L&H was a Belgian corporation with its United States executive offices located in Burlington, Massachusetts.  L&H developed and licensed speech technologies, including speech

recognition software. Throughout the Class Period, L&H was listed on the NASDAQ exchange under the symbol LHSPE. L&H's common stock was also listed on the EASDAQ. L&H is not named as a defendant in this action because it filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware on November 29, 2000. On May 29, 2003, Judge Judith Wizmur of the U.S. Bankruptcy Court for the District of Delaware confirmed L&H's liquidation plan.

### The Officer Defendants

26.     Defendant Jo Lernout ("Lernout") was a co-founder of L&H and served as its Managing Director of the Board since its organization in 1987, as President from January 1994 until October 1996, as Co-Chairman since October 1996, as a member of the Office of the Chief Executive since February 1996 and Co-Chairman in the Office of the Chief Executive since October 1996. Lernout resigned his management position with the Company on November 9, 2000. Lernout also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

27.     Defendant Pol Hauspie ("Hauspie") was a co-founder of L&H and served as a Managing Director since its organization in 1987, Chairman from January 1994 until October 1996 and as a Co-Chairman of the Board since October 1996, as a member of the Office of the Chief Executive since February 1996 and as Co-Chairman in the Office of the Chief Executive since October 1996. Defendant Hauspie resigned from his positions on November 9, 2000. Hauspie also served as a director of FLV Fund from 1996 to 1997, and after 1997 continued to "spend a portion of his time on activities relating to the FLV Fund."

28.     Defendant Gaston Bastiaens ("Bastiaens") was the President of L&H from October 1996 and Chief Executive Officer from May 1997 until his resignation on August 25, 2000.

29.     Defendant Carl Dammekens ("Dammekens") joined L&H in 1990 as Corporate Controller and served as Senior Vice President of Finance from 1993 to 1996, and as Acting Chief Financial Officer of L&H from 1996 to July 1999.  Dammekens was appointed Chief Financial Officer on July 7, 1999.  Dammekens resigned his position with the Company on November 9, 2000.

30.      Defendant Nico Willaert ("Willaert") was, at all relevant times, Managing Director and Vice chairman of L&H.

31.     Defendant Ellen Spooren ("Spooren") was, at all relevant times, L&H's Senior Vice President of  Marketing and Corporate Communications.  During the Class Period, Spooren sold 100,050 shares of L&H, reaping proceeds of over $3.94 million.  Spooren resigned her position with L&H on August 25, 2000.

32.     Defendants Lernout, Hauspie, Bastiaens, Dammekens and Willaert, are collectively referred to as the "Senior Officers."

**L&H Director Defendants**

33.     Defendant Francis Vanderhoydonck ("Vanderhoydonck"), was a director of L&H from May 1999 until his resignation on or about May 15, 2001.  Vanderhoydonck also served as President and Managing Director of L&H Investment Co. N.V. ("LHIC"), since its inception in 1998.  During the Class Period, Vanderhoydonck sold 100% of his L&H common stock for proceeds of over $3.2 million.

34.     Defendant Erwin Vandendriessche ("Vandendriessche") was a director of L&H, in his individual capacity from 1990 to 1994.  Beginning in January 1994, Vandendriessche served as director as the appointed representative of RVD Securities N.V. ("RVD"). Vandendriessche was also the Chairman of L&H's Audit Committee throughout the Class Period.

35.     Defendant Dirk Cauwelier ("Cauwelier") served as a director of L&H since May 1997.

Cauwelier also served as a member of the Audit Committee.

36.     Defendant Marc G.H. De Pauw ("De Pauw") served as a director of L&H since June 1995. At all relevant times, De Pauw was a member of the Audit Committee of the Board of Directors.

37.     Defendants Vandendriessche, Vanderhoydonck, Cauwelier, and De Pauw are sometimes collectively referred to herein as the "Director Defendants."

38.     Defendants Cauwelier, DePauw and Vandendriessche are sometimes collectively referred to herein as the "Audit Committee Directors" or the "Audit Committee Defendants."

**KPMG Defendants**

39.     Defendant Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (a.k.a. KPMG Bedrijfsrevisoren or KPMG Belgium) ("KPMG Belgium"), is a Belgian public accounting firm employing 950 partners and staff in six cities. KPMG Belgium is a member of KPMG International. KPMG Belgium has been L&H's outside auditor since 1991, when KMPG acquired the Belgian accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980s. During the Class Period, KPMG Belgium issued unqualified reports on L&H's financial statements for 1997 through 1999; gave an opinion that those financials statements were prepared in accordance with GAAP; stated that its audit was conducted in accordance with GAAS, and consented to L&H's inclusion of KPMG Belgium's reports on those financial statements in filings with the SEC. During the Class Period, KPMG Belgium also served as outside auditor for FLV Fund.

40.     Defendant KPMG LLP ("KPMG US") is a public accounting firm based in the United States and a member of KPMG International. During the Class Period, KPMG US audited L&H's financial statements with KPMG Belgium.

**Banking Defendants**

12

41.     Defendant Dexia S.A. is a financial institution based in Belgium and, as a result of its acquisition of Artesia in 2001, is one of the three largest banks in that country. It has over €350 billion in assets.

42.     Dexia S.A. regularly transacts business in the United States. It has numerous financial services subsidiaries in the United States including Dexia Credit Local New York Agency, Financial Security Assurance, Dexia Bank New York, Artesia Mortgage Capital Corp., Astns Finance, and Dexia Securities U.S.A.

43.     Defendant Dexia Bank Belgium is a wholly-owned subsidiary of Dexia S.A. and regularly transacts business in the United States by virtue of having its Dexia Bank New York branch headquartered in New York.

44.     Artesia Banking Corporation was a wholly-owned subsidiary of Acrofin CVBA, a Belgian financial services group. On March 31, 2001, Dexia S.A. announced that it was acquiring Artesia Banking Corporation from Acrofin, and that Artesia would be merged into Dexia S.A.'s wholly-owned banking subsidiary Dexia Bank Belgium.

45.     Artesia Banking Corporation continuously and systematically transacted business in the United States prior to its acquisition by Dexia through multiple subsidiaries distributed throughout the country. Artesia's wholly-owned subsidiary Artesia Mortgage Capital Corporation ("Artesia Mortgage"), for example, conducted business in the United States through its headquarters in Delaware and offices at 1180 NW Maple St. Suite 202, Issaqua, Washington 98027. In fact, Artesia Mortgage continues to conduct business under the same name although it is now owned by Dexia instead of Artesia. Since 1996, Artesia Mortgage has closed loans with a principal balance of approximately $2 billion. Artesia also conducted business in the United States prior to its acquisition by Dexia through its wholly-owned subsidiary Artesia North America (headquartered in Delaware),

and its fifty-percent owned joint venture, Artesia Securities, headquartered in New York.

46.    Artesia Banking Corporation engaged in lending transactions in the United States. In particular, Artesia was part of a Banking consortium that lent $230 million as part of L&H's acquisition of Dictaphone. The borrowers of the funds were Dictaphone of Stratfield, Connecticut, L&H and FLV Fund, jointly and severally. In addition, in 1997 Artesia lent money to its client, Vasco Data Security International ("Vasco"), located in Illinois. Later, in early 1999, Artesia was a lead underwriter in a private placement that provided financing to Vasco.

47.    Defendants Dexia, S.A. and Dexia Bank Belgium are sometimes collectively referred to herein as "Dexia."

48.    By reason of their positions with the Company, each of the defendants identified as officers and directors of L&H had access to internal Company documents, reports and other information, including the adverse non-public information concerning the Company's financial condition and future prospects.  These defendants, as detailed herein, attended management and/or board of directors meetings.  As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

49.    The individual defendants, as officers and directors of a publicly traded company, had a duty to promptly disseminate truthful and accurate information with respect to L&H and to promptly correct any public statements issued by or on behalf of the Company that had become false or misleading.

50.    It is appropriate to treat the Senior Officers, the Director Defendants and Audit Committee Directors as a group for pleading purposes and to presume that the false and misleading information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of this narrowly defined group of defendants.

Each of the above officers or directors of L&H, by virtue of their high-level position with the Company, directly participated in the management of the Company and was privy to confidential proprietary information concerning the Company and its business, operations and accounting practices as alleged herein.  The Senior Officers, Director Defendants and Audit Committee Directors were involved or participated in the drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein.  These defendants were, thus, aware that these false and misleading statements and financial results were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

51.     Each of the defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated.  Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and the other members of the Class.

52.     All Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein

### IV.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

53.     L&H was a speech recognition software manufacturer that was founded in 1987 by defendants Lernout and Hauspie.  Its three core technologies were automatic speech recognition, text-to-speech conversion, and digital speech compression.

54.     In 1995, L&H completed its initial public offering and commenced trading on NASDAQ and was quoted on EASDAQ.  From 1987 through 1995, the Company had never been profitable and had only produced a few million dollars in annual revenues.

55.     Beginning in the third quarter of 1996, L&H expanded its business primarily through a dizzying array of acquisitions, to reach its goal of becoming "the leading international provider of advanced speech and language technologies, products and services."  In its 1997 Form 20-F, the company stated:

> Beginning in the third quarter of 1996, the Company expanded its business substantially through acquisitions, to include translations services, language technologies and dictation software.  The Company also expanded its core speech technologies through acquisitions.  More recently the Company has acquired businesses for its translation services division and to augment the Company's language technologies division.

56.     As a result of the Company's new focuses, L&H's sales quadrupled from 1995 to 1996. What followed was a period of unprecedented growth for L&H, making the Company an international success story and the pride of Belgium.

57.     From 1997 to June 2000, L&H reported incredible revenue growth B bolstered by a number of acquisitions, related-party transactions, and fraudulent accounting.  In 1997, the Company's total revenues increased 220% to $99.4 million from $31 million in 1996.  In 1998, L&H's revenues purportedly rose 113% to $211.6 million, and by 1999, the total revenues were claimed to be $344 million.

58.     A major focus of L&H's growth was the practice of acquiring complementary businesses and technologies as a means of supplementing its own internal development activities. Under Bastiaens' leadership, L&H acquired at least 20 companies during the Class Period, as illustrated by the following chart:

| DATE[1] | NAME OF COMPANY ACQUIRED | TOTAL CONSIDERATION | AMOUNT OF L&H SECURITIES ISSUED AS CONSIDERATION | AMOUNT OF CASH PAID AS CONSIDERATION |
|---|---|---|---|---|
| 03/19/98 | Applications Technology, Inc. | $17.5 million | $5.2 million | $12.3 million |
| 03/31/98 | Inso Corporation's Linguistic Software Business | $19.5 million | $9.75 million | $9.75 million |
| 06/08/98 | Dictation Consortium, N.V. | $40 million | | $40 million |
| 07/20/98 | Globalink, Inc. | $70.2 million | $70.2 million | |
| 07/20/98 | AI Logic Corporation | $5.5 million | | $5.5 million |
| 07/20/98 | NeocorTech | $1.0 million | | $1.0 million |
| 08/05/98 | Heitmann Group | $35 million | $15 million | $20 million* |
| 09/30/98 | TikSoft | $12 million | $6 million | $6 million |
| 05/19/98 | Fonix Healthcare Solutions Group | $28 million | | $28 million* |
| 06/29/99 | Flanders Dialogue Company | $6.5 million | | $6.5 million |
| 06/29/99 | Brussels Translation Group | $59 million | | $42 million $17 million* |
| | | | | |

[1] All information contained in the above-chart is derived from the initial L&H press releases announcing the acquisition of named companies.

17

| 08/30/99 | Computer Aided Medical Systems | $6 million | | $6 million |
|---|---|---|---|---|
| 09/13/99 | Bumil Information & Communications, Ltd. | $50 million | | $50 million |
| 12/22/99 | Omni-Med Transcription, Inc. Linguistic Technologies, Inc. Rodeer Systems, Inc. | $49 million (aggregate) | | $49 million (aggregate) |
| 02/22/00 | Matra Nortel Communications Elan Informatiquie | $16 million (aggregate) | $1 million (aggregate) | $15 million (aggregate) |
| 03/07/00 | Dictaphone Corporation | $935.6 million | $510.6 million | $425 million* |
| 03/28/00 | Dragon Systems, Inc. | $460 million | $460 million | |
| **Total** | | **$1.8108 billion** | **$1.077 billion** | **$.733 billion** |

\* Assumption of liabilities.

59.     As illustrated above, L&H used its own inflated stock as currency for over 40% of its

Class Period acquisitions.

**B.     THE MATERIALLY FALSE AND MISLEADING STATEMENTS**

60.     On April 28, 1998, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout &

Hauspie Reports Record Q1 Revenues of $35 Million; Strong Earnings of $0.13 Per Share Before

18

One Time Charge for First Quarter" (the "April 28, 1998 Press Release").  The April 28, 1998 Press

Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the first quarter of 1998, L&H's total revenues were $35.1 million, an increase of
> 112% over reported revenues of $16.6 million for the first quarter of 1997.

*   *   *

> Net income before one time charges and unusual items for the first quarter of 1998
> reached $7 million, or $0.13 per share on 52.5 million average diluted shares
> outstanding which is a 62.5 % increase when compared to $2.7 million in net
> income, or $0.08 per share on $34.4 million average outstanding shares for the first
> quarter of 1997.

*   *   *

> The first quarter of 1998 marked a number of important events for Lernout &
> Hauspie, said Gaston Bastiaens, president and CEO of Lernout & Hauspie. We
> shipped L&H Voice Xpress for Medicine, our continuous speech dictation product
> for general medical use, and we now enter the personal computer retail market today
> with L&H Voice Xpress and Voice Xpress Plus shipping in the market. Our ability to
> consistently meet product rollout milestones was augmented by our tremendous
> success in securing contracts and completing strategic acquisitions.  All in all, it has
> been an outstanding quarter for L&H.

*   *   *

> According to Bastiaens, consistent financial performance, the ability to roll out new
> products on schedule and making acquisitions complementing its core technologies
> has strengthened L&H's position as a leading speech and language technology
> company in the world.

*   *   *

> [S]aid Jo Lernout, L&H co-founder and co-chairman "L&H is a leading contributor
> to this effort by developing numerous new offerings in areas ranging from
> continuous dictation to Internet translation.  The burgeoning market acceptance for
> speech technology is underscored by L&H's continuing strong revenues and new
> contract bookings."

The April 28, 1998 Press Release also reported the following:

19

|  | (000) 3 Months Ended March 31, 1998 |
|---|---|
| Revenues |  |
|    Core Technologies | $11,795 |
|    Dictation | $5,641 |
|    Translation Services | $11,853 |
|    Language Technology | $5,776 |
|  |  |
| Total Net Revenues | $35,065 |
| Loss from Operations | $($8,111) |
| Net loss | $($3,982) |
|  | As of March 31, 1998 |
| Accounts Receivable | $35,655 |
|  |  |
| Total Assets | $246,834 |

61.     On May 1, 1998, L&H filed with the SEC its Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934 which included as "Exhibit 2" a copy of the April 28, 1998 Press Release (the "Q1 1998 6-K").  Bastiaens signed the Q1 1998 6-K.

62.     The April 28, 1998 Press Release and the Q1 1998 6-K were materially false and misleading because revenues and accounts receivable were artificially inflated by at least $2 million and earnings were materially overstated.

63.     On July 28, 1998, L&H issued a press release *via* Business Wire titled "Lernout & Hauspie Reports Record Q2 Revenues of $45 Million; Record Net Profits of $9.5 Million or $0.17 EPS Before Exceptional Items" (the "July 28, 1998 Press Release").  The July 28, 1998 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1998, L&H's total revenues were $45 million, and increase of 113% over reported revenues of $21.1 million for the second quarter of 1997.

* * *

Net income before one time charges and unusual items for the second quarter of 1998 reached $9.5 million.  This represents $0.17 per share on 55.1 million average diluted shares outstanding which is a 138% increase when compared to $4.0 million in net income, or $0.11 per share on 36.1 million average outstanding shares for the second quarter of 1997.

* * *

"The strong performance of our company is [sic] all our business activities proves the strength of our integrated speech and linguistic strategy and the ability of our management team to implement," said Gaston Bastiaens, president and CEO of Lernout & Hauspie.

* * *

[S]aid Jo Lernout, L&H co-founder and co-chairman "L&H has been very proactive in meeting the market demand by regularly introducing new products, diversifying our sales channels and offering competitive pricing.  These efforts have been rewarded with continuing strong revenues and new contract bookings."
.

The July 28, 1998 Press Release also reported the following:

|  | (000s) 3 Months Ended June 30, 1998 | (000s) 6 Months Ended June 30, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $12,023 | $23,818 |
| Dictation | $7,323 | $12,964 |
| Translation | $12,288 | $18,064 |
| Language Technology | $13,357 | $25,210 |
|  |  |  |
| Total Net Revenues | $44,991 | $80,056 |

| | | |
|---|---|---|
| Loss from operations | ($31,907) | ($40,018) |
| Net Loss | ($34,543) | ($38,524) |
| | As of June 30, 1998 | |
| Accounts Receivable | $42,820 | |
| | | |
| Total Assets | $404,270 | |

64.     On August 7, 1998, L&H filed with the SEC its Form 6-K Report of Foreign Private
Issuer Pursuant to Rule 13a-16 or 15d-1 of the Securities Exchange Act of 1934, which included as
"Exhibit 2" a copy of the July 28, 1998 Press Release (the "Q2 1998 6-K").  Bastiaens signed the Q2
1998 6-K.

65.     The July 28, 1998 Press Release and the Q2 1998 6-K were materially false and
misleading because revenues and accounts receivable were artificially inflated by at least $800,000
and earnings were overstated.

66.     On October 27, 1998, L&H issued a press release *via* Business Wire titled "Lernout &
Hauspie Reports Record Q3 Revenues of $54.9 Million; Record Net Profits of $12.1 or $0.22 EPS
Before Exceptional Items" (the "October 27, 1998 Press Release").  The October 27, 1998 Press
Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1998, L&H's total revenues were $54.9 million, an increase
> of 97% over reported revenues of $27.9 million for the third quarter of 1997.

*   *   *

> Net income before one-time charges and unusual items for the third quarter of 1998
> reached $12.1 million.  This represents $0.22 per share on 55.9 million average

diluted shares outstanding which is a 133% increase when compared to $5.2 million in net income, or $0.13 per share on 40.5 million average outstanding shares for the third Quarter of 1997.

The October 27, 1998 Press Release also reported the following:

| | (000s)<br>3 Months Ended<br>September 30, 1998 | (000s)<br>9 Months Ended<br>September 30, 1998 |
|---|---|---|
| Revenues | | |
| Core Technologies | $13,449 | $37,266 |
| Dictation | $9,972 | $22,936 |
| Linguistic Services | $18,094 | $43,304 |
| Language Technology | $13,346 | $31,410 |
| Total Net Revenues | $54,860 | $134,916 |
| Loss from operations | ($34,153) | ($74,172) |
| Net Loss | ($39,262) | ($77,787) |
| | As of<br>September 30, 1998 | |
| Accounts Receivable | $60,513 | |
| | | |
| Total Assets | $523,871 | |

67.    On October 29, 1998, L&H filed with the SEC its Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1998 Press Release (the "Q3 1998 6-K"). Thomas B. Doherty, L&H's then-Senior Vice President of Finance and Financial Planning, signed the Q3 1998 6-K.

68.    The October 27, 1998 Press Release and the Q3 1998 6-K were materially false and misleading because revenues and accounts receivable were overstated by at least $10.6 million and

earnings were overstated.

69.     On April 7, 1999, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout & Hauspie Reports Record Revenues and Record Earnings Before One-Time Charges for Fourth Quarter 1998 and Fiscal Year 1998" (the "April 7, 1999 Press Release").  The April 7, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> Lernout & Hauspie (Nasdaq: LHSP) (Easdaq: LHSP) (L&H), a worldwide market leader in speech and linguistic technologies, products and services, today announced results for the fourth quarter of $76.7 million in revenue, or a 126% increase in the reported revenue of $33.8 million for the fourth quarter 1997.  For the fiscal year 1998, the company reported total revenues of $211.6 million or an increase of 113% over the reported revenues of $99.4 million for 1997.

*   *   *

> The Company reported approximately $12.9 million in net income, before one-time charges and exceptional items, for the fourth quarter of 1998 or EPS (Earnings Per Share) of $0.22 cents per share on 58.3 million average diluted shares outstanding. The Company's fourth quarter net income includes an increase in goodwill amortization expense of approximately $1.5 million or $0.03 per share, relating to the company's previously announced revaluation of in process research and development acquired in prior quarters, to reflect new United States Securities and Exchange Commission (the "SEC") guidelines.  If not for this change, the Company's net income before one-time charges would have been $0.25 per share.

*   *   *

> Net income for the full year of 1998, excluding one-time charges, totaled $37.8 million or $0.69 per share on 55.2 million average diluted shares compared to $20 million or $0.53 per share on 38.9 million average diluted shares during 1997.

> "There are a number of factors that have contributed to our successful year.  Our revenues increased significantly between 1997 and 1998 not only because there was considerable growth in the market for speech and language technologies, products and services, but particularly because of L&H's ability to deliver new products, solutions and services," said Gaston Bastiaens, president and CEO of Lernout & Hauspie.  "The strong growth in each of our business divisions is attributable in part to our professional, successful integration of acquired technologies and especially to our strong internal growth."

*   *   *

24

"During this past year, the market has gained an even greater appreciation of the vast potential for speech and language technologies.  In fact, the Gatner Groupo recently issued a report citing speech technology, artificial intelligence, natural language technology, wearable computing, biometrics and voice over the Internet as 'technologies to watch' for 1999," said Jo Lernout, co-founder and co-chairman of L&H.  "L&H has returned record revenues for 1998 because we are expert in the full range of speech and language technologies, including artificial intelligence, Natural Language Technology (NLT) and voice over the Internet, and can combine them to create multi-lingual speech-enabled offerings.  By combining these offerings we can meet a wide range of global needs."

The April 7, 1999 Press Release also reported the following:

|  | 3 Months Ended December 31, 1998 | Year Ended December 31, 1998 |
|---|---|---|
| Revenues |  |  |
| Core Technologies | $19,086 | $56,352 |
| Dictation | $14,898 | $37,834 |
| Translation Services | $24,596 | $67,900 |
| Language Technology | $18,097 | $49,507 |
| Total Net Revenues | $76,677 | $211,593 |
| Income/(Loss) from operations | $13,836 | ($43,741) |
| Net income/(loss) | $10,213 | ($48,630) |
|  | As of December 31, 1998 |  |
| Accounts Receivable | $81,212 |  |
|  |  |  |
| Total Assets | $571,017 |  |

70.     On April 19, 1999, L&H filed with the SEC its Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the April 7, 1999 Press Release (the "Q4 1998 6-K"). Bastiaens signed the Q4 1998 6-K.

71.     On June 30, 1999, L&H filed with the SEC, its Form 20-F Annual Report Pursuant to Section 13 or 15d of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31,

1998 ( the "1998 20-F"). The 1998 20-F included the same financial information contained in the April 7, 1999 Press Release. Bastiaens signed the 1998 20-F on June 29, 1999.

72.     The April 7, 1999 Press Release, the Q4 1998 6-K and the 1998 20-F were materially false and misleading because fourth quarter revenues and accounts receivable were overstated by at least $14.5 million and earnings were overstated. Year-end 1998 revenues were overstated by $27.9 million and earnings were overstated.

73.     The 1998 Form 20-F included the following statement by KPMG  Belgium:

LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES
INDEPENDENT AUDITORS' REPORT

The Board of Directors and Shareholders Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance sheets of Lernout & Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31, 1997 and December 31, 1998, and the related consolidated statements of operations, shareholders' equity, cash flows and comprehensive incomes for each of the years in the three-year period ended December 31, 1998. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products N.V. and subsidiaries as of December 31, 1997 and December 31, 1998, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998, in conformity with generally accepted accounting principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren Brussels, Belgium April 9, 1999

74.    The above statement by KPMG Belgium was materially false and misleading for the reasons set forth in ¶¶ 60-72.

75.    On May 18, 1999, L&H issued a press release *via* Business Wire titled "Lernout & Hauspie Reports Strong Revenues and Strong Earnings For First Quarter; Company Achieves Revenues of $70.7 Million and EPS of $0.12 Before Exceptional Items" (the "May 18, 1999 Press Release").  The May 18, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated in part:

> For the first quarter of 1999, L&H's total revenues were $70.7 million, an increase of 102% over reported revenues of $35.1 million for the first quarter of 1998.  The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.
>
> *  *  *
>
> Net income before exceptional items for the first quarter of 1999 reached $7 million, or $0.12 per share on 58.1 million average diluted shares outstanding which is a 13% increase when compared to $6.2 million in net income, or $0.12 per share on 52.5 million average outstanding shares for the first quarter of 1998.

The May 18, 1999 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>March 31, 1999 |
|---|---|
| Revenues |  |
|    Technologies & Solutions | $24,726 |
|    Applications | $22,568 |
|    Consulting & Services | $23,414 |
| Total Net Revenues | $70,708 |
| Income from operations | $10,939 |
| Net income | $12,304 |
|  | As of<br>March 31, 1999 |
| Accounts Receivable | $88,301 |

| | |
|---|---|
| Total Assets | $572,233 |

76.     On June 1, 1999, L&H filed with the SEC its Form 6-K Report of Foreign Private Issuer Pursuant to Rule l3a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the May 18, 1999 Press Release (the "Q1 1999 6-K").  Dammekens signed the Q1 1999 6-K.

77.     The May 18, 1999 Press Release and the Q1 1999 6-K were materially false and misleading because revenues and accounts receivables were overstated by at least $24.7 million and earnings were overstated.

78.     On July 28, 1999, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout & Hauspie Reports Strong Revenues, Earnings and Cash Flow For Second Quarter; Company Achieves Revenues of $76 million and EPS of $0.17; Reduced DSO's" (the "July 28, 1999 Press Release"). The July 28, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the second quarter of 1999, L&H's total revenues were $76.0 million, an increase of 69% over reported revenues of $45.0 million for the second quarter of 1998. L&H's total revenues for the six months ending June 30, 1999 were $146.7 million, an increase of 83% over reported revenues of $80.1 million for the same period in 1998.  The company attributes the increased revenues to L&H's continued success in expanding the role speech and language technologies play in a broad range of markets and applications.

> *   *   *

> Net income of Q2 1999 reached $10.1 million, or $0.17 per share on 59.4 million shares which is a 21% increase when compared to $8.3 million, or $0.15 per share on 55.1 million shares for the second quarter of 1998.  Net income for the first six months ended June 30, 1999 reached $17.1 million, or $0.29 per share on 58.8 million average diluted shares outstanding, which is a 17% increase when compared to $14.6 million in net income, or $0.28 per share on 52.5 million average outstanding shares for the six months ended June 30, 1998.

\* \* \*

"L&H has steadfastly pursued its long-term strategy to be the leading provider of speech and language technologies, products and services, particularly as it relates to opportunities in Natural Language-Understanding," said Jo Lernout, L&H co-founder and co-chairman.  "We are especially pleased with our Q2 successes because they affirm that our strategy is sound and successful.  Our continued ability to attract interest from industry leaders, as evidenced by the Intel agreement announced this quarter, reinforces this long term strategy as well."

The July 28, 1999 Press Release also reported the following:

| | (000s)<br>3 Months Ended<br>June 30, 1999 | (000s)<br>6 Months Ended<br>June 30, 1999 |
|---|---|---|
| Revenues | | |
| Technologies & Solutions | $26,485 | $51,211 |
| Applications | $28,984 | $51,552 |
| Consulting & Services | $20,546 | $43,960 |
| Total Net Revenues | $76,015 | $146,723 |
| Income from operations | $15,532 | $26,471 |
| Net income | $10,114 | $26,471 |
| | As of<br>June 30, 1999 | |
| Accounts Receivable | $87,145 | |
| | | |
| Total Assets | $606,303 | |

79.     On August 6, 1999, L&H filed with the SEC a Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the July 28, 1999 Press Release (the "Q2 1999 6-K").  Bastiaens signed the Q2 1999 6-K.

80.     The July 28, 1999 Press Release and the Q2 1999 6-K were materially false and misleading because revenues and accounts receivables were overstated by at least $43.7 million and earnings were overstated.

81.     On October 27, 1999, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout & Hauspie Reports Record Revenues of $87.5 Million and Strong Earnings of $0.16 for Third Quarter; Record Earnings Before Goodwill Amortization of $18.5 Million or $0.31 per Share" (the "October 27, 1999 Press Release").   The October 27, 1999 Press Release was issued from Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the third quarter of 1999, L&H's total revenues were $87.5 million, an increase of 59% over reported revenues of $54.9 million for the third quarter of 1998.  L&H's total revenues for the nine months ended September 30, 1999 were $234.2 million, an increase of 74% over reported revenues of $134.9 million for the same period in 1998.
>
> *   *   *
>
> Net income for Q3 1999, before goodwill amortization, reached $18.5 million, or $0.31 per share on 60.5 million shares.  This is a 25% increase compared to $14.7 million before goodwill amortization and one-time charges, or $0.26 per share on 55.8 million fully diluted shares, for the third quarter of 1998.  Net income for the first nine months ended September 30, 1999 reached $50 million before goodwill amortization and one-time charges, or $0.85 per share on 59.1 million fully diluted shares which is a 43% increase when compared to $34.7 million in net income, or $0.64 per share on 54.1 million fully diluted shares for the nine months ended September 30, 1998.  Net income for the third quarter of 1999 was $9.8 million or $.16 per share on a fully-diluted basis versus a net loss of $35.6 million or $.70 per share net loss for the third quarter of 1998.

The October 27, 1999 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>September 30, 1999 | (000s)<br>9 Months Ended<br>September 30, 1999 |
|---|---|---|
| Revenues |  |  |
| Technologies & Solutions | $31,033 | $82,244 |

30

| | | |
|---|---|---|
| Applications | $32,107 | $83,659 |
| Consulting & Services | $24,333 | $68,293 |
| Total Net Revenues | $87,473 | $234,196 |
| Income from operations | $16,827 | $43,296 |
| Net income | $10,446 | $31,096 |
| | As of September 30, 1999 | |
| Accounts Receivable | $122,871 | |
| | | |
| Total Assets | $640,333 | |

82.     On November 4, 1999, L&H filed with the SEC its Form 6-K Report of Foreign Private Issuer Pursuant to Rule 13a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as "Exhibit 2" a copy of the October 27, 1999 Press Release (the "Q3 1999 6-K"). Dammekens signed the Q3 1999 6-K.

83.     On June 30, 2000, L&H filed with the SEC its Form 10-Q Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period Ended September 30, 1999 (the "Q3 1999 10-Q"). The Q3 1999 10-Q included substantially the same financial information contained in the October 27, 1999 Press Release. Bastiaens and Dammekens signed the Q3 1999 10-Q.

84.     The October 27, 1999 Press Release, the Q3 1999 6-K and the Q3 1999 10-Q were materially false and misleading because revenues and accounts receivables were overstated by at least $40.7 million and earnings were overstated.

85.     On February 9, 2000, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout & Hauspie Reports Record Revenues of $110 Million and Earnings Per Share of $0.22 for Fourth

Quarter (Before Exceptional Items); Strong Fiscal Year 1999; Announces 2-For-1 Stock Split;

Record Earnings of $22.6 Million or $0.37 Earnings Per Share Before Goodwill Amortization and

Exceptional Items; Cash Flow of $68 Million from 1999 Operations and DSO's reduced to 86 Days"

(the "February 9, 2000 Press Release").  The February 9, 2000 Press Release was issued from

Burlington, Massachusetts and Ieper, Belgium and stated, in part:

> For the fourth quarter of 1999, L&H's total revenues were $110 million, or a 43.5%
> increase in the reported revenue of $76.7 million for the fourth quarter 1998.  For the
> fiscal 1999, the company reported total revenues of $344 million or an increase of
> 62.7% over the reported revenues of $211.6 million for 1998.
>
> The company reported approximately $13.4 million in net income for the fourth
> quarter of 1999, before exceptional items, or EPS (Earnings Per Share) of $0.22
> cents per share on 60.7 million average diluted shares outstanding.  Net income for
> fiscal 1999, excluding exceptional items, totaled $40.2 million or $0.67 per share on
> 59.6 million average diluted shares compared to $38.2 million or $0.69 per share on
> 55.2 million average diluted shares during 1998.  The exceptional items for the
> fourth quarter of 1999 resulted in a $2.7 million net loss (unrealized currency
> exchange loss).  For fiscal 1999 the exceptional items resulted in a $2.5 million net
> benefit (mainly unrealized currency exchange gain).
>
> \*   \*   \*
>
> "In 1999 we experienced a strong demand for speech and language technologies,
> applications and solutions, specifically in the Enterprise and Telephony arena.  This
> increase was mainly the result of internal growth and created a positive cash flow
> from operations of $68 million, reflecting the maturity of our operations," said
> Gaston Bastiaens, president and CEO of L&H.  "During 2000 I believe we will reap
> the benefits of these changes as we plan to launch separate entities for Healthcare,
> Internet Translation and Globalization, Enterprise and Telephony Solutions.  We
> foresee L&H's technologies will provide an intuitive speech user interface for the
> ever growing number of wireless, portable and handheld devices."

The February 9, 2000 Press Release also reported the following:

|  | (000s) 3 Months Ended December 31, 1999 | (000s) Year Ended December 31, 1999 |
| --- | --- | --- |
|  |  |  |

| Revenues | | |
|---|---|---|
| Technologies & Solutions | $56,416 | $138,660 |
| Applications | $30,034 | $113,693 |
| Consulting & Services | $23,591 | $91,884 |
| Total Net Revenues | $110,041 | $344,237 |
| Income from operations | $22,984 | $66,280 |
| Net income | $10,645 | $41,741 |
| | | |
| Cash and Marketable Securities | $130,630 | |
| Accounts Receivable | $104,989 | |
| | | |
| Total Assets | $693,738 | |

86.     On June 30, 2000, L&H filed its Form 10-K Annual Report Pursuant to Section 13 or

15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended December 31, 1999 with the

SEC (the "1999 Form 10-K").   The 1999 Form 10-K included substantially the same financial

information contained in the February 9, 2000 Press Release.   Bastiaens, Dammekens, Lernout,

Hauspie, Willaert, and Cauwelier signed the 1999 Form 10-K.

87.     The February 9, 2000 Press Release and the 1999 Form 10-K were materially false and

misleading because fourth quarter revenues and accounts receivables were overstated by at least

$65.6 million and earnings were overstated.   Year end 1999 revenues and accounts receivables were

overstated by $174.7 million and earnings were overstated.

88.     The 1999 Form 10-K contained the following statement by KPMG Belgium:

**LERNOUT & HAUSPIE SPEECH PRODUCTS N.V. AND SUBSIDIARIES
INDEPENDENT AUDITORS' REPORT**

The Board of Directors and Shareholders Lernout & Hauspie Speech Products N.V.:

We have audited the accompanying consolidated balance sheets of Lernout &
Hauspie Speech Products N.V. and subsidiaries (the Company) as of December 31,
1998 and December 31, 1999, and the related consolidated statements of operations,
shareholders' equity, cash flows and comprehensive income (loss) for each of the
years in the three-year period ended December 31, 1999.  These consolidated
financial statements-are the responsibility of the Company's management.  Our
responsibility is to express an opinion on these consolidated financial statements
based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in
the United States.  Those standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of
material misstatement.  An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements.  An audit also
includes assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.  We
believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly,
in all material respects, the financial position of Lernout & Hauspie Speech Products
N. V. and subsidiaries as of December 31, 1998 and December 31, 1999, and the
results of their operations and their cash flows for each of the years in the three-year
period ended December 31, 1999, in conformity with generally accepted accounting
principles in the United States.

Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren
Brussels, Belgium
April 27, 2000

89.     The above statement by KPMG Belgium was materially false and misleading for the

reasons set forth in ¶¶ 75-87.

90.     On May 9, 2000, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout &

Hauspie Reports Record Revenues and Strong Earnings for First Quarter 2000; Company Achieves

Revenues of $110.7 million and EPS of $0.37 Before Goodwill Amortization and Exceptional Items"

(the "May 9, 2000 Press Release").  The May 9, 2000 Press Release was issued from Burlington,

Massachusetts and Ieper, Belgium and stated, in part:

For the first quarter of 2000, L&H's total revenues were $110.7 million, an increase

34

of 57% over reported revenues of $70.7 million for the first quarter of 1999. The company attributes the increased revenues to continued growth in telephony, enterprise solutions and embedded market strengths. Approximately 74% of the revenue increase was attributed to organic growth.

Net income before exceptional items for the first quarter of 2000 reached $12.2 million, or $.19 per share on 63.9 million average diluted shares outstanding which is a 75% increase when compared to $7.0 million in net income, or $0.12 per share on 58.1 million average diluted shares outstanding for the first quarter of 1999. The excluded exceptional amount in Q1 2000 was a $4.2 million net benefit (mainly unrealized currency exchange gain). Earnings per share, EPS before goodwill amortization, were $0.37 compared to $0.24 during the first quarter of 1999.

The May 9, 2000 Press Release also reported the following:

|  | (000s)<br>3 Months Ended<br>March 31, 2000 |
|---|---|
| Revenues |  |
| Technologies & Solutions | $58,886 |
| Applications | $27,993 |
| Consulting & Services | $23,815 |
| Total Net Revenues | $110,694 |
| Income from operations | $26,722 |
| Net income | $16,447 |
|  | As of<br>March 31, 2000 |
| Cash and Marketable Securities | $179,139 |
| Accounts Receivable | $128,741 |
|  |  |
| Total Assets | $828,141 |

91.     On May 12, 2000, L&H filed with the SEC its Form 6-K Report of Foreign Private

Issuer Pursuant to Rule l3a-16 or 15d-16 of the Securities Exchange Act of 1934, which included as

"Exhibit 2" a copy of the May 9, 2000 Press Release (the "Q1 2000 6-K").  Dammekens signed the

Q1 2000 6-K.

92.     On June 30, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to Section 13

or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period ended March 31, 2000 (the

"Q1 2000 10-Q").   The Q1 2000 10-Q included substantially the same financial information

contained in the May 9, 2000 Press Release.  Bastiaens and Dammekens signed the Q1 2000 10-Q.

93.     The May 9, 2000 Press Release, the Q1 2000 6-K and the Q1 2000 10-Q were

materially false and misleading because revenues and accounts receivables were overstated by at least

$58.4 million and earnings were overstated.

94.     On August 8, 2000, L&H issued a press release *via* <u>Business Wire</u> titled "Lernout &

Hauspie Reports Record Revenues of Approximately $155 Million for Q2, 2000 and Earnings of

$0.05 Before Goodwill Amortization and Exceptional Items" (the "August 8, 2000 Press Release").

The August 8, 2000 Press Release was issued from Burlington, Massachusetts and Belgium and

stated, in part:

> L&H's total revenues were approximately $155 million, an increase of 104% over
> reported revenues of $76 million for the second quarter of 1999.  Thirty-one million
> dollars of the company's second quarter 2000 revenues came from Dictaphone and
> Dragon. Excluding Dictaphone and Dragon, L&H's second quarter revenues were
> $124 million, a 63% increase from revenues of $76 mullion in the second quarter of
> 1999.  The company attributes 72% of this increase to organic growth.
>
> Net income before goodwill and exceptional items for the second quarter of 2000
> were $7.1 million, or $0.05 per share on approximately 140 million average diluted
> shares outstanding as compared to $17.3 million, or $0.15 per share during the
> second quarter of 1999 on approximately 119 million average diluted shares
> outstanding.

*  *  *

**Geographical Analysis of Revenues in the Second Quarter**

European revenues were approximately $36.4 million or 23% of total revenues compared to $29.3 million or 39% in the second quarter of 1999.

Revenues for North America were approximately $48.2 million or 31% of total revenues compared to $18.7 million or 25% of total revenues for the second quarter 1999. The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.

Korea contributed approximately $68 million or 44% of total company revenues.

Currently, L&H has over 150 corporate customers in Korea including Art Lab, Digital Life, Digital Sei Young Ltd, EPC, Hanvit Bank, Hanvit Securities, Hung Chang, Hyundai Securities, Koscom, LG Electronics, Samsung Electronics, and Terrasoft. Its second quarter 2000 revenues continued to be strong in Korea

\* \* \*

**The increase in U.S. revenue is largely attributable to the Dictaphone and Dragon acquisitions.**
"The combination of Dragon and Dictaphone with L&H and the retention of the talented executive management from both companies provide us with an organization and resources that are unquestionably the strongest and finest in this industry," said Gaston Bastiaens, president and CEO of L&H. "We are very excited to apply these resources to tackle the ever growing opportunities in healthcare, enterprise and telephony, applications, globalization and the Internet. There has never been a more exciting or promising period in the speech and language technology industry."

"The second quarter of 2000 was filled with successes that we believe we can replicate in other areas of our business," said Jo Lernout, co-founder and chairman of L&H. "During the second quarter we continued to move toward a solutions oriented approach, as evidenced by the introduction of our healthcare solutions, our consumer applications and our NAK prototype solution. We also had numerous solutions sales in Asia. We believe these achievements can serve as a model for additional growth in the U.S. and Europe."

\* \* \*

**Balance Sheet & Cash Flow Highlights, June 30, 2000**

Cash and Marketable Securities increased to approximately $200 million from $179 million at the end of the previous quarter.

Accounts Receivable increased to $238 million from $129 million at the end of the second quarter. The increase was due primarily to the inclusion of Dictaphone and Dragon.

37

Short-term debt was $252 million primarily as a result of the assumption of the debt associated with the acquisition of Dictaphone:

Net working capital was approximately $48 million, down primarily as a result of the assumption of the short-term debt associated with the acquisition of Dictaphone.

Net goodwill was approximately $1,701 million, an increase of approximately $1,283 versus the first quarter as a result of the acquisition of Dictaphone and Dragon.

Long-term debt was approximately $234 million as a result of the assumption of $200 million of Dictaphone senior subordinated notes.

Shareholders' equity was ($1,531) million.

Operating cash flow for the quarter was approximately $12 million and $32 million year-to-date.

Net cash used from investing activities was approximately $71 million and $145 million year-to-date.

Net cash provided by investing activities was approximately $83 million and $191 million year-to-date.

The August 8, 2000 Press Release also reported the following:

|  | 3 Months Ended June 30, 2000 | 6 Months Ended June 30, 2000 |
|---|---|---|
| Revenues |  |  |
| Technologies & Solutions | $78,904 | $137,790 |
| Applications | $50,440 | $78,433 |
| Consulting & Services | $25,562 | $49,378 |
| Total Net Revenues | $154,906 | $265,601 |
| Income (Loss) from operations | ($15,936) | 10,787 |
| Net loss | ($33,667) | ($17,219) |

95.     On or about August 14, 2000, L&H filed its Form 10-Q Quarterly Report Pursuant to

Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Quarterly Period ended June 30, 2000 (the "Q2 2000 10-Q"). The Q2 2000 10-Q included the same financial information included in the August 8, 2000 Press Release. Bastiaens and Dammekens signed the Q2 2000 Quarterly 10-Q.

96.    The August 8, 2000 Press Release and the Q2 2000 10-Q were materially false and misleading because revenues and accounts receivables were overstated by at least $60.7 million and earnings were overstated.

### C.    THE OVERSTATEMENT OF PUBLICLY REPORTED REVENUES AND EARNINGS

97.    Throughout the Class Period, L&H engaged in numerous schemes that were intended to, and did, artificially inflate the Company's revenues, earnings and the value of L&H's common stock. As a result of defendants' far-reaching fraud, L&H eventually admitted that over $377 million of revenue from 1998 through June of 2000 was improperly recorded B including the reversal of all revenue recorded in Korea from September 1999 through June 30, 2000.

98.    In Burlington, defendants' fraudulent accounting practices included: barter transactions, undisclosed rights to return product, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the artificial division of agreements into separate contracts to book revenue in an earlier quarter.

99.    The improper revenue practices were not confined to Burlington. In Belgium, L&H routinely recorded revenue prematurely by: backdating of contracts, booking revenue prior to delivery of products, promising to deliver additional products at no extra charge "when and if available," and booking a large loan from Capital Union as revenue.

### 1.    Barter/Exchange Transaction

100.    L&H repeatedly recorded revenue from barter or exchange transactions where no cash

changed hands.  Essentially, L&H and a "customer" would agree to exchange products held for sale to a separate end-user customer.  L&H would nonetheless record the transaction as a straight sale and record revenue immediately.

101.     The recognition of revenue from such barter transactions violated Accounting Principles Board Opinion No. 29, which states that "an exchange of a product or property held for sale in the ordinary course of business for a product for property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange" does not culminate in an earnings process and that revenue may not be recognized on an exchange of non-monetary assets if fair values are not determinable.

102.     As noted in the complaint in the L&H Action, a former channel sales manager from the Burlington office of L&H said barter/swap transactions were widespread at L&H Burlington and "a standard practice within the whole company, absolutely from the top down . . . .  It was expected.  It was the way things were done."  "Everybody knew about it.  Nobody hid it.  Everybody acted like it was some kind of genius scheme to book revenue."  The former channel sales manager understood that Bastiaens was responsible for implementing the cross-quarter deals and barter transactions.

103.     For example, according to the complaint in the L&H Action, in the first quarter of 1998, L&H entered into an $18,000 license agreement with Xybernaut, with the intent that Xybernaut would resell L&H's Voice Express for Medicine software.  In return, Xybernaut sent hardware (portable, "wearable" computers) valued at $18,000 to L&H.  According to a former channel sales manager in L&H's Burlington office, "it was absolutely a swap," and L&H paid a sales commission on the deal.

104.     The Audit Committee Report determined that a number of barter transactions would have to be restated and the revenue reversed. For example:

40

a.      On March 31, 1998, a customer, believed to be Kortean, licensed L&H software for $300,000 from the Burlington office. In return, on June 29, 1998, L&H licensed $500,000 of contexts to be developed by Kortean, with a $200,000 rebate if L&H obtained financing for the customer. Kortean never sold any L&H product, and L&H relieved the customer of its obligations. Kortean intended to develop technology to facilitate sales to its own customers, so the earnings process was not culminated in the first quarter of 1998 when it was booked by L&H. Further, the fair value of the context development work could not be determined because the customer never developed anything. Thus, the Audit Committee concluded that the entire $300,000 recognized as revenue by L&H in the first quarter of 1998 had to be reversed.

b.      On March 31, 1998, Sequoia Software Corporation licensed $30,000 of L&H software for resale from the Burlington office. In the same quarter, L&H licensed $30,000 of the customer's product. With the two license arrangements, L&H and the customer exchanged products to be held for sale to end customers, and thus the earnings process had not been completed. Thus, the Audit Committee concluded that the entire $30,000 recognized as revenue by L&H in the first quarter of 1998 had to be reversed.

c.      On September 29, 1998, L&H's Burlington office entered into a reseller agreement with Speech Machines. Pursuant to that agreement, L&H recognized $375,000 in revenue during the third quarter of 1998, and $435,000 in revenue during the fourth quarter of 1998. On January 15, 1999, L&H entered into an amended reseller agreement with Speech Machines that obligated L&H to pay an upfront fee of $1.25 million to Speech Machines for no additional consideration. Bastiaens signed the January 15, 1999 Agreement on behalf of L&H. L&H and Speech Machines exchanged products to be held for sale to end customers, thus, the earnings process had not been culminated in the third and fourth quarters of 1998 when L&H recognized the revenue. Thus, the Audit Committee concluded that all revenue recorded from this transaction in the later half of 1998 had to be reversed.

d.      On September 30, 1998, Nine Rivers Technology ("NRT") entered a value added reseller agreement with L&H Burlington, agreeing to license $950,000 of L&H's software for resale. L&H recorded $950,000 in revenue from the sale in the third quarter of 1998. As part of the September 30, 1998 agreement, L&H committed to pay almost $112,000 of marketing expenditures, reducing L&H's net benefit to approximately $838,000. On January 15, 1999, L&H licensed $838,000 of the NRT's software for resale. Dammekens signed both the September 30, 1998 and January 15, 1999 agreements. A May 18, 1999 internal L&H e-mail from William Neeb to David Berglund [both L&H employees] referenced the September 30, 1998 agreement, and concluded: "According to Dave Miller [Director of Operations at NRT], they have no plans to pay us. They claim this was a reciprocal agreement, and that L&H was to place orders of equal value." Thus, L&H and the customer exchanged products to be held for sale to end customers and the earnings process had

41

not been completed in the third quarter of 1998 when L&H recognized $950,000 in revenue from this transaction. Further, since the customer never paid the receivable, but instead delivered product to L&H, the earning process was never culminated. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the third quarter 1998 had to be reversed.

e.      On December 31, 1998, Interpra Medical Imaging Network, Ltd. ("Interpra"), licensed $250,000 of L&H software from L&H's Burlington office. On the next business day, January 4, 1999, L&H, in return, licensed $250,000 of Interpra's software (plus additional engineering fees). Later, on March 31, 1999, Interpra licensed an additional $250,000 of L&H software, and in the third quarter of 1999, L&H licensed an additional $250,000 of software. Since L&H and Interpra exchanged products to be held for sale to end customers, the earnings process was not complete at the time revenue was booked. Further, since the customer never paid the receivables, but instead delivered product to L&H, the earnings process was never culminated. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

f.      On December 19, 1998, L&H Belgium recognized $800,000 of license fee revenue based on an agreement with Educa N.V. The parties entered a second agreement, also dated December 19, 1998, which was identical in all respects except that the fee was only $500,000. The customer, however, never had any intention to pay the $800,000 and, in fact, believed there was an oral agreement for L&H to purchase $800,000 of software from the customer for resale. L&H never invoiced the customer for either the $500,000 or $800,000 license fees. Further, L&H was never paid any amount under these agreements. To the extent this transaction was a swap with the parties intending to exchange products to be held for sale to end customers, the earnings process was not complete at the time L&H recorded the revenue. Further, as discussed below, because the Company did not invoice Interpra, collectibility would be at issue. Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

g.      On December 27, 1998, Applied Voice Recognition ("Applied Voice") licensed $1 million of L&H software under a value added reseller agreement ("VAR") from the Burlington office. Soon thereafter, on January 11, 1999, L&H committed to pay $400,000 of the development of contexts by Applied Voice. The customer intended to develop technology to be used by L&H to facilitate sales to third party customers; therefore, the earning process was not culminated in the fourth quarter of 1998. Further, the Audit Committee concluded, "it appears unlikely that the parties were able to determine the fair value of that context development work." Thus, the Audit Committee concluded that the entire revenue recorded from this transaction in the fourth quarter of 1998 had to be reversed.

**2.      Booking Revenue Absent A Contract**

105.    L&H also inflated earnings by prematurely recognizing revenues where no contract was signed or where the terms of the contract were not finalized.  Throughout the Class Period, defendants repeatedly booked sales, even though negotiations were still ongoing and the "customer" was under no binding obligation to purchase the product.

106.    Statement of Position ("SOP") 97-2 provides that there must be persuasive evidence of an existing arrangement in order to recognize revenue and that "if the vendor has a customary business practice of utilizing written contracts, evidence of the arrangement is provided only by a contract signed by both parties."  L&H's own revenue recognition policy provides that L&H only recognizes revenue, *inter alia,* "upon the signing of the license agreement . . . when no contractual terms remain unsatisfied. . . ."

107.    The Audit Committee report revealed a number of transactions where revenues were booked prior to the completion of a contract that were required to be restated.  For example

a.      On June 30, 1998, L&H Burlington entered into a VAR agreement with Digital Voice, Inc., requiring a $150,000 prepaid royalty.  L&H booked $150,000 in revenue from this agreement in the second quarter of 1998.  An August 6, 1998 internal L&H e-mail referred to the need to finalize the contract "that was signed in June."  The August 6, 1998 e-mail discussed specific terms of the contract to be modified and shows that the terms of the agreement were not finalized in the second quarter of 1998, when the revenue was prematurely recognized. Since the final, modified contract was not signed, or even agreed upon, by both parties until after June 30, 1998, no revenue should have been recognized in the second quarter 1998.

b.      In the second quarter 1999, L&H Belgium recognized $3 million in licensing revenue under a June 30, 1999 agreement with Medical.  On July 7, 1999, however, Lernout sent an e-mail to Bastiaens and Hauspie, indicating that the contract had not yet been signed.  Since the contract had not yet been signed, the $3 million in revenue should not have been recognized in the second quarter of 1999.

c.      In the third quarter of 1999, L&H Belgium recognized $50,000 of revenue from a purported customer, despite the fact that L&H had never invoiced the customer and that, according to an unidentified source in the Audit Committee report, the terms of the contract were never finalized and there was never any final

agreement.  Accordingly, the $50,000 was improperly recognized during the third quarter of 1999.

d        In the fourth quarter of 1999, L&H recognized $4 million of revenue based on a December 30, 1999 agreement between L&H Belgium and an Armenian LDC customer.  An internal L&H email dated January 5, 2000 from Filip Beemaert ("Beemaert"), L&H legal counsel, to defendant Willaert and Dammekens, however, discussed the terms to be included in the contract, including fees of $3 million.  The e-mail makes it clear that the terms of the agreement were not finalized during 1999, and, thus, L&H had not met the criteria for "persuasive evidence of an arrangement" until the first quarter of 2000.  Accordingly, this $4 million was improperly recorded as revenue in 1999.

e.        In the fourth quarter of 1999, L&H Belgium recognized $5 million in revenue from a license agreement with a company, believed to be T.I.B.  A January 4, 2000 e-mail from the Beemaert to Hauspie and Jo Lernout, however, indicated that the contract was not yet signed.  According to the e-mail "give me a name of the person at T.I.B. who has to read this again and who has to sign if everything is ok."  Subsequently, the L&H Audit Committee reported that the contract was not signed until January 6, 2000, thus, the revenue was improperly recorded in the fourth quarter of 1999.

f.        In the fourth quarter of 1999, L&H Belgium recognized $4 million in revenue from license agreement with I-travel dated December 31, 1999.  An internal L&H e-mail dated January 5, 2000 from Beemaert to Willaert and Dammekens indicated that the contract was signed after year-end.  Since the contract was not signed by both parties during 1999, the revenue was improperly recorded in the fourth quarter of 1999.

g.        In the first quarter of 2000, L&H Belgium recognized $8 million of revenue based on a license agreement dated March 31, 2000 with European Language Center.  According to an e-mail dated April 4, 2000 from Beemaert to Willaert, Lernout, Bastiaens and Dammekens, the customer requested information, including royalty pricing information and the list of licensed products, to finalize the agreement.  Since both parties did not sign the finalized contract until the second quarter of 2000, the revenue was improperly recognized in the first quarter of 2000.

### 3.        Back-Dating Contracts

108.        On March 25, 1998, Vasco Data Security International ("Vasco"), a Burlington customer, licensed $800,000 of L&H software.  At or around the same time, L&H loaned Vasco $3 million, in the form of a note convertible into Vasco shares.  The loan agreement included extended

44

payment terms providing that repayment was not due until January 4, 1999.  According to L&H's financial statements, Vasco licensed additional L&H software in 1998, entering into a second licensing agreement with L&H, this one priced at $900,000 on December 31, 1998.  However, as noted in the L&H Action complaint, according to Vasco's former Chief Technology Officer, this second agreement was actually entered into in January 1999, but backdated at the demand of defendant Hauspie, who threatened to cut off L&H's funding of Vasco if Vasco's management refused to alter the date of the licensing agreement.  Furthermore, the technology covered by both of the L&H licenses was useless to Vasco B L&H did not have an application that Vasco could use for any product development.  L&H recorded the $900,000 for the back-dated contract in 1998.

109.   With the second licensing agreement backdated to December 1998, L&H came through with further funding, allowing Vasco to repay its $3 million loan from L&H in the second quarter of 1999.  This time, Vasco was bailed out by LHIC, a company formed by Lernout and Hauspie, and run by Vanderhoydonck, to invest in companies that specialize in speech and language based products.  LHIC loaned Vasco $5 million and, as a result of the loan, LHIC owned 7% of Vasco and held a seat on the company's board of directors.  That seat was filled by defendant Hauspie. Another top investor in Vasco is Mercator.

110.   L&H's stated policy is to defer recognition of any revenue not due within 90 days of quarter end.  L&H violated this policy when it recognized revenue from the Vasco transactions in the amounts of $800,000 and $900,000 in the first and fourth quarters of 1998, respectively. Furthermore, as stated in the complaint in the L&H Action, the fact that the $3 million loan from L&H to Vasco contained "extended payment terms" beyond 90 days, and that the loan far exceeded the total license fees from both agreements, strongly indicated that the collectibility of the licensing fees was neither probable nor fixed and determinable at the signing of the agreements.  The revenue from these

transactions was not recognizable until at least the second quarter of 1999, when Vasco paid off the $3 million loan. Given the circumstances of the repayment of the loan, described above, even recognition of the revenue in the second quarter of 1999 was inappropriate.

111.    In addition to forcing Vasco to backdate contracts, as noted in the complaint in the L&H Action, according to a former chief technology officer at Vasco, in early 1998, Hauspie tried unsuccessfully to "force" Vasco into acquiring Keyware Technologies ("Keyware"), a company predominately owned by FLV Fund and GIMV. Keyware was a company that developed technology to verify a person's identity by means of personal characteristic such as voice, face and fingerprints. Keyware was founded in 1996 and was one of the first companies to move into Flanders Language Valley. FLV Fund and GIMV were Keyware's largest shareholders..

### 4.    Booking Revenues When Collectibility was in Doubt

112.    In addition to booking revenue before contract negotiations were finalized, L&H repeatedly recorded sales when it was doubtful that the customer had the ability to pay for its products or services. These instances involved, inter alia, where the customer was not invoiced for the product or services or when the customer's ability to pay depended on an investment from L&H, thus demonstrating that collectibility was not probable as required by SOP 97-2.

113.    According to the Audit Committee report, L&H had a policy of not invoicing customers until the Company believed the customer could pay, in order to avoid triggering a value added tax obligation.

114.    SOP 97-2, issued by the American Institute of Certified Public Accountants ("AICPA"), states that collectibility must be deemed to be probable in order for revenue to be recognized and that if any extended payment terms indicate that the fee is not fixed and determinable then that revenue should be deferred until the payment becomes due. Furthermore, SOP 97-2 states:

"if payment of a significant portion of the software licensing fee is not due until after expiration of

the license or more than twelve months after delivery, the licensing fee is presumed not to be fixed or

determinable."

115.    The Audit Committee Report revealed a number of transactions that were required to

be restated because L&H recorded revenue while collectibility was in question.  For example:

a.      As discussed above, on March 25, 1998, Vasco licensed $800,000 of L&H
software.  At or around the same time, L&H loaned the customer $3 million.  This
loan agreement included extended payment terms providing that the loan was not due
until January 4, 1999.  The fact that the loan to Vasco contained "extended payment
terms" extending beyond 90 days, and that the loan exceeded the total amount of the
license fees, strongly indicates that the collectibility of the fees was neither probable
nor fixed and determinable at the signing of contracts.  Thus, $800,000 and $900,000
of revenue from this customer were prematurely recognized in the first and fourth
quarters of 1998, respectively.

b.      In the first, second and third quarters of 1998, BCB Voice Systems ("BCB"),
a Burlington customer, licensed a total of $1.2 million of L&H software.  In July 15,
1998, L&H and BCB entered into a stock swap valued at $1.6 million.  BCB was a
start-up, with little capital, and intended to use its L&H stock from the swap to pay
the license fees to L&H.  Under the swap arrangement, however, BCB was unable to
sell the L&H stock until October 1998.  Thus, the proceeds from the BCB licensing
"revenues" were not available until the fourth quarter of 1998.  Further, there was no
assurance that the proceeds from that eventual sale would be sufficient to cover the
payment.  Thus, collectibility of the receivable from the customer was not probable
until--at the earliest -- the fourth quarter of 1998 and L&H recognized revenue
prematurely.

c.      As noted above, on December 31, 1998, Interpra Medical Imaging Network,
Ltd. ("Interpra"), a Burlington customer, licensed $250,000 of L&H software.  On
March 31, 1999, the customer licensed an additional $250,000 of L&H software.
The customer has maintained that it was verbally promised funding from the FLV
Fund at the time of the license deal and would not pay the license fees with at
receiving FLV funding.  This promise indicated that L&H was unable to determine
that the collectibility of the fees from the licensing agreements were probable at the
time the revenue was recognized.

d.      On December 31, 1998, L&H recognized $250,000 of license revenue based
on an agreement with a Belgium customer, believed to be Excalibur Technologies,
N.V.  L&H never invoiced the customer for these fees.  As a general rule, L&H did
not invoice customers until it believed the customer could pay.  Further, the customer

was a start-up that had been established only one month prior to the license agreement. L&H did not establish that the collection of the receivable was probable at the time it recognized revenue. Thus, the $250,000 in revenue should not have been recognized until the fee was collected.

e.      On March 17, 1999, L&H Belgium signed a license agreement for $900,000 with G2 Speech B.V. Of this amount, $500,000 was due within 90 days, and $400,000 was due after 90 days. The agreement called for L&H to deliver Dutch, German, French and UK English. Prior to the end of the first quarter of 1999, an amendment was signed changing the payment terms such that the entire $900,000 was due within 90 days. L&H delivered the Dutch version B almost one year later B in March 2000. As of November 2000, L&H had not delivered any of the other versions. The customer never paid any of the $900,000. Since delivery did not occur during the first quarter of 1999, the revenue related to the transaction was improperly recognized. At a minimum, only the fraction of the license agreement fees attributable to the Dutch version could be recorded, but only in first quarter of 2000.

f.      On September 27, 1999, L&H Belgium improperly recognized $450,000 of revenue based on a license agreement where L&H never invoiced the customer. The customer was expecting an investment from an L&H related source. Thus, collectibility was not probable at the time it recognized revenue in the third quarter of 1999.

## 5.      **Booking Revenues on Contingent Contracts and/or Prior to Delivery**

116.    During the Class Period, L&H routinely recognized revenues from sales despite the fact that contingencies existed, such as the requirement that L&H later perform development work for the customer or where delivery had not been completed.

117.    SOP 97-2 provides, *inter alia*, that delivery of all the software must occur before the revenue can be recognized.

118.    The Audit Committee Report cited to several contracts for which revenue was improperly recorded because delivery had not occurred. For example:

a.      In the first quarter of 1999, L&H Belgium recognized $1 million of license revenue based on a license agreement from I-Merge. An August 25, 2000 letter from Eric Moons of L&H to Tony Snauwart indicates that the software was not delivered until June 1999, and was replaced two months later in August 1999. Accordingly,

48

because delivery had not occurred, the revenue should not have been recorded in the first quarter of 1999.

b.      On June 30, 1999, L&H Belgium recognized as revenue $900,000 based on a license agreement with a customer, believed to be Cegeka Healthcare Systems N.V., that allocated the fee equally to the Dutch, German and UK English language versions of Voice Xpress, at $300,000 a piece.  L&H only invoiced the customer for $600,000 of the fee.  The agreement stated that L&H would deliver the Dutch language version "when and if commercially available."  The Dutch version was delivered in April or May of 2000, and L&H received $300,000 in payment at that time.  A beta version of UK English was delivered in March/April 2000.  No final version of the UK English or German software was ever delivered. The $900,000 was prematurely recorded in the second quarter of 1999 because the revenue attributable to the Dutch version was not earned until a year later and the remaining $600,000 was contingent on L&H performing additional development work.

c.      In the third quarter of 1999, L&H Belgium recognized $220,000 of license revenue based on a September 27, 1999 agreement.  L&H never invoiced for these fees and delivery did not occur until March 8, 2000 Bapproximately six months later.  Based upon L&H's failure to invoice the customer, collection of the receivable was not probable at the time the Company recognized its revenues.  Nevertheless, the $220,000 should not have been recorded in the third quarter of 1999, because delivery did not occur until the first quarter of 2000.

d.      On September 30, 1999, L&H Burlington entered in a distribution agreement allowing a customer to distribute both professional and retail products.  The customer agreed to pay L&H $1 million prepaid royalty on the professional product.  There was no prepaid royalty on the retail products.  With respect to the professional products, the agreement required L&H to deliver the American English version currently, and to deliver the Australian accent version of the software "when and if" it becomes available.  On October 26, 1999, the parties signed a clarification letter removing the "when and if available" language from the earlier agreement.  Accordingly, because the final terms of the agreement, with regard to the Australian accent when and if available clause, were not finalized until the fourth quarter of 1999, the revenue should not have been recorded in the third quarter of 1999.

## 6.      <u>Side-Agreements B Capital Union</u>

119.    In the fourth quarter of 1999, L&H improperly recorded $8 million in revenue stemming from a December 29, 1999 software license agreement entered into with Capital Union EC, an investment bank based in Bahrain, United Arab Emirates ("Capital Union").  Pursuant to the December 29, 1999 Transferable License Agreement (the "TL Agreement"), Capital Union purchased

a license to use certain L&H systems and methodology for the development of speech software products in two languages, Arabic and Arabic Dialects. Capital Union paid L&H $8 million, ($4 million per language), for the license.

120.    However, according to side agreements signed that same day, December 29, 1999, and the TL Agreement's own terms, Capital Union was never going to be the end-user of the license, but instead would "sell" the license to other entities before the agreement was a year old.  In fact, as noted in the complaint in the L&H Action, according to the January 21, 2001 Affidavit of Salah Al Madusherji, the Managing Director of Capital Union, the TL Agreement contemplated that by June 2000 ʙ six months after the agreement's inception ʙ L&H would create two Belgian LDCs, specifically for the purpose of purchasing the license from Capital Union.  The newly created LDCs, to be called the "Arabic Development Company" and the "Arabic Dialects Development Company," would refund the $8 million license fee Capital Union paid to L&H.

121.    In the event that the sale of the license to the non-existent LDC's did not materialize, one of the side agreements entered into on December 29, 1999, a letter signed by Lernout and Hauspie, provided a cushy safety net to Capital Union: L&H promised to pay to Capital Union $9.25 million (the $8 million license fee and interest of $1.25 million) on or before December 31, 2000 (one year and two days after the TL Agreement), in the event that Arabic Development Company and Arabic Dialects Development Company had not purchased Capital Union's $8 million license by June 30, 2000.

122.    This transaction was a *de facto* loan from Capital Union to L&H. L&H improperly recorded the $8 million paid to it by Capital Union in the fourth quarter of 1999 because the full purchase price of the license ʙ with hefty interest ʙ would be refunded to Capital Union within one year.  The fees in this arrangement should not have been recognized as revenue because they were not

"fixed or determinable" as required by SOP 97-2, and the earnings process, in what was, at best, a consignment sale, was not consummated.

**7.**     **Booking Revenue Where the "Customer" Had the Right to Return**

123.     L&H repeatedly recorded revenues despite the fact that the customer had a right to return the product.

124.     Statement of Financial Accounting Standards ("SFAS") No. 48 provides that a company may record revenue from a sales transaction where the customer has the right to return the product, in very limited circumstances that were not met in the following transactions.  Moreover, the Company must disclose that it grants its customers rights of return.  L&H never made the requisite disclosure.

125.     The Audit Committee Report cited to several contracts from which revenues were improperly recorded because L&H failed to properly account for returned products.  For example:

a.     On December 31, 1998, L&H entered into a distribution agreement with DNH Distributing ("DNH"), a Burlington, Massachusetts customer.  Under the agreement, DNH was obligated to prepay $500,000 of royalties to L&H. During the fourth quarter of 1998, L&H recognized $350,000 of revenue under the agreement. The contract between DNH and L&H provided DNH the right to return product, and, in fact, DNH never paid <u>any</u> fees, and returned the entire product.  In reviewing the transaction, the Audit Committee determined that "the evidence indicates that the [customer] never had any intent to pay the fees under the agreement until it sold through to end customers, indicating that the collectibility of the fees was not probable in the fourth quarter of 1998."   Accordingly, L&H improperly booked $350,000 in the fourth quarter of 1998.

b.     On September 30, 1998, Computer Consulting Group ("CCG"), a Burlington customer, licensed $70,000 of software from L&H.  As part of the licensing agreement, L&H committed to pay CCG $145,300 of marketing expenses.  On December 29, 1998, CCG signed a distributor agreement requiring a $569,620 non-refundable fee.  During the fourth quarter of 1998, L&H recognized $152,500 of this fee purportedly based on a purchase order from CCG.  The contract, however, gave the customer the right to return product, and CCG never paid any money to L&H under the agreement.  The Audit Committee concluded that "[t]he evidence indicates that [the customer] never had any intent to pay the fees under the agreement until it

sold through to end customers, indicating that the collectibility of the fees was not probable in Q4 1998."

### 8. Other Examples of Fraudulent Practices of Revenue Recognition

126.    In addition to the above accounting violations, defendants recorded revenue from a number of additional transactions in violation of GAAP.

127.    During the second quarter of 1998, L&H recognized $500,000 for the sale of software to a customer that had no use for the software when purchased.  Nevertheless, the customer paid the $500,000 fee, through funding provided by an entity that was funded by defendants Lernout and Hauspie.  As the Audit Committee ultimately determined, the $500,000 payment was, in reality, an additional equity infusion by defendants Lernout and Hauspie into L&H, not a revenue generating transaction.  Thus, the $500,000 should have been treated as additional paid-in-capital, not revenue.

128.    L&H signed an LDC agreement for Farsi with W.H. Operations, Ltd., in the third quarter of 1998 and another for Turkish in the first quarter of 1999.  The customer purchased the shares of the LDC from the original investors on September 23, 1999 and signed amended LDC agreements with L&H.  As noted in the complaint in the L&H Action, when W.H. Operations was buying the LDCs from the initial investors, the customer wanted $1.3 million of free revenue in the form of warrants from L&H.  Dammekens and Willaert then told the customer that they had to pay for the warrants because of the impact on the Company's profit and loss statement, but that L&H would make it up to them later.  On August l, 2000, L&H entered into a contract with the customer obligating L&H to pay $1.8 million to the customer over two years for "introductions" to influential politicians and business people.  According to Dammekens, this agreement was entered into to reimburse the customer for the warrants.  Additionally, the customer (through its subsidiary, Langware) hired L&H to work on the development of Farsi and Turkish.  Since the intent at the time

of the sale of the LDCs to the customer was to reimburse it for its warrant purchase, it was , in effect, a refund on a portion of the license revenue.  The revenue recorded for the Farsi and Turkish transactions was required to be reduced by an amount equal to the amounts paid to the customer, i.e., $1.8 million, since GAAP requires that revenue should be recorded at the net amount received from the customer.

129.    As noted in the complaint in the L&H Action, according to a former marketing communications manager and events manager at L&H's Burlington office, L&H repeatedly shipped non-working products.  For example, the former manager noted that in December 1998, Chris Force, Vice President of the Healthcare Solutions Group, authorized shipment of inoperable software (a version of L&H's Clinical Reporter) to a customer in order to make year-end numbers.

130.    The above-referenced revenue recognition schemes, together with the related-party transaction and Korean problems (discussed below), significantly contributed to L&H's overstatement of Class Period revenue by over $377 million.

131.    These improper revenue and sales tactics were well known within L&H.  In fact, according to a former channel sales manager, the Burlington office held weekly sales meetings to discuss results and forecasts.  Sales staff, division heads and Bastiaens attended these meetings.  In fact, the meetings were often held in Bastiaens' office.  At these weekly meetings, the participants discussed forecasts, including positive and negative trends and "bluebirds" ("what can you pull out of the sky").  After forecast numbers were provided, they generated an Excel spreadsheet given to David Kramer, the direct sales manager in charge of medical and legal software.  These spreadsheets were forwarded to Bastiaens who had spreadsheet forecasts for the entire company.

### D.    THE KOREAN FRAUD

132.    Prior to September of 1999, L&H had few Korean contracts and little revenue

generated from Korea.  However, on September 13, 1999, the Company orchestrated a dramatic shift in its Korean strategy by acquiring Bumil Information & Communications, Co. Ltd. ("Bumil") and establishing the L&H Korea subsidiary.

133.    Bumil was portrayed as "a leading systems integrator developing customized applications for the telecommunications industry" and "one of Korea's leading developers of interactive voice, call center and other telecommunications market applications."  Bumil had been an L&H licensee and "joint development partner" since March 1997 and was involved in L&H's major Korean transactions, including a deal with ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service, and Hanvit Bank, Korea's largest commercial banking institution.

134.    L&H purchased Bumil for $25 million in cash, upfront.  As additional consideration for the acquisition, Seo, Bumil's sole shareholder, was entitled to receive an "earn-out" of $25 million, provided that L&H Korea met certain reporting requirements between the acquisition date and December 31, 2000.  Pursuant to a Stock Purchase Agreement, any potential "earn-out" would not be paid until 2001.

135.    On September 13, 1999, L&H issued a press release announcing that it had expanded its Pacific Rim presence by acquiring Bumil.  Specifically, the Company announced:

> Bumil has been an L&H business partner and licensee since 1997 and, during that time, has deployed L&H's speech technology in several highly visible, strategic telecommunications applications for leading Korean companies.  Most recently, Bumil used L&H's speech recognition to speech-enable an automated attendant system it developed for Hanvit Bank, Korea's largest commercial banking institution.  Bumil also recently used L&H's speech recognition and text to speech technology to develop the ASR Stock Quote Server, Korea's largest telephone based automated stock quote and trading service.
>
> The acquisition of Bumil builds on L&H's already significant presence and resources in the Far East and helps position it for the leadership position there.  L&H's existing

Asia Pacific customer base includes Samsung, LG Semicon, NEC, Hitachi, Sega, Inventec, Group Sense Limited, Pioneer, Alpine and FujiXerox, among others. It has offices in Tokyo, Beijing, Hong Kong, Taipei and Singapore and Sydney Australia. L&H's speech offerings for the Asian Pacific market include the world's first PC-based Cantonese continuous speech recognition product as well as ASR, TTS and machine translation support for Korean, Mandarin and Japanese.

"As we pursue our long-term objectives, we continue to receive validation that our growth strategy is sound B particularly for the worldwide telecommunications industry," said Jo Lernout, L&H co-founder and co-chairman. "Our recent successes with Bumil, as well as industry analysts' predictions regarding the rapidly increasing demand for speech enabled applications, underscores the outstanding growth opportunities that this acquisition helps to bring to us."

The press release also quoted Bastiaens as stating:

Bumil has leveraged its management and development expertise and business relationships to become a leader in the Pacific Rim in the creation and deployment of speech-enabled solutions for the burgeoning telecommunications industry . . . . By combining Bumil's thriving business with L&H's vision and expertise, I am convinced we can continue to build a highly successful Korean and Asia Pacific operation.

136.    Even before L&H acquired Bumil, the Senior Officers were aware of the significant internal control issues in Korea. As noted in the L&H Action complaint, on September 9, 1999, Louis Woo, President and General Manager of L&H Asia Pacific, sent an e-mail to Dammekens and Bastiaens concerning "financial accountability of L&H Korea." Specifically, Woo stated:

Mr. Seo was, by all accounts, the sole owner of Bumil and he had not needed to answer to anyone but himself. In Asia, not only in S. Korea, owners of family business tend to mix the company finances with personal finances. We must have a clear financial process and procedure for them to adhere to so that no possible abuses can be made and tolerated. . . . It is next to impossible to expect [that] the current financial controller and accounting manager will behave any differently from that of the Bumil days. It will be impossible for them to uphold the internationally accepted financial practices if they happen to be different from the current practices and it is equally impossible to expect them to over-rule Mr. Seo if his practice deviates from ours.

It is extremely important to hire a strong controller from S. Korea to head up our financial department in L&H Korea. If we can lay this condition down as part of the acquisition and integration process NOW, there will be no hard feelings. If we delay

> making that condition clearly NOW, it will be perceived as embarrassing Mr. Seo. Especially if the condition is spelled out only after we have reviewed his financial practice.

(Emphasis in original).

137.    Despite Woo's warning, the Bumil acquisition triggered a nine-month flurry of activity in Korea where L&H continually announced new "deals" and record revenue.  For example, on December 28, 1999, L&H issued a press release announcing "several deals with customers in the telecommunications, enterprise solutions and embedded technologies markets. . . . These agreements, signed with industry-leading companies in Asia and several companies in Europe, follow recently announced deals in the US."  In the December 28, 1999 Press Release, L&H cited:

> strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea.  Among the solutions provided are dialogue systems that provide customers with a fast, simple and convenient way to access information, as well as embedded speech engines and language technologies.  The signed contracts include:

>> Hyundai Securities, Samsung Securities, LG Securities, Dasheen Securities and Daewoo Securities, along with more than 10 other securities companies, have selected L&H to develop client server solutions for online trading and automated dialogue systems that allow securities customers to receive stock quotes and trade….

>>                    *   *   *

>> LG Electronics has agreed to use L&H's TTS technologies.

>> Intelligent Communications has agreed to use L&H's TTS technologies for use in e-mail reading and unified messaging applications.

>> SoftTech Advantage expanded their agreement with L&H to utilize L&H RealSpeak for their unified messaging platform for the Philippines.

138.    In early 2000, L&H continued to report incredibly strong revenue growth in Korea. On January 10, 2000, L&H issued a press release announcing "more than a dozen new contracts with

telecommunications developers in Korea and elsewhere in the Pacific Rim and Europe," and listing such customers as "Hyundai Securities, Samsung Securities, LG Securities, Dasheen Securities, Daewoo Securities, Delfi, GenSoft, EPC Asia and neoTelecom, among others."

139.    On January 31, 2000, L&H issued a press release announcing a multi-year license agreement with Hung Chang Co. Ltd. в "a Seoul-based telecommunications technology leader."  The January 31, 2000 Press Release, quoted Bastiaens as stating that "[o]ur ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence."

140.    Also on January 31, 2000, <u>Asia Computer Weekly</u> published an interview that quoted Hauspie as stating, "We are optimistic about the market here (Singapore) as we predict to make approximately half a billion this year, with a third of our revenues coming from Asia."

141.    On February 1, 2000, L&H issued a glowing press release announcing the signing of a multi-year agreement with Hung Chang Co., Ltd., a Seoul-based telecommunications technology company.  In the February 1st Press Release, Bastiaens was quoted as stating:

> Our ever-increasing success in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence. These successes will help us to shortly create a separate business group for that industry. . . .

142.    L&H again highlighted the purported positive effect of these Korean deals in a February 9, 2000 press release, showcasing the Company's fourth quarter 1999 growth and a two-for-one stock split:

> The demand for speech-enabled applications continued to grow in the Pacific Rim and L&H technologies were increasingly popular in the region. South Korea and other Pac Rim-based developers who plan to build applications employing L&H's

> realSpeak, ASRT, TTS and dialogue systems solutions include: Hyundai Securities, Samsung Securities, LG Securities, Dasheen Securities and Daewoo Securities, EPC Asia, IBCC (International Business Computer Co., Ltd.) NeoTelecom, LG Electronic, Intelligent Communications, Softech Advantage, and Soffel Telecommunication Pte. Limited. . . .  L&H enhanced its ability to develop telephony solutions, increased its presence in Korea and continued to expand its telecommunications leadership by acquiring resources that included Bumil ... and others.

The press release quoted Bastiaens as stating:

> In 1999 we experienced a strong demand for speech and language technologies, applications and solution. . . .  This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting the maturity of our operations.

143.    To investors, L&H's purported revenue generated by the so-called Korean customers was astounding.  In 1999, L&H total sales exploded an astounding 63% to $344 million due, in large part, to the Asian market.  While L&H's Asian market comprised only $10 million of 1998 sales, that number exploded to $150 million in 1999.  Moreover, for the first two quarters of 2000, Korean sales hit $127 million; in Korea alone, L&H recorded nearly, $160 million between September 1999 and June 30, 2000.

144.    Unfortunately for L&H shareholders, all of the Korean revenues were fictitious.  L&H had few real customers in Korea.  The majority of sales were from sham transactions, well orchestrated by the Senior Officers to report increased sales, reductions of accounts receivables and increased cash.

145.    The statements contained in the September 13, 1999, December 28, 1999, January 10, 2000, January 31, 2000, February 1, 2000 and February 9, 2000 press releases, as well as Hauspie's statements in the January 31, 2000 Asia Computer Weekly interview were materially false and misleading when made, because:

a.      A number of the companies identified as customers were not L&H customers,

including Samsung Securities and LG Electronics;

b.      All of the purported contracts, sales and revenues generated by L&H Korea were entirely fictitious, as the Company repeatedly entered side-agreements, agreeing not to seek payment from customers; and

c.      On May 3, 2001, L&H would reveal that "all revenues recorded by" L&H Korea from September 1999 to June 30, 2000 revenue would be restated "since a substantial portion of such revenues could not be substantiated."

146.    During the Class Period, to respond to sales pressure, L&H Korea misrepresented its actual revenues and cash through various schemes that included side agreements with customers and the use of factoring agreements with various banks to give the appearance that customers were making payments on outstanding agreements B when, in fact, L&H was merely paying itself through funneled sources.

## 1.    <u>Side Agreements</u>

147.    The root of L&H's Korean fraud was the Company's practice of repeatedly entering into large sham contacts at the close of the quarters in order to record revenues and report to investors spectacular financial growth.  The purported "customers" involved in these "transactions" were typically small businesses and start-ups (often related parties to L&H and its employees) that had neither the ability nor intention of paying L&H any "revenue."  To disguise this fact from the market, the Company then created "arrangements" to "give the appearance of valid license agreements being sold to existing businesses."

148.    L&H referred to these arrangements as "strategic" sales.  Essentially, L&H would enter into a purported license or maintenance agreement that would enable L&H to book licensing revenue.  L&H would also enter into a side agreement (either oral or written) that would materially alter the so-called contract.  As noted in the L&H complaint, at sales meetings, salespersons were instructed to agree to terms -- outside of L&H's standard license and maintenance agreement -- that

provided for significant changes to the standard contract, including agreements not to enforce the collection of accounts receivables from the customer and agreements to defer contract payments. L&H then recognized the full value of the sale immediately, despite the fact that the transactions were complete shams and that the Company had no expectation of collecting these large royalties within a reasonable time.

149.     Through these side agreements, L&H purported to meet its sales goals and report incredible revenue growth from September 1999 through June 2000.   However, because the agreements were shams and did not involve any actual payment of licensing fees, a problem arose of needing to show cash collections.   In order to solve this problem, L&H merely expanded the fraudulent Korean scheme.

### 2.      Factoring Agreements

150.     The scheme to create the appearance that cash had been received by the Company involved L&H factoring unpaid receivables to Korean banks to obtain cash upfront. L&H would bring customer invoices to Korean banks in exchange for cash B allowing L&H to inflate its reported income, pay bonuses and drive up its stock price.   L&H, however, would enter into side agreements with the banks that turned the sales' contracts into de facto loans.

151.     Beginning on September 30, 1999, L&H Korea entered "factoring arrangements" by which L&H sold the accounts receivable from licensing agreements to four Korean banks: Hanvit Bank, Shinhan Bank, Hana Bank and Chohung Bank.   The Korean banks involved did not have factoring arrangements with other Korean companies prior to L&H. Under the scheme, the banks would "purchase" L&H's accounts receivable and place the funds in a "restricted time deposit" at the bank that L&H agreed not to withdraw.   L&H then recorded the time deposit on its own books and eliminated the accounts receivable.   Therefore, through this arrangement, L&H's financial statements

reflected an increase in sales, cash collections and a large amount of cash sitting in restricted time deposits in four Korean banks.

152. A typical factoring agreement entered into between L&H and the Korean Banks read:

> I (we) [L&H] promise to adhere to the following clauses in factoring <u>note receivable</u> without recourse pursuant to factoring agreement dated December 31, 1999 with the Bank, and submit this confirmation letter.
>
> 1. Although the signed factoring agreements have been without recourse, I (we) promise to take recourse responsibility under this confirmation in the event that the transferred note receivable is defaulted.
>
> 2. (Upon proceeds from <u>factored note receivable</u> is received,) I (we) shall deposit the amount as agreed by the Bank and us, sign a separate pledge agreement and adhere to that agreement.
>
> 3. Pursuant to the above clause, (I (we) will not raise any objection when the deposit is used to offset against factored not receivable, when this notes receivable is defaulted.)

153. In reality, there was little or no payment by the sham customers, and all of the cash was held by the banks. Thus, once it became apparent that the customers would not repay the loan, the banks merely foreclosed on the time deposits, leaving L&H with nothing. As a result, over $100 million of L&H's so-called Korean "revenue" and "cash@ disappeared from the Company's records overnight.

154. L&H Korea's practice of factoring receivables, with recourse, was widespread and well-known by L&H management and KPMG and/or recklessly disregarded by them. Indeed, these transactions were highly suspicious and should have raised huge "red flags" not only for L&H management but for its auditors KPMG as to why tens of millions of dollars of cash was parked in four Korean banks in restricted time deposit accounts. Moreover, the terms of the

so-called "sales" raised serious revenue recognition issues. For example:

a.      On September 30, 1999, Voice Tech Korea signed distribution and development agreements with L&H Korea.  L&H recognized approximately $7 million in revenue from this in the third quarter of 1999 and over $1.6 million in the fourth quarter of 1999.  On October 21, 1999, VoiceTek signed amendments removing its right to distribute the product "if and when the product become[s] commercially available."  In the third and fourth quarter of 1999 and the first quarter of 2000, L&H factored over $8.4 million in receivables from that customer through a Korean bank.  L&H management and KPMG were aware of this transaction, as evidenced in an October 18, 1999 e-mail from KPMG partner Oh Kwon to a series of persons, including: William Van Aerde, the KPMG Belgium Audit Partner for 1999, Carl Dammekens, and Frederick Deschodt, L&H's Assistant Controller.  In the "urgent" e-mail, Kwon raised "critical revenue recognition issues" regarding VoiceTek, noting: "there are no proper documents on the revenue generation schedule and condition."  Specifically, Kwon pointed out that all the revenue should not have been recorded from for these five-year contracts and that the terms of the "when-and-if available" condition, created problems regarding delivery and collectibility.  Further, the e-mail expressly acknowledged that "the receivable was factored with a local bank with a collateral of Bumil's bank deposit and we believe the factoring is 'with recourse'".

b.      Also on September 30, 1999, International Business Computers ("IBC") signed distribution and development agreements with L&H Korea. Pursuant to these agreements, L&H recognized over $4 million from the IBC agreement in the third quarter of 1999.  On October 21, 1999, IBC signed amendments removing their right to distribute "when and if available" products. In the third quarter of 1999, L&H factored approximately $5.36 million of the ICM receivable through a Korean bank. L&H management and KPMG were aware of this transaction, as evidenced in the October 18, 1999 e-mail from Kwon to a series of persons, as discussed above.  In Kwon's October 18, 1999 e-mail, KPMG indicated that the L&H Korea bank accounts have been held as collateral for the factoring agreements and-that the agreements may have been factored "with recourse."

c.      On December 8, 1999, L&H Korea signed a license agreement with Worldwide Co. Ltd. ("HI").  This agreement included a pre-paid license fee of $19 million and a maintenance/development fee of $2 million.  On January 10, 2000, after the close of fiscal year 1999, HI signed an amendment stating that the $19 million and $2 million pre-payments were non-refundable. During the fourth quarter of 1999, L&H record $10,583,270 from the license fee.  In the first and second quarter of 2000, L&H recorded $1 million and $6,968,563 from the license fee, respectively.  Thereafter, on March 29, 2000, L&H and HI entered into a new license agreement with a $5 million pre-payment.  During the fourth quarter of 1999, L&H factored $13,695,990 of HI's receivable with a Korean bank.  Then, in the first quarter of 2000, L&H factored another $4 million from this contract.  The Audit

Committee Report questioned whether collectibility was sufficiently probable for the revenue to have been recognized and noted that KPMG was aware of the HI agreements.

    d.      On December 27, 1999, L&H signed a Distributing, Merchandising and Broadcasting Agreement with Digital Sei Young Ltd. ("Digital"), with a $10 million pre-payment.  L&H recognized $8,187,374 of licensed revenue during the fourth quarter of 1999, and $1,511,430 of revenue from a PCS carve out in the first quarter of 2000.  Also on December 27, 1999, L&H and Digital entered into a License and Co-Development Agreement with $2 million non-refundable engineering fees to be paid quarterly through March 31, 2002.  L&H recognized $755,600 and $194,532 of engineering fees during the first and second quarters of 2000, respectively.  During the fourth quarter of 1999, L&H factored approximately $11.306 million of Digital's receivables through a Korean bank.  The Audit Committee Report questioned whether collectibility was sufficiently probable for the revenue to have been recognized and noted that KPMG was aware of the Digital agreements.

    e.      On May 16, 2000, L&H Korea signed a license and development agreement with Evat T&C, Ltd.  This agreement was written in Korean and provided for a pre-payment of approximately $917,000, to be paid quarterly through December 2001.  L&H recognized revenue of $267,850 in the second quarter of 2000 (representing the amount of the payments due in the second and third quarters of 2000).  L&H then factored the account receivable in the amount of $157,791 in the second quarter of 2000 with a Korean bank.

    f.      On June 27, 2000, L&H Korea signed a license and development agreement with IMP Vision Co.  The agreement was written in Korean and provided for a $1 million prepayment fee payable to L&H. L&H recognized $799,264 of license revenues during the second quarter of 2000, and also factored the receivable of $750,000 with a Korean bank at the same time.

    155.    While the factoring agreements allowed L&H to report on paper a reduction of accounts receivable and an influx of cash, the fact remained that no actual cash flow was being generated as all the cash was required to remain on deposit at four separate Korean banks.  As a result, KPMG voiced strong concerns about L&H receiving "payments" before the close of the fiscal year.  Specifically, during the course of L&H's June 30, 2000 audit, KPMG questioned the collectibility of the outstanding accounts receivable from Korea and indicated to L&H management that collections between 10% and 20% of the accounts receivable balance would be sufficient to

avoid having to record a full reserve of the accounts receivable balance.

### 3.    Recording Refundable Revenue

156.    L&H also repeatedly booked revenue on a series of license agreements, despite the fact that the agreements did not state that the prepayment fee was non refundable.  The Senior Officers and KPMG were aware of this problem and sought to modify previously signed and recorded contracts by sending correction letters during later quarters.

157.    For example, as noted in the L&H Action complaint, on July 18, 2000, Frederick Deschodt, L&H's assistant controller, sent an e-mail to, inter alia, Soo Am Cho (defendant Seo's right-hand man in Korea) and Dammekens, with the subject line, "IMPORTANT ! L&H KOREA - Q2 Revenue."  In the urgent e-mail, Deschodt wrote:

> We noticed that in the Q2 license agreements listed below, it is not mentioned that the license fee is non-refundable !!  Moreover these license agreements are all in Korean and prepared without any involvement of the L&H corporate legal department. . . . The fact of not mentioning the non-refundability clause seriously endangers the recognition of the revenue associated with these contracts >> USD 3.792.150.  KPMG Boston will not accept us recognizing the revenue without the non-refundable character!! (Emphasis in original).

The e-mail then listed nine customers where L&H had recorded $3,792,150 in revenue, despite the fact that the licensing fees, as written, were refundable.  The specific "customers" involved were: HyunMin Systems, Sim's Valley, Evart T&C, Future Internet, Hyundai Securities, WelcomNet, Korea Education Media, BiTech and EuroNetism. Deschodt concluded the e-mail by stating:

> . . . we need as soon as possible for each of the customers mentioned above: >>>>> a letter signed by the customer mentioning that this letter is a correction to the license agreement and that "it has always been the intention of both parties that the license fee would be non-refundable."  In the letter reference should be made to the original contract.  The letter should be signed both by the customer and L&H Korea.

> We expect your full cooperation in order to hopefully resolve this matter.  It is even not sure whether KPMG will be willing to accept revenue recognition on the basis of these letters.  **I hope it is clear that we can not accept such practices any longer!!**

(underlined emphasis in original; bold emphasis added).

158.    As noted in the L&H Action complaint, a subsequent series of e-mails, dated July 20, 2000, indicated that for five of the listed contracts, the situation was "OK" because "KPMG appears to have no problem" with each contract.   However, for Evart T&C, WelcomNet and BiTech, the persons indicated: "Problem! They are still negotiating with the customer to get the letter signed."   In response to this update, on July 20, 2000, Dammekens wrote to Soo Am Cho, "We NEED to get these three solved!"

159.    Regardless of whether subsequent documents were signed, L&H recorded the contingent revenue prematurely and those transactions were required to be restated under GAAP, including the following:

a.    On June 30, 2000, L&H Korea signed a licensee agreement with Midas Tech Co. Ltd.  This agreement was written in Korean and did not state whether the $1.3 million prepayment to L&H was non-refundable.  L&H recognized $1,293,930 of the revenue in the second quarter of 2000.

b.    On May 17, 2000, L&H Korea signed a license and development agreement with a customer.  The total license and development fee pre-payment under the agreement was $604,000, but the agreement did not provide the allocation of pre-payment.  Additionally, the agreement was written in Korean and did not state whether the pre-payment to L&H was non-refundable.  L&H recognized $428,560 of license revenue in the second quarter of 2000.

c.    On May 16, 2000, L&H Korea signed a license and development agreement with a customer.  The total license prepayment was approximately $917,000, to be paid quarterly through December 2001.  The agreement was written in Korean and did not state whether the pre-payment to L&H was non-refundable.  L&H recognized $267,850 of license revenue in the second quarter of 2000 (equal to the amount of the payments due in the second and third quarters of 2000).

d.    On June 27, 2000, L&H Korea signed a license and development agreement with IMP Vision Company.  The agreement was written in Korean and did not state whether the $1 million pre-payment to L&H was non-refundable. At sometime prior to November 2000, IMP paid L&H $800,000 of the pre-payment.  L&H recognized $799,264 of license revenue in the second quarter of 2000.  L&H claimed that the

customer later signed a letter indicated that the pre-payment was non-refundable.

### 4.    Collection Is Improbable

160.    L&H also continued to book sales prior to any payments from the customer в and in several cases, L&H never collected any payment.

161.    As noted in the L&H Action complaint, L&H Korea entered into a $6 million licensing agreement with Zen Entertainment ("Zen").  The $6 million royalty commitment was payable within 90 days and due on or before June 30, 2000.  On June 7, 2000, Frederick Deschodt, a former KPMG auditor who left to become L&H's assistant controller, wrote to Soo Am Cho in Korea, as well as Dammekens and Jacques Vanloo in Belgium, indicating, "So far we did not receive payment yet, but if we do not collect the money before June 30, 2000, we might encounter problems with our auditors."  On June 29, 2000, Dammekens sent a follow-up e-mail to Sam Am Cho, copying Deschodt's June 26, 2000 e-mail, inquiring "Can you update me on the status of ZEN в see below.  I expect questions next week for KPMG."  Then, on July 13, 2000, after the close of the second quarter of 2000, Deschodt again wrote Cho, Dammekens, and others, inquiring: "What is the status of the payment of the $6 million Zen Entertainment Korea still owes to LHSP N.V. and which was payable at June 30, 2000.  KPMG is enquiring (sic) why it was not paid yet.  You [Soo Cho] told that you anticipate payment for beginning of July, once an (sic) number of small issues were resolved.  Have those issues been resolved in the meanwhile?  Can you keep us informed on this matter."

162.    Notwithstanding that the "issues" were not resolved, L&H is believed to have recognized the revenue in the second quarter of 2000 prior to collection in violation of GAAP.

### 5.      The Earn-out Scheme

163.     Pursuant to the original Stock Purchase Agreement signed at the time of the Bumil

acquisition, Seo was entitled to an "earn-out" of $25 million only if L&H Korea met certain

performance requirements between September 30, 1999 and December 31, 2000.   Thus, any

"earn-out" payment was not required to be paid until 2001.

164.     Based on L&H Korea's fraudulent financial results, and Bastiaens' advice, however,

L&H's Board of Directors accelerated the full $25 million earn-out and paid it almost one year early,

on January 28, 2000.

165.     As noted in the L&H Action complaint, Bastiaens, and others, sought to present this

early earn-out as a reward for Seo's and L&H Korea's performance.  According to a February 3, 2000

e-mail from Bastiaens to, among others, Stephen Huysman, the KPMG Belgium Audit Manager, and

William VanAerde, the KPMG Belgium 1999 Audit Partner, and Dammekens and Hauspie at L&H:

> the Earnout of L&H Korea was related to [L&H Korea] reaching a target gross
> margin of $37.5 mil over 6 Quarters beginning at the signing date and ending DEC
> 31 2000 with a min target of $22.5 mio. L&H Korea (former Bumil) has already
> overachieved this target by DEC 31 '99 and as such we had a board meeting on Jan
> 17 2000 on this subject. The board has approved to pay out the earnout because of
> this very positive result in line with the agreement and the payment has occurred by
> the end of January 2000 to the Bumil shareholders.

166.     Contrary to Bastiaens' purported reasoning, the earn-out was not in response to

Korea's supposed success, but rather part of the scheme to fund L&H Korea's improper relationship

with Korean banks that participated in the factoring scheme described above.  In fact, as noted in the

L&H Action complaint, a February 3, 2000 e-mail from Seo to Lernout, Hauspie, and Willaert,

shortly after receiving the $25 million earn-out, confirms the hidden basis for the accelerated

payment:

> Thanks for your great assistance extended to me.  I well received the remitted

67

amount of 25 million USD.  <u>With your prompt action, I could keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much </u>better than before.  Thanks again for your help.

I assure that I will do all my best for L&H Group and for continuous business success of L&H.

Sincerely yours,

Ju-Chul Seo

(emphasis added).

167.    Thus, the so-called $25 million earn-out payment was necessary to provide added funding to Korean banks and enabled L&H to more aggressively pursue its factoring scheme in the first and second quarter of 2000.  Moreover, L&H fraudulently inflated its numbers, providing defendants with a cover for pulling off this early payment to Seo without raising shareholder suspicions.

### E.    IMPROPER REVENUE RECOGNITION CONCERNING STRATEGIC-PARTNERS/RELATED-PARTY TRANSACTIONS

168.    Another scheme employed by defendants to manufacture revenues involved the creation of "strategic partners" to contract with L&H to develop the Company's software for specific applications and/or languages.  These "strategic partners" were LDCs and CLDCs, and they would pay licensing revenues to L&H, and then "develop" the software.  At the end of the contract terms, L&H would have the option B which was generally exercised B to acquire the strategic partner and the developed product.

169.    To the outside world, it appeared that these strategic partners would contract for license agreements and then bear the cost and risk of developing the software.  In reality, the transactions were a sham.

170.    While L&H claimed that the LDCs and CLDCs were independent, unaffiliated

68

entities, in reality, most were owned by undisclosed related parties such as FLV Fund and Mercator. Further, the "strategic partners" were small start-ups without the resources to perform the research and development work. Instead, L&H and its employees would perform the development work for the LDCs and CLDCs, bearing all research and development costs. When L&H purchased the LDCs or CLDCs, however, it would capitalize the majority of the purchase price as goodwill (including the amounts spent on research and development). As capitalized assets, L&H was able to amortize the cost of goodwill over an extended time period, rather than treating the research and development costs as an expense that would immediately reduce earnings.

## 1.    <u>Background</u>

171.    In 1996, L&H formed Dictation Consortium N.V. ("Dictation") to develop software for L&H. L&H then turned to friends as "outside" investors to fund Dictation. As a result of L&H's efforts, on December 31, 1996, FLV Fund and FLV Management invested in Dictation for a total stake of 61% of the company. In 1997, this stake was reduced to 43%. On December 7, 2000, <u>The Wall Street Journal</u> reported that the remaining unnamed private investors "were companies incorporated in the secrecy and tax havens of Luxembourg and the British Virgin Islands, their owners undisclosed."

172.    Artesia provided financing that was instrumental to the Dictation project. Indeed, according to documents filed in the Dexia Action, it was during the Dictation financing in 1996 that Artesia first learned that under U.S. accounting rules, L&H could not recognize revenue on deals with third parties such as Dictation unless Dictation and its financing remained entirely independent of L&H.

173.    Artesia knew that Dictation was merely a shell entity created by and hardly independent of L&H. It was, in fact, L&H, as opposed to a Dictation representative, who first

approached Artesia about financing the project.  Other notes in Artesia's loan files confirm Artesia's awareness of  Dictation's "artificial" status, including a May 14, 1997 note stating that "Dictation Consortium is an empty company, without clients, without contact with clients, actually without any commercial activity that was incorporated with an eye on the NASDAQ listing."

174.    However, despite clear knowledge that Dictation and L&H were not independent entities and that U.S. accounting rules clearly prohibited any involvement by L&H or its principals in guaranteeing financing to Dictation, Artesia designed and accepted a secret guarantee of the Dictation loan from Lernout, Hauspie and Willaert.  Artesia did so -- in violation of its own lending policies – in order to conceal the guarantee from L&H's auditors, the SEC, and the investing public so as to allow L&H to improperly recognize revenue on its licensing transaction with Dictation.  In return, L&H granted Artesia 300,000 L&H stock warrants worth at least $300,000.

175.    In December 1996, L&H entered into a very profitable licensing agreement with Dictation.  Pursuant to this agreement, Dictation provided L&H with $26.6 million in revenue, or 25% of L&H's 1996 sales and 19% of L&H's 1997 sales.

176.    Between December 1996 and early 1998, Dictation "developed" the software, purportedly bearing the research and development costs.  However, Dictation was not actually performing any of the work to develop the software.  Rather, L&H employees wrote Dictation's business plan and did the software work under contract, as defendant Lernout later acknowledged.

177.    Once the development was completed, L&H had the option to purchase Dictation. In May of 1998, at the end of the contract, L&H purchased Dictation for $40 million, resulting in a significant gain to Dictation's investors including FLV Fund.  In effect, L&H was purchasing the software it created at a significant premium.  Then, L&H booked the goodwill associated with the sale as an asset and amortized the transaction over a period of years rather than recording the research

and development expenses as current expenses.

178. Bolstered by the success of the Dictation arrangement, in May of 1997, L&H entered a similar relationship with Brussels Translation Group NV ("BTG"). On March 13, 1997, BTG was established as a limited liability company in Belgium, "primarily engaged to acquire, develop, commercialize and license machine translation software." Artesia was a key factor in the creation of BTG, providing the initial financing to allow BTG to operate. Artesia loaned a total of $22.9 million to BTG with the intent that L&H would find external investors to repay the loan. However, L&H never disclosed the owners of BTG, and a December 7, 2000 <u>Wall Street Journal</u> article was only able to trace ownership "through a Luxembourg company to two entities based in the Channel Islands, but no further." Artesia recognized that BTG lacked the financial resources and technical capability necessary to develop L&H's software. Nevertheless, pursuant to the fraudulent scheme alleged herein, Artesia loaned those funds to BTG so that they could be passed off to investors as legitimate licensing fees paid to L&H.

179. In March of 1997, BTG entered a software development and commercialization agreement with L&H, under which L&H agreed to provide engineering services for the development of machine translation services for L&H's iTranslator services. L&H also licensed certain software to BTG.

180. The agreement called for BTG to pay L&H $3.5 million in license fees plus royalties which was increased to $5 million in May 1997. L&H also entered into an agreement to provide BTG with engineering services under which BTG paid L&H approximately $30 million. As with the Dictation deal , Artesia provided the financing that allowed the BTG deal to be consummated. As documents uncovered in the Dexia Action have revealed, during the financing of BTG in late 1997 and early 1998, Artesia was once again clearly informed that under U.S.

71

accounting rules, L&H could not recognize any revenue on deals with third parties such as BTG unless BTG and its financing were kept wholly independent of L&H.

181.    In June 1999, at the end of the contract, L&H purchased BTG for $59 million.  This was comprised of an aggregate purchase price of approximately $42.3 million and the assumption of approximately $17 million of debt.  The purchase price exceeded the fair value of the net assets acquired and was allocated to goodwill or other intangible assets.  As in the Dictation Consortium transaction, L&H was able to obtain the product without deducting the research and development expenses.  Instead, L&H was able to record nearly $35 million in revenues during 1997 through 1999 and then, when it purchased BTG, L&H capitalized the acquisition price turning what would normally be an expense into an asset.

182.    From 1997 though 1999, L&H incurred $9 million in expenses to develop the BTG software.  The net result of this transaction was that L&H paid BTG approximately $50 million over its own direct costs to acquire software which it developed.

## 2.    The Undisclosed 30 Start-Up Companies

183.    In 1998, in an effort to further inflate L&H's revenues and share price, the defendants began a scheme that would later be described by The Wall Street Journal as a "Dictation Consortium-type structure B but on steroids."

184.    L&H helped create, and Artesia provided financing for, 30 start-up companies based in Belgium and Singapore, purportedly to "develop" variants of its software for non-mainstream languages. L&H repeatedly maintained that unaffiliated "private investors" owned the start-ups.

185.    In an April 7, 1999 press release, L&H announced among the highlights of fiscal year 1998:

[L&H] [b]egan development of approximately 20 additional exotic languages with its

financial and technological partners.  During 1998 contracts were signed for the following languages: Ukraine, Polish, Czech, Slavic, Bahasa, Greek and Farsi, to support a range of speech technologies. . . .  In order to develop these additional languages within certain time and financial constraints, L&H is working with partners who will undertake the localization and development of these language areas and share the financial risks and rewards.  L&H will license its tools to the partners and will secure the quality of the various applications and languages.

186.    In its 1998 Annual Report on Form 20-F, L&H expanded its description of these transactions:

Pursuant to these agreements, we have exclusively licensed our speech and language technology development tools to strategic partners <u>that are unaffiliated with us to</u> develop and localize our technology for specified new languages.  Our strategic partners also have exclusive rights . . . to develop, market, and distribute products incorporating the development technology.  In addition to one-time license fees, we have the rights to receive royalties based on our partners' net revenues from sales of products incorporating the developed technology.

(emphasis added).

187.    The revenue derived from these "strategic partners" was striking.  In fact, these so-called unaffiliated "strategic partners" accounted for 10% of L&H's 1998 reported revenues and 25% of its 1999-reported revenue.  The above statements concerning "unaffiliated" parties was false and misleading when made because throughout the Class Period, however, L&H did not disclose that the majority of the start-ups were actually funded by parties related to L&H or through loans provided by Artesia that were guaranteed by the principals of L&H.  Moreover, L&H and defendants failed to disclose that by no later than December 1998, L&H was performing substantially all of the development work for the LDCs and CLDCs.  In fact, as would later be revealed, 17 of the LDCs and 7 of the CLDCs, were owned в directly or indirectly-by FLV Fund or Mercator.  Specifically, eight were backed by FLV Fund.  Another four were subsidiaries of Language Investment Co., a company run by Willem Hardeman, a director of the FLV Fund.  Finally, sixteen of the thirty were predominately owned by Mercator.

188.    In fact, the Company's Audit Committee Report would later raise significant questions

about these 30 start-ups, concluding:

> [T]he Company and the LDCs realized, as early as December 1998, that completion
> of the work by the LDCs was not practicable and the Company began to provide
> some level of services, if not development work.  As a result, the accounting should
> have been changed from up-front revenue recognition of the full license fee to
> deferral of the revenue and recognition of the revenue as the services or development
> was completed.

*   *   *

> We believe, based upon our review of certain internal documents and outside
> marketing material and limited discussions with the investors or their representatives,
> that the investors anticipated, in substance, that they were buying the future rights to
> a product (language) to be developed by L&H and thus were effectively funding the
> Company's research and development efforts to build that language.

189.    The Audit Committee Report ultimately concluded that approximately $79 million in

revenue was improperly recorded as a result of these "strategic partner" transactions.  The proper

treatment for each transaction, however, would depend on whether or not the LDCs or CLDCs were

related parties.  The Audit Committee counsel, however, lacked sufficient information concerning the

investors in the LDCs, CLDCs and IACs due, in part, to lack of cooperation by "[management and

some board members of L&H."  Nevertheless, the Report concluded:

> If the investors are not related parties, accounting for such transactions would require
> deferral of all the revenues and recognition over the development period. . . If the
> investors are related parties, the relevant accounting literature presumes that the
> related party investors will be repaid and the funded amount are recognized as a
> liability.

Either way, L&H fraudulently booked the revenue from those transactions during the Class Period.

190.    L&H, however, could not accomplish this fraud without the direct participation of the

related parties.  L&H's financial statements and other disclosures failed to disclose the relationship

between the "start-up" customers of L&H and FLV Fund or Mercator.  L&H affirmatively and falsely

74

represented that these "licensees" were "unaffiliated customers," and that 1998 revenues from

companies funded by FLV Fund, Mercator and/or LHIC were minor.

### F.     L&H'S USE OF THE FLV FUND IN THE FRAUD

191.    Defendants Lernout and Hauspie created the FLV Fund in 1995, and were directors of

the fund's management arm from 1995 until 1997.  According to The Wall Street Journal, after 1997,

Lernout and Hauspie maintained "considerable sway" over the Fund's affairs as evidenced by the

closed relationship between the Company and the Fund since the Fund's inception.

192.    In 1995, FLV took a 49% stake in the Belgian unit of Quarterdeck Corp., the

California software company then headed by Bastiaens.  According to a December 7, 2000 Wall

Street Journal article, Quarterdeck's Belgian unit then became L&H's "largest customer, accounting

for 30% of revenue that year, and Quarterdeck itself contributed in 6.5% of L&H's sales."

193.    Then, as noted above, FLV Fund and FLV Management together owned a majority

stake in Dictation Consortium, a company that provided $26.6 million in revenue to L&H from 1996

through 1998.

194.    Due to stock market and analyst sensitivity about L&H's close ties with FLV Fund,

L&H took great steps to conceal its involvement with, and reliance on, the FLV Fund and  other

related parties.

195.    During the Class Period, L&H disclosed that FLV Fund was a related party, but only

reported minimal revenue from FLV Fund sources. For instance, in its 1998 Annual Report on Form

20-F, L&H stated that only 3.7% of 1998 revenue was provided by "companies funded in part by the

FLV Fund."  Similarly, in its 1999 Annual Report on Form 20-F, L&H revealed that only 0.3% of

1999 revenues were provided by "companies funded in party by the FLV Fund and L&H Investment

Co."

196.    FLV Fund's so-called diminishing role in L&H's revenues is belied by the actions of L&H sales persons, as well as FLV's role in 12 of the 30 LDCs and CLDCs.

197.    As noted in the L&H Action complaint, according to a former channel sales manager from the Burlington office, L&H sales representatives routinely told customers that if they acquired or licensed L&H products, FLV Fund would make an investment in the customer, noting there was no real separation between L&H and FLV Fund.  "I always thought they were the same thing, because of the attitude we had, the positioning," said the former channel sales manager.  In fact, during presentations to potential customers, sales and marketing representatives would describe the FLV Fund as a potential investor, and even devoted a portion of a PowerPoint slide presentation to describe the FLV Fund and how it worked.

198.    On December 7, 2000, The Wall Street Journal quoted Michael Faherty, a former L&H salesman in the United States, as stating that he and other L&H salespersons were encouraged to refer potential, cash-poor customers to FLV Fund.  The article quoted Mr. Faherty as stating, "If FLV invests $1 million [in the customer] . . . it was understood that we'd get about $300,000" in the form of license fees paid by that customer to L&H.  In internal L&H sales forecasts provided by Mr. Faherty to The Wall Street Journal, an entire category was developed for prospects that had been referred to FLV Fund.  A description of one potential $25,000 L&H customer noted that its business plan was "in to FLV."

199.    As revealed by The Wall Street Journal, the FLV Fund was the undisclosed "related-party" behind eight of the thirty "start-ups" that accounted for 10% of L&H's revenues in 1998 and 25% in 1999.

200.    Specifically, FLV Fund was directly involved in owning or funding the following customers/transactions during the Class Period:

a.   In the first quarter of 1999, L&H recorded $10 million in licensing fees from four Singapore start-up companies: I-Merge Pte., I-Office Pte., I-Mail Pte. and I-News Pte.  Approximately six months later, FLV Fund invested $8 million for a 49% stake in each of the four start-ups.  In violation of GAAP, the FLV Fund investment was not disclosed in L&H's 1999 financial filings.

b.   During the third quarter of 1999, four additional Singapore startups agreed to pay $16 million in license fees to L&H for software rights.  L&H recognized all of this revenue during the third quarter of 1999.  On October 22, 1999, however, FLV Fund invested $10 million in the companies, who then used $8 million to pay L&H.  FLV disposed of its ownership in the four start-ups prior to December 31, 1999 by selling it for $11 million to HI World.  As of September 22, 2000, however, HI World had not paid FLV Fund and a HI World executive gave <u>The Wall Street Journal</u> conflicting reports on whether the money was owed.  L&H never disclosed that the $16 million in revenue came from a related party as required by GAAP.

201.   In addition to the eight "start-ups" listed above, an additional four were organized as subsidiaries of Language Investment Co. ("LIC"), whose Chief Executive Officer, Willem Hardeman, was an FLV Fund director.  LIC owned four start-ups that each purchased licenses valued at $3 million in late 1998.  The start-ups each paid L&H $1.5 million in December of 1998.  However, according to <u>The Wall Street Journal</u>, L&H recorded the full $12 million of revenue in the fourth quarter of 1998 as received.  LIC confirmed that the remaining $6 million was never paid.

202.   According to a November 6, 2000 <u>Wall Street Journal</u> article, LIC founded four start-ups, the Greek Development Co., the Polish Development Co., the Hungarian Development Co. and Czech Development Co. in late 1998 "at the behest of L&H," especially Nico Willaert who made a presentation about L&H's "new franchising system."  The article reported:

Under the [new franchising] system, Mr. Willaert explains, L&H proposed to give investors the opportunity to develop potentially profitable new versions of L&H software for nonmainstream languages, in exchange for license payments and a share of future revenue generated by start-up firms the investors would create to do the development work. . . . Under the deal LIC eventually signed with L&H on behalf of its four start-ups, each of the firms was to pay $1.5 million upfront, but didn't have to pay the remaining $1.5 million they owed L&H until a later date. . . .  "The point for us was to have these companies begin to develop software for these lesser-used

languages and then sell the companies for a profit," Mr. Hardeman said. "For us, it was a purely financial investment."

The article notes that LIC eventually sold the four firms in December 1999 to Velstra for an undisclosed sum. As described below, Velstra is almost exclusively owned by Mercator.

203.    Investors were unaware that a related-party, FLV Fund, was behind such a large number of transactions. In fact, the above referenced transactions alone far exceed L&H's disclosure that only 3.7 % of the Company 1998 revenues and 0.3% of the 1999 revenues where from related parties.

204.    In addition to the above-referenced actions, the Audit Committee Report also raised several concerns about FLV Fund's involvement in related party transactions where "a more fulsome disclosure may [have been] appropriate," including, *inter alia*:

    a.    L&H purportedly offered its customers investments by FLV for a "finder's fee";

    b.    Philip Vermuelen, CEO of the statutory manager for the FLV Fund, wrote e-mails to senior management at L&H "summarizing FLV Fund's investments and the ways in which those investments would help L&H";

    c.    FLV Fund's investment in four CLDCs for a short period, before selling its interest to HI World, a newly formed Korean company with close ties to L&H; and

    d.    Korea's action of providing $30 million in collateral for a loan to Seo, President of L&H Korea, described herein.

205.    L&H's "finders fee" practice of coercing "customers" into contracting with L&H in order to obtain FLV Fund funding was particularly severe in the Burlington office. For example, as noted in the L&H Action complaint, an e-mail dated February 3, 2000 from John Soloninka of Interpra to Peter Durlach, Vice President, Marketing & Business Development at L&H Burlington's Healthcare Solutions Group, summarizes the aggressive tactics practiced by L&H Burlington:

    Summary of selected key events in the L&H/Interpra/Merge history as related by J P Soloninka variously to Michael Benol, Peter Durlach and in part to Rick Oldach of

L&H on different occasions:

- L&H brought FLV financing opportunity to Interpra in Feb/March 99; we were in need of major financing to remain in business.

- LV appeared to show sincere interest in us.

- Although FLV stated that they were independent of L&H, Chris Force and Mark Santosuosso stated that FLV funding was in fact conditional on a large presale of non-existent product (essentially of 20% commission on $2.5m financing).

- L&H used extortionist tactics.  The following is an excerpt, paraphrased as accurately as I can from March 99 telephone conversation ... it sounds like a B movie, and would be pathetically funny if it weren't real.  I have 4 witnesses who will attest that this is an accurate representation of the tone of the conversation and key statements made.  Mark Santosuosso was in Interpra's office with our senior management team. Chris Force was off-site on the telephone.

*   *   *

Interpra:    You want a 20% commission (on the $2.5m FLV financing) in the form of presale licenses?  We can't do 20%. Firstly, we don't need more than year's worth of licenses . . . how could we justify to our shareholders that we would take several years' worth of inventory which would go stale?  Our auditors would never accept this.  We can't pay such a level.  Besides, how do we know that you can deliver on the FLV money?  FLV . . . said they were independent of you.

Mark:      In the 22 deals of this type we've done, they've all paid 20% and they've all got their money.

Interpra:    Are you saying if we say no to the 20%, you will quash the deal with FLV?

Mark:      We're just saying that in the past when people have agreed to the 20% they got the money, when they didn't . . .

Interpra:    We just can't do the 20%, We won't. . . .

*   *   *

Interpra:    . . . We can try and justify $250,000 in licenses, (10% commission), but not more. If we can't do it at 10% we can't do the deal. . . . after some discussion Mark and Chris very begrudgingly agree to 10%.

Interpra:    . . .  But we are going to need written assurance that if the FLV

financing fails to go through, we are not on the hook to pay L&H for those licenses.

    Chris:     No! No documented side deals.  I can't recognize revenue if there are any side deals.

    Interpra:    But we can't do the deals without assurance.  We would be irresponsible and as Directors, even personally liable. Chris:  Look guys, I want this to go through. We've done 22 deals, it's virtually a sure thing.  Besides, if the deal doesn't go through, what good would it do me to chase a company with no money and going bankrupt. Trust me, we will not be looking for our money if the deal doesn't go through.

    Interpra:    If you are so sure ... put it in writing.

    Chris:     I can't.  I won't.

    Interpra:    ... (after much deliberation) ... We will doe the deal at 105 ($250,000) under the understanding that this liability is contingent on us getting the FLV funding:

    Chris/Mark accept the deal.

## VI.    LIABILITY OF THE KPMG DEFENDANTS

### A.    RELATIONSHIP AMONG THE KPMG DEFENDANTS AND EACH OFFICE ACTS AS ONE FIRM WITH RESPECT TO L&H

206.    KPMG International ("KPMG Int'l") is a Swiss Verein, or association.  Each KPMG firm worldwide is a member of KPMG Int'l.  KPMG Belgium and KPMG LLP are both members of KPMG Int'l. KPMG Int'l. markets itself and all of its member firms as a single entity.  At its website, KPMG Int'l. has specifically stated as follows:

**Overview**

In a global marketplace distinguished by remarkable growth and consolidation, companies face a host of new challenges in today's economy.  <u>KPMG helps clients successfully respond to changing opportunities by providing professional services, wherever and whenever they're needed.</u>

KPMG has tailored its services - including assurance, tax and legal, consulting, and financial advisory services - to address the complex business challenges faced by global clients. <u>Through the firm's international network of industry professionals, the</u>

best people, products and technologies are combined to enhance services with industry insights and best practices.

In 2000, KPMG achieved record revenues of US$13.5 billion, an 11 percent increase driven by all of our major service lines. More than 100,000 KPMG professionals in member firms worldwide collaborate across industry, service and national boundaries to deliver professional services in 155 countries. This enviable network of firms is connected through our local and national resources with neater flexibility, responsiveness and consistency of service delivery worldwide. (emphasis added).

207.    In its Annual Report for 1999, KPMG Int'l stated that "KPMG is acting as 'One Firm' worldwide to consistently meet the changing needs of global clients through an integrated array of tailored solutions . . . KPMG's 100,000 professionals in 159 countries help our clients achieve their critical business objectives through experience and personal commitment to excellence." The 1999 Annual Report also stated that KPMG expects its "global lead partners to marshal KPMG's finest resources, wherever they reside." The 1999 Annual Report also praised the work of integrated teams of KPMG professionals from offices around the world to service its global clients.

208.    Because L&H was one of KPMG's global clients, many KPMG offices B located in the United States, Belgium, the United Kingdom and elsewhere B actively, participated in the reviews and audits of L&H's financial statements during the Class Period. In its 1997 and 1998 Annual Reports to Shareholders, L&H listed the Ghent, Belgium and Boston, Massachusetts offices of KPMG as the Company's principal auditors.

209.    KPMG Belgium, a member of KPMG Int'l, is a public accounting firm employing 950 partners and staff in six cities in Belgium. L&H became an audit client of KPMG Belgium after it acquired the accounting firm of Behets, Boes & Co., which had been auditing L&H since the late 1980s.

210.    According to the Report by the Statutory Auditor for the Fiscal Year December 31, 1998, filed as Exhibit B to the L&H Proxy Statement for the Annual Meeting and the Extraordinary

81

Meeting of Stockholders to be Held on May 21, 1999, filed with the SEC on Form 6-K on May 24, 1999 (the "1999 Proxy"), Paul P. Behets was the partner of KPMG Belgium responsible for the audit of L&H's 1998 financial statements and certain quarterly reviews in 1999. Stefan Huysman was the Engagement Senior Manager of KPMG Belgium responsible for the audits of L&H's statements.

211.   However, many other KPMG offices were involved in the L&H audits or otherwise responsible for providing professional services to L&H. In the United States, KPMG's offices in Atlanta, Boston, Northern Virginia, and Houston, among others, were actively involved in the audit, particularly with respect to L&H's U.S. operations in Burlington and other subsidiaries based in the U.S. James Boyer was the KPMG partner in KPMG's Boston office responsible for the services rendered by KPMG to L&H in the U.S.

212.   Abroad, Robert McLamb, KPMG's SEC reviewing partner based in KPMG's US Capital Markets Group, worked extensively on the L&H audits and reviews and was, for most of the Class Period, based in KPMG UK's London, England office. At some point during 2000, McLamb was based in KPMG's Houston, Texas office.

213.   McLamb's involvement with L&H was extensive and began as early as 1997. As noted in the L&H Action complaint, according to a Highlights and Summary Review Memorandum for December 31, 1997, dated April 28, 1998:

> Conversion of local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets London Office and SEC reviewing partner. The US financial statements have been finalized after Bo's two day review visit of April 16 and 17, 1999 and subsequent review by Digby Wirtz on April 21 and 23. All the review comments of both Bob and Digby have been cleared.

* * *

> As explained earlier, KPMG Capital Markets Group London have reviewed the compliance with US GAAP reporting with both KPMG Ghent and the client. In addition, US Capital Markets Group KPMG London reviewed the draft financial

statements in February 1998 and the final financial statements (incl. Footnotes) in April 1998 before release.  All US reporting issues have been cleared with KPMG US Capital Markets Group London.

214.     KPMG's constituent partnerships in the U.S., U.K., Belgium and Korea effectively operated as a single auditing firm with regard to L&H and the preparation of its quarterly financial results.  Each office was assigned to and worked on various aspects of the engagements.  The U.S. auditors would show up at L&H's Burlington headquarters at the end of each quarter to prepare L&H's financial statements; the Belgian auditors would do the same in Belgium and the Korean auditors would do the same in Korea. McLamb, Wirtz, Behets and then Van Aerde oversaw the year-end audits of L&H and each reviewed and provided input into the completion of the audits.

215.     KPMG was actively involved in the preparation and dissemination of L&H's quarterly, as well as its year-end financial statements, before and during the Class Period.  KPMG auditors and consultants were present at L&H at the end of each quarter during the Class Period for the purpose of reviewing (and, in some instances described below, auditing) L&H's quarterly financial results before they were issued to the investing public.

216.     For example, the press release announcing financial results for the first quarter of fiscal year 1999 issued by L&H was sent to Behets and McLamb for review and comment before it was issued.

217.     Moreover, as another example of KPMG's involvement with the issuance of quarterly financial statements, according the "Group Audit Strategy and Reporting Instructions," dated August 24, 1999, the number one "key review objective" for the review of L&H's third quarter 1999 financial results was to "allow KPMG Ghent to provide clearance to the client on the Q3-99 consolidated financial statements of LHS prepared in accordance with group accounting policies and US GAAP."  (emphasis added).

218.    As noted in the L&H Action complaint, McLamb and Behets provided substantial input on the preparation of the Company's 1998 financial results and audit report. McLamb provided edits to the language of the audit report issued by KPMG Belgium as well as substantial revisions to the financial statements and disclosures.  Moreover, McLamb actually prepared and provided certain amounts and disclosures to L&H's 1998 financial statements.

219.    As noted in the L&H Action complaint, in KPMG's Completion Memorandum dated April 9, 1999, prepared in connection with its audit of L&H for fiscal year 1998, Behets stated:

> During the course of the audit, some key issues were discussed and conclusions were reach [sic] in agreement with advice from the US Capital Markets group in London [Wirtz and McLamb].

> *   *   *

> <u>KPMG personnel from all participating offices involved reviewed the revenue recognition policies</u> and practices followed to ensure compliance with group revenue recognition policy and with US GAAP regulations. (emphasis added).

220.    KPMG's involvement in the preparation of the Company's quarterly and annual financial results was pervasive, extending so far as to result in the actual preparation of certain reported financial results and disclosures contained in such financial statements.

221.    Indeed, as noted in the L&H Action complaint, in a letter to the L&H Board of Directors from Lernout dated April 25, 2001, Lernout wrote:

> In the course of the past ten years, we built up a good working relationship with KPMG, and we relied extensively on the advice from numerous KPMG divisions in various countries as well as on the KPMG audit departments, in particular in Belgium and in the United States.

> As part of this relationship, all information which we deemed relevant was always communicated to KPMG. Often, they worked side-by-side with the company in the execution of transactions.

According to Lernout:

84

From the start, KPMG played a dual role:

(1) on the one hand, KPMG was a commissioner of Lernout & Hauspie Speech Products N.V., including of its subsidiaries, and therefore also of the Korean subsidiaries; and

 (2) on the other hand, KPMG was also a consultant for the company.

In that capacity, KPMG was closely involved at the end of each quarter in processing the figures for the interim accounts - as consultants they advised and assisted the financial and bookkeeping departments of Lernout & Hauspie Speech Products. KPMG consultants came every quarter to the office to draw up the interim accounts together with the bookkeeping department of Lernout & Hauspie Speech Products N.V.

Consequently, it is impossible to believe that KPMG now claims that it did not notice earlier the alleged (actually, disputed) "irregularities" in the Belgian bookkeeping during its auditing assignments as commissioner and when it assisted us in drawing up the books. In fact, KPMG helped the staff of the bookkeeping department of Lernout & Hauspie Speech Products N.V. understand and apply the US GAAP Rules (these are the accounting standards which must be observed by corporations whose shares are traded on EASDAQ and NASDAQ).

\* \* \*

It was also KPMG's assignment to make sure that sufficient control mechanisms were in place and that the internal procedures were such that any resorting to fraud by the local people in charge was excluded as much as possible.

\* \* \*

I remember pertinently that in some concrete cases the bookkeeping department of Lernout & Hauspie Speech Products N.V. decided after consulting with KPMG that there was sufficient consent between the parties to view these [licensing agreements] as actual agreements, even if the written agreements had not yet been signed in their final form.

\* \* \*

I believe that all agreements with related parties were disclosed in the proper manner. To arrive at that conclusion, I relied on the advice and support which KPMG, as an international auditing company, provided to Lernout & Hauspie Speech Products. KPMG not only provided assistance for the processing of the quarterly figures, but also helped the company with the disclosures required by NASDAQ and EASDAQ rules.

85

\*   \*   \*

Furthermore, KPMG was particularly well paid for this assistance, which made us assume that it used a sufficient number of specialists and collaborators to make sure that Lernout & Hauspie Speech Products followed the rules imposed by law. (emphasis added)

### B.   KPMG'S DETERMINATION OF CERTAIN AMOUNTS IN QUARTERLY FINANCIAL STATEMENTS

222.   KPMG effectively served as an adjunct to L&H's accounting department during fiscal years 1998 and 1999.  As alleged above, KPMG auditors and consultants were present at L&H at the end of every quarter during the Class Period and worked closely with L&H on the preparation of the quarterly financial statements.  [As an example of KPMG's involvement in the preparation of the financial statements, as noted in the L&H Action complaint, KPMG, through KPMG Consulting, a division of the same Swiss association as KPMG Belgium, KPMG LLP and KPMG UK, performed valuation services for acquisitions made during that time by L&H.]  In particular, KPMG was hired to determine the allocation of the purchase price among the various assets acquired.  KPMG  provided allocation of the purchase price for at least the following acquisitions:

a)   The allocation for the Application Technology, Inc. acquisition in April of 1998.

b)   The allocation for the Accent Software International acquisition in June of 1998.

c)   The allocation for the Bumil acquisition in September 1999.

d)   The allocation for the Dragon acquisition in 2001.

223.   The work performed by KPMG resulted in millions of dollars being allocated into

86

"goodwill and other business acquisitions intangibles" and recorded as assets on L&H's quarterly balance sheets.  For example, KPMG and L&H included the following amounts in the financial statements with respect to the acquisitions of Bumil and Dragon:

**Allocation of Dragon per: Q2 2000 10-Q**          (in 000s)

Assets Acquired:

      Working capital                              $(118,282)

      Property and equipment              $2,230

      Goodwill                                        $461,240

      **TOTAL**                                    <u>$445,278</u>

**Allocation of Bumil per: Q3 1999 10-Q**          (in 000s)

Assets acquired:

      Working capital                              $(108)

      Property and equipment              $927

      Goodwill                                        $25,988

      Liabilities assumed                        $(1,083)

      **TOTAL**                                    <u>$25,724</u>

KPMG was directly responsible for the amounts entered on L&H's financial statements for these particular assets. Aside from making KPMG complicit in the preparation of L&H's financial

statements, such conduct violated GAAS in that KPMG audited L&H's consolidated financial statements. In essence, KPMG audited its own valuation work and therefore was not independent.

224.     Moreover, in performing reviews and audits of L&H, KPMG assigned various values to represent materiality, or the amount which KPMG determined would influence persons reading L&H's financial statements. To justify misstatements in L&H's financial statements, KPMG netted known (or "hard") overstatements of revenues or assets with certain possible understatements thereby allowing individually material items to be overstated, yet included in L&H's financial statements. For example, as noted in the L&H Action complaint, during KPMG's six-month review for June 30, 2000, over $2.8 million in known, net misstatements were discovered by KPMG, yet no corrective action was required by, or undertaken by, KPMG. In the memoranda dealing with the meeting concerning the six-month review, KPMG documented its improper acquiescence by stating "KPMG is willing to let some adjustments flow through." KPMG's statement demonstrates a complete disregard for the function of an independent auditor in ensuring that the financial statements are free from material misstatement. Moreover, given the fact that KPMG was making the final decision regarding which entries would and would not be recorded, its conduct made KPMG complicit in the preparation of the false quarterly financial statements. Such action violates SEC Staff Accounting Bulletin No. 99 that was issued on August 12, 1999.

**C.     KPMG HAD FULL AND COMPLETE ACCESS TO INFORMATION**

225.     As a result of providing audit and other services for the Company, KPMG personnel were frequently present at L&H's corporate headquarters in the United States and Belgium, as well as other L&H offices throughout the world during 1998, 1999 and the first two quarters of fiscal year 2000. Indeed, KPMG had continual and unfettered access to, and knowledge of, L&H's confidential internal corporate, financial operating and business information and had ample opportunity to observe

and review the Company's business and accounting practices, and to test the Company's internal and publicly reported financial statements, as well as review the Company's internal controls. KPMG's intimate knowledge of L&H was based on almost ten years as the Company's auditor. Indeed, KPMG has served as the Company's auditor since 1991 and purports to be a "leading provider" of audit services. In particular, during the Class Period, KPMG claimed on its website that:

> Assurance practice helps manage client risk so they can focus on their core business. By intimately understanding each client's business, we convert information into insights to uncover hidden opportunities to improve client efficiency and performance.

> We also know that <u>intimately understanding</u> each client's business - its challenges and objectives - builds close relationships. It's how KPMG adds exceptional value. (emphasis added.)

226.    By virtue of its position as the independent accountant and auditor for L&H, KPMG therefore had unlimited access to the Company's key personnel, accounting books and records and transactional documents at all relevant times.

227.    Indeed, the KPMG Int'l website stated the following, <u>inter alia</u>, with respect to the auditor's close involvement with the Company at all times during the fiscal year:

**Year Round**

[KPMG's Business Measurement Process] provides a continuous audit process. Your auditor stays in touch with you year B round keeping current with your business and changing market conditions, and providing you with ongoing feedback on how your business decisions could affect your financial results.

228.    Moreover, <u>The Financial Statement Audit: Why A New Age Requires An Evolving Methodology</u>, a publication prepared by KPMG and available at its website, stated: "Few are privy to as much information as an auditor." <u>Id.</u>. at 15 (quoting Frank O. Marrs, "Using Your Audit As A Management Tool," <u>Leaders</u>, Vol. 19, No. 3, July/Aug./Sept. 1996).

229.    As noted in the L&H Action complaint, in his letter to the L&H Board of Directors

dated April 25, 2001, Lernout indicated that, "from the day we were quoted on the stock exchange on 12/1/95, we turned to KPMG for every decision of any significance." Indeed, as early as 1996, L&H involved KPMG in the accounting for specific contracts at the time they were contemplated. For example, in the Minutes of Regular Meeting of the Board of Directors, dated January 11, 1996, the directors discussed two new contracts which generated $1,800,000 and $1,000,000 of revenue for the Company. The meeting minutes indicate "there is a discussion of the need to involve the Company's accountants, KPMG, in review of these agreements for the purposes of determining revenue recognition policies."

230.    To elaborate, as noted in the L&H Action complaint, Lernout explained in his April 25, 2000 letter to the Board of Directors:

> To illustrate this I refer to the assistance which was given, for example, with about any sizable acquisition by LHS. It cannot be denied that for this reason alone, KPMG had perfect insight into the various aspects of the LHS organization, if only because of its involvement with the due diligence, audits and even the negotiations. (emphasis added).

231.    The symbiotic relationship between KPMG and L&H is further exemplified by the fact that, according to Lernout, L&H employees had "direct access to KPMG, even for very practical and day-to-day problems." Recognizing that this close relationship between auditor and client was unusual in light of the requirement under GAAS that auditors remain independent in fact and, in appearance, Lernout wrote:

> It cannot even be denied that the greater part of the learning process involving the adjustment to the US rules took place thanks to KPMG's help, which went much farther than is usual for auditors who often keep a certain difference.

232.    Lernout's statement regarding the extent of KPMG's activities are corroborated by a KPMG meeting agenda dated August 23, 1999, in which KPMG indicated that it planned to hold a US GAAP training seminar for L&H employees.

90

233.     In the Report of the Statutory Auditor on the Statutory Accounts Submitted to the

General Shareholders' Meeting of [L&H], attached as Exhibit B to the L&H Proxy Statement for the

Annual Meeting and the Extraordinary Meeting of Stockholders to be Held May 4, 1998 (the "1998

Proxy"), KPMG Belgium stated:

> We conducted our audit in accordance with the standards of the "Instituut der
> Bedrikfsrevisoren."  Those standards require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements are free of
> material misstatement, taking into account the legal and regulatory requirements
> applicable to financial statements in Belgium.
>
> In accordance with these standards we have considered the Company's
> administrative and accounting organization as well as internal control procedures.
> The Company management have provided us with all explanations and information
> which we required for our audit.

234.     KPMG made an identical statement regarding its consideration of L&H's internal

controls and access to information in Exhibit B to the 1999 Proxy.

## D.     KPMG'S ACTUAL KNOWLEDGE OF AND PARTICIPATION IN THE FRAUD

235.     In a startling breach of its duty to act as the public's "watchdog," KPMG participated

in, and had actual knowledge of, the fraud perpetrated at L&H during the Class Period.  In particular,

KPMG advised L&H to backdate contracts to create the appearance that revenue recognition was

appropriate.  Moreover, KPMG was aware of specific instances of improper revenue recognition and

documented its serious concerns about the validity of the revenue recognition associated with the

LDCs but nonetheless turned a blind eye to the fraud, using its false audit reports to serve as the

lynchpin for the fraud.

### l.        <u>Active Participation in Revenue Recognition Fraud</u>

236.       KPMG went far beyond simply turning a blind eye to the fraud, however, and went so far as to actively participate in the fraud by instructing L&H to backdate contracts for inclusion in revenues reported to the public, even though such contracts were not binding agreements at the time such revenues were recorded.

237.       As noted in the L&H Action complaint, in an e-mail dated January 5, 2000, five days after the end of L&H's fiscal year 1999, McLamb sent Dammekens an attached memorandum entitled "COMMENTS ON CERTAIN DRAFT AGREEMENTS."  The e-mail was copied to Glen Davison, another KPMG auditor.  According to the e-mail, McLamb had reviewed "draft" agreements in an effort to tell Dammekens how to create the appearance that the revenue on such contracts could be recognized in the fourth quarter of fiscal year 1999.  The contracts were with Digital Sei-Young Ltd, Doshin Electronics, Co., Ltd., Neo Information Telecom Corp. and HI Worldwide.  L&H sought to recognize $23 million in revenue under these contracts.  With respect to the Digital, Doshin and Neo contracts, McLamb instructed Dammekens that the draft contracts had to be "signed and dated by each party."  Thus, McLamb knew that the "draft" agreements were not final as of the end of the year, but nonetheless, in direct contravention of GAAP, permitted L&H to recognize the revenue in the fourth quarter of fiscal year 1999.

238.       As noted in the L&H Action complaint, in his January 5, 2000 e-mail, McLamb also discussed a number of issues with respect to the contracts, each of which should have precluded or limited substantially the amount of revenue recognized in the fourth quarter of 1999.  For the Digital Sei-Young, Doshin and Neo Information contracts, McLamb noted specific items which precluded revenue recognition:

1.        The contract should be signed and dated by each party.  Having just an

effective date is unacceptable.

2.      Need to determine the financial viability of Digital to determine whether they have the financial ability to pay the $10 million.

3.      Need to see clear evidence of the delivery of the deliverables under each part of the contract.

\* \* \*

7.      Under each part of the contract Digital is required to obtain L&H's approval for design of packaging and other artwork. *This is continuing involvement of L&H and causes a problem with revenue recognition.*

\* \* \*

10.     *Article A.8.1 makes it possible for Digital to get its money back. . . .*

\* \* \*

I have not looked into this further as I think that VSOE [Vendor Specific Objective Evidence] will not be established for each element and the entire $10 million would need to be amortized into income over the term of the agreement.

I also believe that the accounting is affected by the continuing involvement of L&H (see 7 above) and the royalties could be refunded under certain circumstances (see 10 above).  [italics supplied.]

McLamb made similar comments about the Doshin and Neo Information contracts in his January, 2000 memorandum.  With regard to the HI Worldwide contract, McLamb wrote that he had "previously reviewed this contract and given my comments to Carl [Dammekens]."

239.     Notwithstanding the myriad issues raised by McLamb in his January 5, 2000 e-mail,

KPMG still permitted the revenue from these contracts to be fully recognized in the fourth quarter of

1999.  As part of the Audit Committee Investigation, Arthur Andersen specifically identified the

revenues from the Sei-Young and HI Worldwide contracts as being improperly recognized.  Since

that time, as alleged, L&H has reversed all of the revenue associated with all of the contracts

reviewed by McLamb.

### 2.     Actual Knowledge of False Revenue Recognition

240.     KPMG's actual knowledge of accounting problems specifically with respect  to

revenue recognition at L&H extended directly to Korea.  As noted in the L&H Action complaint, in

an "URGENT" e-mail message dated October 10, 1999 from Oh Kwon, a partner in KPMG's Korea

office and copied to Dammekens and Van Aerde just weeks before the issuance of L&H's press

release announcing third quarter financial results, Kwon wrote:

> We have just completed our fieldwork for the September closing of Bumil [L&H's
> Korean subsidiary].   However, we have a critical revenue recognition issue as
> follows and, I want you to confirm this in your office as appropriate L&H
> responsible personnel.
>
> At 30 September 1999, L&H Korea ("Bumil") recognized the software revenue of
> approximately U$11 million, the largest amount Bumil ever recorded.  The sales
> were made to two unknown local software companies, VoiceTek (US $7M) and
> International Business Computer (US $4M), respectively, and I believe that
> Frederick's visit to Bumil last time was probably to review or record these
> transactions.  Frederik [Deschodt's assistant controller at L&H] told the accountant
> of Bumil that this transaction was agree [sic] by KPMG at the Corporate level.  I am
> surprised why he did not discussed [sic] with me when we met last time.
>
> We were not informed of the details of VoiceTek.  Same to ICB.  We know that
> VoiceTek was established in July this year in the minimum paid-in capital.  We are
> not aware of anything on IBC.  There are sales contracts dated 30 September 1999
> with these new customers but there are no proper documents on the revenue
> generation schedule and condition.  The contracts say that the sales is final and no
> refund is required and the localizing expenses to be incurred will be charged to the
> customers additionally, etc.  Furthermore the receivable was factored with a local

<u>bank with a collateral of Bumil's bank deposit and we believe the factoring is with recourse</u>.

Because of this transaction at 30, September 1999, Bumil showed big profit, about, US $13M, in September while it had loss carry forward of approximately US $0.5M until the end of August.

 Based on our understanding, I have several critical questions.

1.      Why did Bumil recognized the whole amount in September? Per their explanation, the ultimate resolution in Korean will take about five years to complete even though Bumil is not required to refund the contract amount.  Therefore, at least, the revenue should be recognized over five years or more.

2.      The revenue recognition basis under USGAAP (SOP91-1 and 97-2) should be carefully complied in this transaction. Because of its sensitive nature of the first consolidation with L&H, I recommend you should consult your SEC partner on this issue. <u>My preliminary interpretation is that this revenue recognition has some problems particularly in terms of "when-and-if" available conditions, delivery of products, and collectibility</u>.

As you know this issue should be cleared promptly to complete the consolidation, please discuss at Corporate level and advise me of the discussions.  If it meets the requirements of SOP's, we may conclude the September closing and consolidation package of Bumil.  (emphasis added).

 Thanks in advance for your immediate action.

241.     Notwithstanding the fact that the transactions referred to in Kwon's e-mail were false transactions, KPMG knowingly or recklessly permitted L&H to report such transactions as revenue in its financial results for the third quarter of 1999 and for the fiscal year ended December 31, 1999. Moreover, it is clear that KPMG was aware that the accounts receivable recorded in connection with this transaction had been factored  with recourse to a Korean bank.

242.     A "factor" is essentially a sale of an account receivable.  When the terms of the sale are "with recourse," the buyer of the receivable may proceed against the seller of the receivable if the third party debtor defaults.  The distinction is critical because if the sale of the receivable is "with recourse," then such sale is not final and may not be recorded as a sale under GAAP, as concluded by

the Audit Committee Investigation.

243.    Kwon's "preliminary interpretation" regarding the impropriety of recognizing the revenue was absolutely correct.  In connection with the Audit Committee Investigation, Andersen specifically determined that the transactions with VoiceTek and ICB must be reversed and noted specifically that "<u>KPMG was aware of transaction</u>" at the time it was originally recorded. (emphasis added).

### 3.    Actual Knowledge of LDC Fraud

244.    KPMG knew of serious issues surrounding the recognition of revenue in connection with the LDCs as early as July 1999.  As noted in the L&H Action complaint, in a "private & confidential" letter from Van Aerde to Bastiaens dated July 29, 1999, Van Aerde confirmed a meeting for September l, 1999 between Bastiaens, Van Aerde, McLamb and Boyer (the KPMG Boston Audit Partner) for the purpose of discussing the "Language Companies" and, in particular, Van Aerde:

> $    "wanted an update on the status, review of independence;"
>
> $    "required names of investors to arrange a separate meeting;"
>
> $    "wanted to review collectability of the LDC receivables."

245.    The July 29, 1999 letter also indicated that Van Aerde wanted an "update on the status of all issues raised in the Report to the Audit Committee," the most important among them being "revenue recognition."

246.    Foreshadowing things to come, as noted in the L&H Action complaint, KPMG noted in a "Prioritised list of issues to be addressed" attached to the July 29, 1999 letter that "specific proof of the collectability of individual outstanding receivables" was necessary "in order to avoid the reversal of revenue recognized in prior quarters."

96

247.    Also on the agenda were responses to numerous issues raised by McLamb about L&H's financial statements for the second quarter of 1999.  After each issue identified by McLamb, someone from KPMG listed a response to the question raised.  Instead of specifically addressing and answering each question raised by McLamb about the financial statements, however, the KPMG auditor often wrote only that the response given to McLamb was that the review is only a "high level review and enquiry" so further inquiry was unnecessary.  Thus, instead of properly investigating the issues raised by McLamb, KPMG abrogated its responsibility by failing to take the steps necessary to investigate the serious issues raised.

248.    KPMG did not resolve the issue of the LDCs to its satisfaction in connection with the second quarter 1999 review.  Indeed, the LDC issue remained unresolved into the Fall of 1999 and at least through June 30, 2000.  For example, as noted in the L&H Action complaint, KPMG remained concerned about the LDCs and the issue of whether the investors in the LDCs were parties related to L&H.  In fact, a "special review" of this issue was requested by the "KPMG USA Professional Practice" group in connection with the review performed by KPMG on L&H's third quarter 1999 financial statements.

249.    Although KPMG identified the LDCs as an important audit issue, as noted in the L&H Action complaint, Van Aerde, in a "confidential memorandum" to McLamb dated September 30, 1999 (the "LDC Memorandum"), stated that "certain scope limitations were imposed on [KPMG] when performing our review." (emphasis added).  Obviously suspicious of whether the LDCs were independent, Van Aerde wanted to meet in person with the LDC investors.  However, when he attempted to meet with the investors, Van Aerde was told:

> The shareholders and/or investors of the LDCs could not be met. Contacts could be
> made with the managing directors of subject LDCs.  We were informed that
> shareholders or investors may not wish to be contacted.  There are no legal grounds

to enforce such a contact (at this stage).

The LDC Memorandum indicates that KPMG:

> Noted that it did not receive 4 delivery reports confirming that product had been delivered to the LDC and confirming that the LDC was independent;

> Noted that the receivables due from the LDCs were significantly overdue by six to nine months;

> Noted that one of the LDCs refused to confirm in writing it was independent from L&H.

250.   The LDC Memorandum states:

> This memorandum has been prepared on the request of KPMG US Professional Practice.  They are responsible for the further distribution of it except for the audit confirmation letter replies (Annex IV) which should not be distributed outside the Firm with our prior written consent.

251.   "Scope limitation" is a technical auditing term.  The third standard of auditing field work requires that the auditor's opinion be based on sufficient competent evidential matter.  If adequate evidence is not collected, a so-called "scope limitation" occurs.  With respect to scope limitations, the authoritative auditing literature states:

> The auditor can determine that he is able to express and unqualified opinion only if his audit has been conducted in accordance with generally accepted auditing standards and if he has therefore been able to apply all the procedures he considers necessary in the circumstances.  Restrictions on the scope of his audit, whether imposed by the client or by circumstances, such as the timing of his work, the inability to obtain sufficient competent evidential matter, or an inadequacy in the accounting records, may require him to qualify his opinion or disclaim an opinion. (emphasis added).

Van Aerde knew that there were problems with the Company's transactions and operations, and, as a result, should not have accepted the scope limitation imposed by L&H management or should have caused KPMG to later issue a qualified audit opinion with regard to L&H's financial results. Nonetheless, and contrary to its actual knowledge, KPMG issued an unqualified audit opinion with

regard to L&H's 1999 consolidated financial statements.

252.    Further indicating that KPMG was concerned whether the LDCs were independent, KPMG informed the Audit Committee in its Report to the Audit Committee for the Fourth Quarter of 1999 that management had represented that such LDCs were independent.  Heightening KPMG's awareness was the fact that the SEC had commenced an informal inquiry into the Company's accounting practices in January 2000, and further, that the SEC had specifically requested documents from KPMG relevant to the probe in April 2000.

253.    As noted in the L&H Action complaint, in a series of e-mails dated between January 27 and January 29, 2000, KPMG further documented the serious doubts it had concerning the validity of revenue transactions recorded by L&H in connection with the LDCs.  For example, in an e-mail message from McLamb to Van Aerde, Huysman and Dammekens, dated January 29, 2000, McLamb wrote:

> It seems that a single payment of $25 million was paid to L&H Korea.  The payment was for amounts owed to LHS (the group in total) by a number of LDC's.  Who made this payment?  We need to see the wire transfer or check and determine what bank account it came from. Why did the payment for several LDC's come from a single bank account?  This makes it more important that we find out who the individual investors are for each of the LDC's  It is no longer acceptable for us to rely on an agent acting for a group of investors.  When we find out the company or person that the $25 million payment came from we need to get KPMG Korea to find out about the Company or person.  If the payment was made by a Company we need to know who the owners of the company are. This is very important.

McLamb correctly identified the source of the payment as "very important" but  ultimately failed to ascertain the source of the payment and permitted the improper revenue recognition.

254.    Most importantly, KPMG had complete knowledge of one of the most important facts which ultimately led to the uncovering of the fraud by The Wall Street Journal: the fact that many, if not all, of the LDCs had the exact same business addresses.  Recognizing that such facts indicated

strongly that the transactions were improper, Huysman, the KPMG audit manager wrote:

> 4.      Philip, some of the customers of L&H Singapore are Salfas, Duranzo, Baleston and Snegal Pte Ltd.  These customers  are all located on No. 5 Jalan Besar #5-01 Singapore 208785.  Are you aware of any operational activity at these premises?  Is R&D taking place or are people actually developing languages? For some other contracts signed between L&H Asia and Lupeni, Jelgava and Harrica Pte Ltd, the address is in always Shenton. Way 5; 12-05 UIC Building, Singapore 06888. The same question as above is asked.  For all of these contracts, is there to your knowledge a local general manager (the contracts have in each case been signed by Belgian people).

KPMG knew that the LDCs shared the same addresses and that the contracts were signed by Belgians, not Koreans. KPMG further recognized that these circumstances essentially precluded the possibility that such transactions were legitimate business transactions.  Notwithstanding this keen awareness, KPMG turned a blind eye to the fraud and permitted L&H to recognize false revenues from the LDCs transactions.

255.    As noted in the L&H Action complaint, the January 27, 2000 e-mail also reiterated KPMG U.S.'s extensive involvement in the issuance of opinions on L&H's financial results, stating: "I also send this mail to the US partner who is reviewing this engagement from a US Gaap prospective (Bob McLamb, in KPMG Houston).  You can send your answers to him at the same time."

256.    By June of 2000, however, KPMG had still failed to perform audit procedures sufficient to determine whether the LDCs were, in fact independent from L&H.  Even though KPMG's office in Korea had prepared audited financial statements for the Korean subsidiary and issued a separate audit report on such financials on March 29, 2000 and even though KPMG Belgium had already completed its field work on the audit of the consolidated financial statements on April 27, 2000, its audit was far from complete and KPMG knew of serious and significant issues that were outstanding with respect to the accuracy of L&H's financial statements.

257.    As noted in the L&H Action complaint, in an e-mail message from McLamb to Van

Aerde dated June 26, 2000, just days before L&H filed its Form 10-K for fiscal year 1999 which

included KPMG's unqualified audit opinion concerning L&H's 1999 financial results, McLamb

revealed that KPMG had not yet performed audit procedures designed to determine whether the

LDC's were, in fact, independent.

258.    Undoubtedly motivated by the pressure of the SEC investigation, in the  message,

McLamb instructed Van Aerde to take the following steps in a last minute  effort to verify both the

LDC revenue and questionable revenue from Korea:

> Several procedures that we should perform, in addition to contacting investors, are as
> follows:
>
> We should do a two year cash flow statement, it does not need to be perfect, but we
> should look at where their cash outflows have gone and the timing of the cash
> outflows.  We should compare the timing of the outflows to the timing of the
> payments made by the LDS/LDC's and Korean customers and determine the date of
> payment, bank account number, name of the bank and name of owner of bank
> account.  A list of information should be prepared.
>
> We should develop a list of all acquisitions with the following information:
>
> > Date of Acquisition
> >
> > Name of Company acquired
> >
> > Method of payment (stock, cash or something else)
> >
> > Initial payment amount, including date of payment
> >
> > Earnout requirements, including date earnout must be determined by
> >
> > Earnout payments, including date of payment
> >
> > Reason for paying earnout early, if applicable
> >
> > Description of how purchase price determined (Investment banker
> > study, etc.) if investment banker study, we should get a copy of
> > study specifically how was Bumil purchase price determined

101

Jo and Pol have also should [sic] some stock forward to GE capital, we should Compare the date of this transaction to the dates of the LDS/LDC's of Korean Customers payments

<u>I know this is a difficult time and please feel free to call me day or night</u>. (emphasis added).

259.    Although KPMG had already completed its audit of L&H and the Korean subsidiary, it is clear that it was still grappling with these major accounting issues dating back to L&H's 1998 financial results. Notwithstanding the uncertainty around the validity of the transactions and the widening of the SEC investigation, KPMG signed off on the 1999 financial statements and consented to the inclusion of its unqualified (yet false) audit report on the 1998 and 1999 financial statements in the 1999 Form 10-K.

## E.    THE RED FLAGS

260.    Although KPMG had actual knowledge of: (1) glaring irregularities in L&H's financial statements at the time it conducted its quarterly reviews and annual audits; and (2) inadequate (or nonexistent) systems of internal controls, there were seemingly countless red flags waving at KPMG, alerting it to the misstatements in the financial statements. If these red flags had been investigated by KPMG, as it was obligated to do under GAAS, it would not have issued unqualified audit opinions. Having done so in the face of these large "red flags," KPMG, in reckless disregard for the truth, certified L&H's consolidated financial statements as being in conformity with GAAP.

### 1.    History of Problems with Specific Contracts

261.    As early as 1997, KPMG noted revenue recognition as a significant audit issue at L&H and found that adjustments were required with respect to "reversal of revenue recognised in 1997 and additional doubtful debt reserves." Further, KPMG communicated certain issues to

management that included issues surrounding "timeliness of availability of information on revenue contracts@ and a need to "provide US GAAP training to key people in the subsidiaries." Thus, even before the Class Period began, KPMG was aware of prior instances of revenue reversal and the fact that the L&H accounting department was unable to prepare financial statements in accordance with GAAP.

262.    As noted in the L&H Action complaint, in connection with its audit of L&H's financial statements for the second quarter of fiscal year 1999, KPMG documented numerous problems with the Company's revenue recognition.  In a Report to the Audit Committee for the Second Quarter of 1999 dated August 18, 1999, KPMG indicated that the Audit Committee had not reviewed the press release announcing the second quarter financial results before it was issued to the investing public.  In connection with the second quarter review, KPMG documented <u>no less than nine</u> transactions for which revenue recognition was suspect.  These transactions were with Dialogic, Cegeka, Bumil, Group Sense, Microsoft, Samsung and the Learning Company.  KPMG also raised concerns regarding the recognition of revenue from distributors and from certain "guaranteed payments."

263.    KPMG knowingly or recklessly permitted the recognition of revenue with respect to the Cegeka contract.  Indeed, according to the complaint in the L&H Action, KPMG specifically reviewed the Cegeka contract, at the time of the second quarter audit, for which L&H had recognized $900,000 in revenue for the second quarter of 1999.  After reviewing the contract, KPMG proposed only that the Company record a marketing expense of $150,000 in connection with the transaction. However, the plain language of the contract required that the Dutch language version of VoiceXpress (accounting for $300,000 of the total revenue recognized) be delivered "when and if" it is available. The contract also required L&H to account for $300,000 of the total revenue recognized.  Because the

Dutch version was not available and the English and German versions had not been delivered, none of the revenue could be recognized under GAAP.  KPMG's action in permitting revenue recognition for a product which did not yet exist was, at best, reckless.

264.     Moreover, KPMG failed to determine whether the English and German versions had actually been shipped.  In fact, as noted in the L&H Action complaint, such versions had not been shipped and, as a result, the revenue was restated in connection with the Audit Committee investigation.  It is inconceivable that KPMG could have failed to ascertain the appropriate accounting treatment for a contract that, by its plain terms, and through simple verification, would have indicated revenue could not be recognized.  KPMG either actually knew of and participated in the fraud, or was entirely reckless and simply turned a blind eye to L&H's fraudulent practices.

## 2.     Knowledge Regarding Lack of Internal Controls

265.     KPMG knew that the Company did not have an adequate (if any) system of internal controls.  As noted in the L&H Action complaint, at a meeting between KPMG and the Audit Committee on May 4, 1998, KPMG reported that the internal audit and internal control functions of the Company needed to be strengthened. KPMG also informed the audit committee that the Company must improve its financial reporting for consolidated financial statements.

266.     However, although KPMG knew that the Company's internal controls were inadequate (or nonexistent), as noted in the L&H Action complaint, in a draft letter to the Board of Directors and the Audit Committee of L&H dated June 4, 1998 issued in connection with the audit of the Company's 1997 financial statements, KPMG stated:

> Our examination was based on substantive tests of financial information and, as you will appreciate, such an examination would not necessarily reveal all errors or irregularities that may exist. Consequently, substantial reliance must be placed on the system of internal controls as your principal safeguard against errors and irregularities. (emphasis added).

Thus, KPMG knowingly or recklessly placed reliance on a system of internal controls that it knew was inadequate (or nonexistent).

267.    Further, although KPMG informed the Company that an internal audit function was necessary at L&H, it knew that the Company failed to ever implement such a function. As the complaint in the L&H Action noted, the April 12, 1999 Minutes of a Telephone Meeting of the Board of Directors, L&H stated:

> Mr. Erwin Vandendriessche, Chairman of the Audit Committee, presents a report of the Audit Committee. Mr. Vandendriessche indicates that the Audit Committee will be receiving a Management Letter from KPMG, following which it will have a further meeting with representatives with KPMG and will make an additional report to the Board of Directors. Mr. Vandendriessche also discusses the previously reported intention of the Company to establish an internal audit function, as a result of the growing complexity of the Company's business. This had originally been targeted to be done by the end of February, but because of time commitments resulting from the SEC's review of the Company's US GAAP financial statements, this has been postponed. Now that the SEC's review has been completed, a new schedule will be set to implement this function.

268.    KPMG continued to report to the Board and the Audit Committee throughout the Class Period that the Company's internal controls were inadequate and that L&H had failed to implement the necessary internal control function. As noted in the L&H Action complaint, according to the Minutes of Regular Meeting of the Board of Directors, dated August 30, 1999:

> Mr. Vandendriessche reports on activities of the Audit Committee. He indicates that the Audit Committee has had two meetings within the last several weeks. He also reports that the Company's previous audit partner, Paul Behets, has left KPMG to join the Flanders Language Valley Foundation (SAIL Trust) and the Audit Committee has met with the new KPMG partner regarding the transition. Mr. Vandendriessche also reports that KPMG has done an extensive review at the end of the second quarter and has also issued recommendations to the Company regarding increases in the internal control staff. He also indicates that the Audit Committee is reviewing the need for an internal auditor, and will report back to the Board of Directors with this recommendation. He also indicates, as previously reported by Mr. Bastiaens, that the Audit Committee will have a meeting prior to each quarterly release. (emphasis added).

269.     Apart from the knowledge that L&H lacked internal controls, KPMG had actual knowledge that L&H's accounting department was run in a reckless manner.  As the complaint in the L&H Action noted, in an e-mail message from Dammekens to McLamb dated May 3, 2000, Dammekens stated:

> I DO WANT TO BRING UP ANOTHER POINT - AM I CAPABLE OR [SIC] REMAINING CFO IN AN ORGNISATION LIKE THIS? PERSONALLY I DO NOT THINK SO.
>
> I AM CONVINCED THAT IT IS TIME TO BRING IN AN EXPERIENCED GUY, THAT CAN BRING STABILITY AND DISCIPLINE AND KNOWS HOW TO RUN THE FINANCES OF A BIG COMPANY (BECAUSE HE GREW UP IN ONE AND HAS DONE IT BEFORE).
>
> THINGS ARE GETTING OVER MY HEAD в I AM STAFFING UP MY PEOPLE, BUT WITH ALL THE DEALS/ ACQUISITIONS THAT GO ON, I DO NOT HAVE TIME ENOUGH TO EVEN THINK ABOUT INTEGRATION OR ORGANISATION.  (caps in original).

Thus, KPMG was well aware that there was no "discipline" in the accounting department at L&H and that the individual in charge of preparing the Company's financial results was in "over [his] head."  It was, at a minimum, reckless for KPMG to issue unqualified audit opinions on the financial statements of a publicly traded company reporting hundreds of millions of dollars of revenues prepared by an individual for which the accounting was admittedly "over [his] head."

270.     During its quarterly reviews, KPMG became aware of additional internal control problems at L&H.  Specifically, KPMG knew the following during its mid-year review for fiscal 2000:

a.     The inter-company balances for accounts receivable and accounts payable would not reconcile;

b.     The lack of a cost accounting system at L&H Mendez Portugal made the determination of work-in-process and proper cutoff for each period impossible;

    c.    The belief by KPMG's Dusseldorf office that the work-in-process account was overstated in relation to L&H Deutschland Group, but no action taken to verify that belief; and

    d.    The belief by KPMG that the investment by L&H Mendez through the acquisition of CL Servicios Linquisticos was overstated by some $950,000, yet no corrective action was taken by KPMG to remedy the misstatement.

271.    KPMG also knew or recklessly disregarded that the data produced by L&H's computer systems was unreliable.  For example, KPMG was aware of the following:

    a.    The amounts stated for accounts receivable and accounts payable from an intra-company standpoint were not reconcilable based upon the information generated by the accounting systems.  Yet, it is noted in the consolidated financial statements for fiscal years end 1998 and 1999 that all inter-company transactions are removed for reporting purposes.

    b.    The non-existence of a cost accounting system in the German subsidiary thereby allowing for the proper allocation of funds between actual research and development costs to be expenses and amounts that are properly capitalized once a product is technologically feasible.

272.    As the end of the Class Period drew near, as noted in the L&H Action complaint, McLamb continued to document that the Company's controls were not sufficient. In a memorandum dated May 8, 2000 to Van Aerde, McLamb identified certain problems for inclusion in a "Management Letter" to be issued to L&H. Management letters are typically prepared by auditors at the conclusion of their consideration of a Company's internal control structure and are used to identify management weaknesses in the accounting system.  The items stated by McLamb were:

    1.    KPMG notes the client needs to create and follow formal written procedures for recording accounts receivable and adequately train personnel to record and relieve receivable balances from the general ledger.

    2.    KPMG noted the client has not established policy and procedures relating to establishing and relieving accruals for contingencies.  The client needs to create and follow formal written procedures for establishing reserves for contingencies.

   3.     KPMG noted the client has not established policies and procedures relating to the valuation and tracking of fixed assets.  The client needs to create and follow formal written procedures for valuing and tracking fixed assets.

273.    Consistent with KPMG's findings during the Class Period regarding the lack of internal controls, after the end of the Class Period, as noted in the L&H Action complaint, the Minutes of Special Meeting of the Board of Directors, dated November 7, 2000, state:

Mr. Vandendriessche indicates that the preliminary conclusions of the Audit Committee are that the internal controls of the Company have been inadequate; that the issues and problems discovered to date in connection with the Audit Committee investigation are such that it appears likely that the financial statements for 1998, 1999 and the first two quarters or [sic] 2000 cannot be relied upon; and that there is not yet any estimate as to the range of problems and possible restatement.  (emphasis added).

Terming the findings regarding inadequate internal controls as "preliminary" was pure fiction. KPMG and the Audit Committee <u>knew</u> throughout the Class Period that the Company did not have a system of internal controls in place and that the financial statements issued by the Company were consistently prepared with flawed or false information derived from such inherently unreliable systems.

### 3.     <u>Knowledge of Serial Violations of Company Policy</u>

274.    Some of the problems identified by KPMG with respect to L&H's accounting practices were particularly alarming in that they constituted known violations of the Company's own stated accounting policies.

275.    For example, as noted in the L&H Action complaint, Kwon, the partner from KPMG's Korea office who discovered and documented known instances of improper revenue recognition, also documented yet another known instance of the Company's intentional violation of its own accounting policy.  With respect to his review of license contracts for the second quarter, Kwon stated:

> Some of the Company's license agreements are written in Korean only without English version, and accordingly, they do not contain L&H non-refundable clause on the agreements.  Out of US $2.6 million of such contracts, US $1.6 million is recognized as revenue in Q2 and US $1 million is deferred.  <u>Such treatment appears to be a against the LHSP revenue recognition policy. Per discussion with H.J. Kang, the Company's financial controller, it is getting difficult to include the non-refundable policy clause due to the reluctance by customers</u>.  (emphasis added).

Incredibly, KPMG failed to take appropriate steps to address these known and intentional GAAP violations and violations of L&H's own internal policies.  Indeed, as noted in the L&H Action complaint, Kwon was essentially told that, because it is difficult to persuade customers to agree that the payments are non-refundable, the Company simply omits those contractual terms but nonetheless included the revenue in the current quarter's financial results.  This blatant violation of Company accounting policy should have led to scrutiny by KPMG.  Instead, KPMG turned a blind eye to the policy violations and continued to approve the patently false financial results.

276.    Moreover, in a USA Highlights and Completion Memorandum dated October 20, 1999 prepared by Boyer, the partner from KPMG's Boston office responsible for audits of L&H's U.S. operations, Boyer noted that the Company knowingly failed to adhere to its own stated accounting policies.  In particular, Boyer found:

> Upon its review of the client's A/R Aging Report as of 9/30/98, KPMG identified several customer accounts greater than $50,000 that were aged over 90 days.  One A/R balance > 90 days noted, Alpha Software Corporation for $1,648,742, has been offset at 9/30/98 by liability balances.  See Section III: Other Audit Issues for specific identification and review.  Remaining customer A/R > 90 days amounts which are greater than $50,000 are listed below as specifically identified problematic A/R.  <u>KPMG notes that the Company is not in conjunction with their corporate policy of reserving all receivables over 90 days</u>. [Chart omitted].  KPMG discussed the circumstances surrounding the above individual customer A/R balances with David Berglund, Controller.  KPMG noted the client's expectation, and relevant authoritative revenue recognition accounting treatment, if applicable.  We have discussed revenue recognition with Tom Doherty, CFO, for all the following items. <u>The delays in payment appear to be based in part on delays in L&H providing implementation services which calls into question the appropriateness of the Company's revenue recognition</u>.  (emphasis added).

277.     At the same time, as noted in the L&H Action complaint, Boyer was aware that one of the Company's U.S. subsidiaries, Globalink, was recording entries in its accounting records at the direction of L&H management without supporting evidence for such entries.   A Globalink Q3 Highlights Memo from David Milligan in KPMG's Northern Virginia office to Boyer dated October 19, 1998, stated:

> We would like to point out that local management has stated to us that the basis for most of the accounting entries recorded by the Company were at the direction of L&H management.  <u>As a result, support for such entries is very limited</u>.  (emphasis added).

As noted in the L&H Action complaint, Milligan further documented that Globalink did not comply with L&H policy on receivables greater than 90 days old, stating:

> Payment terms for the Company's sales are generally 60 to 90 days, and the Company does not get paid until the distributor gets paid.  As of 9/28/98, the majority of the Companys receivables are substantially greater than 90 days.  <u>As a result the reserve recorded on the sales in the two day stub period does not appear consistent with the treatment of the accounts receivable on the books at 9/28/98 (i.e., all A/R greater than 90 days old is reserved)</u>.  Based on the Company's collection history, it appears fairly probable that a majority of the sales currently recorded will not be collected within 90 days.  Therefore, we question whether a larger reserve would be necessary on the stub period sales to be consistent with the L&H reserve policy applied to the A/R. (emphasis added).

As a result of Milligan's inability to review the accounting entries, he concluded:

> From our limited review of the financial statements of Globalink, Inc. and taking into account the matters reported above, ***at this time we are unable to state that*** we are not aware of any matters which would cause us to believe that the financial statements as from September 30, 1998 do not represent the financial position of Globalink, Inc. and the results of operations for the period then ended, or are in non compliance with US GAAP in all material respects.  (emphasis in original).

### 4.     KPMG's Escalation of Scope of Procedures Performed

278.     Although KPMG generally purported to only perform "review" procedures on L&H's quarterly financial information, as noted in the L&H Action complaint, it decided to perform

heightened audit procedures on L&H's financial statements for the second quarter of fiscal year 1999.

The occurrence of the audit procedures is also evident from a document entitled "Group Audit Instructions" which stated:

> The purpose of this memorandum is to:
>
> $       outline the planning and reporting arrangements to KPMG Ghent of the different KPMG offices involved in the audits of Lernout & Hauspie Speech Products and its subsidiaries, (hereafter referred to as "LHS") for the period ending June 30, 1999 (half year).

In a discussion memorandum attached as "Annex 1" to an agenda for a meeting held on July 23, 1999, KPMG wrote:

> The following memorandum summarises the US GAAP issues that have resulted from the audit procedures performed on Lernout & Hauspie Speech Products leper Branch Q2 Financial Statements.  The objective is to discuss the issues during our formal closing meeting.

In a summary of Business and Audit Issues attached as Annex 11 to the meeting agenda, KPMG noted the following issues:

**L&H USA group**

***Revenue recognition for distributors (L&H Applications)***

$       Accounts receivable balances outstanding from the largest distributors have increased significantly during the six months ended June 1999

$       Cash collected from the largest distributors represents on average 25% of sales for the six month period, due to significant credits issued, and also slow collections

$       We understand that payment terms for distributors can be up to 120 days

$       However, at 30 June 1999 the outstanding receivables appears to represent almost all sales for the six month period, suggesting that payments are taking longer than the agreed upon term

$       KPMG would like to understand if there is a concern with collectability with distributors, or if there is a concern with revenue recognition.

The summary further revealed that KPMG discovered an instance where L&H management had committed accounting fraud. In particular, the Summary states:

**Obsolete Inventory (L&H Applications)**

$    **During the 1998 year end audit, KPMG Boston proposed an adjustment to provide for obsolete inventory of USD 444,000. Subsequently, rather than making this adjustment, management reclassified the amount to "accounts receivable other"**

$    **According to management, an arrangement has been reached with Iris to exchange this inventory for the most current version**

$    **However, in the absence of supporting documentation for this agreement, KPMG Boston propose that the inventory should be written off.** (bold in original)

279.    It is inconceivable how KPMG was not put on a heightened level of professional skepticism upon discovering that its client had completely disregarded its mandate and reclassified the obsolete inventory to another asset account in the hopes of avoiding the write off which would have negatively impacted earnings for the quarter.   This is just another example of KPMG discovering accounting irregularities at L&H and turning a blind eye to the accounting misconduct.

280.    Each of these issues, according to the L&H Action complaint, were communicated to Bastiaens and Dammekens by Van Aerde, McLamb and Boyer.  In a "Private & Confidential" letter dated July 26, 1999 written by Van Aerde to Bastiaens, KPMG stated:

Please find below a summary of the major findings of our review of Lernout & Hauspie for the second quarter review.

These findings are the outcome of our meeting with you and your colleagues on Friday 23 June 1999, and supplemented by further input received from our colleagues, Mr. Bob McLamb and Mr. James Boyer during a conference call in the presence of Mr. Carl Dammekens.

The letter also stated:

> In all instances, we would appreciate the adjustments further information requested, be resolved prior to the press release for the second quarter (if possible). If it is apparent that the issues described in this letter and its appendices are leading to a mismatch between recognizing revenues and their associated costs in the correct time period, then consideration should be given to the significant adjustments requested. If you do not agree with our point of view, we would like to obtain from you a written representation as to why the adjustments in appendix one should not be booked. (emphasis added).

281. By stating that KPMG wanted the issues resolved prior to the issuance of the press release "if possible," KPMG further abrogated its responsibilities. Indeed, to the extent L&H was determined to issue the financial results without addressing issues raised by KPMG, it should have considered such actions by L&H management strong indications of problems with management's integrity.

282. Additionally, as noted in the L&H Action complaint, KPMG wrote in the July 26, 1999 letter:

> In view of the high outstanding accounts receivables balances for distributors in the US, and the lack of documented history about collectability, there is uncertainty over the valuation of these receivables. Further doubts are raised by the fact that historically the provision for returns has been set at 14% of sales, whereas in recent months the returns have been in excess of this level. Therefore, it is imperative that measures are taken to demonstrate that this revenue is collectable, and was believed to be so, at the time of product shipment.

283. Thus, KPMG consistently knew about the negative quality of the Company's accounts receivables which necessarily should have cast substantial doubt on the validity of the revenues booked by L&H. Not withstanding the actual knowledge of serious doubts concerning the legitimacy of L&H revenue recognition practices, KPMG continually signed off on the Company's quarterly financial statements.

284. By the end of the third quarter of fiscal year 1999, L&H had still refused to write off the $444,000 inventory identified by KPMG at year-end 1998 as being obsolete. As noted in the

L&H Action complaint, in a letter from Van Aerde to Dammekens dated November 17, 1999 (copied to McLamb) which related to "Important decisions and conclusions with respect to Lernout & Hauspie Speech Products ('LHS') review at September 30, 1999," Van Aerde indicated that the $444,000 of inventory was still carried on L&H's books despite numerous requests that it be written off.   Van Aerde also listed the revenue issues found by Kwon as matters requiring additional attention.

285.     In a memorandum dated October 20, 1999, Boyer documented issues regarding the age of certain accounts receivable.  In particular, Boyer wrote:

> As of September 30, 1999, non distributor accounts receivable is approximately $13 million, of which $5.9 is either specifically or generally reserved, or deferred, leaving $7.1 million unreserved. The aging at September 30, 1999 shows that half of this balance is greater than 90 days past due.  <u>See Section III below for discussion of specific contracts which remain unpaid as of September 30, 1999, well beyond the companies' policy of 90 days for the purposes of revenue recognition</u>.  (emphasis added).

KPMG concluded that based on the slow collections, L&H  "should be on a sell through revenue recognition model."  However, KPMG never actually required that L&H convert to such a model.

Moreover, KPMG discovered that:

> During review of the sales registers for the current quarter KPMG noted several large items over $100,000 which in total represented $1 million in revenue recognized during the third quarter.  <u>Upon review of these items we noted that many of them were actually quotes sent out by L&H sales personnel which had been returned signed by the customer</u>.  Each quote consisted of several elements separately stated with corresponding prices, including software, hardware, installation, interconnection, and maintenance.  It is the client's policy to recognize revenues for these contracts when they ship hardware and software, and to defer service revenues until performed.  (emphasis added).

KPMG knew that the sales quotes were neither contracts as required under L&H's revenue recognition policy nor "persuasive evidence" that an agreement existed, as required under GAAP.  Thus, KPMG knew of clear violations of L&H accounting policy with respect to revenue yet utterly

failed to require reversal of the revenue and still issued its unqualified audit opinions concerning L&H's financial statements.

286.     As noted in the L&H Action complaint, in a letter from Van Aerde to Dammekens dated November 17, 1999 reporting "Important decisions and conclusions with respect to Lernout & Hauspie Speech Products ('LHS') review at September 30, 1999," KPMG provided a list of "Matters to be cleared before KPMG can sign the audit opinion on the December 31, 1999 financial statements."  According to this list:

> "all outstanding receivables and the revenues of the fourth quarter 1999 must be paid in full before year end."

> "The Korean License and distribution agreements must be fully paid ($11 million) before year end."

> "Revenue contracts must exist at the quarter end, they must be signed and also dated together with the signature."

The information contained in the November 17, 1999 letter was communicated to Erwin Vandendriessche, Chairman of the Audit Committee.

## 5.     Knowledge of Non-Functioning Audit Committee

287.     Further alerting KPMG to the accounting fraud was its knowledge that the Audit Committee was excessively lax with respect to the issuance of the Company's quarterly earnings reports and that it was not carrying out its assigned responsibilities.  According to the L&H Action complaint, for example, the Audit Committee met on August 10, 1999, thirteen days <u>after</u> the press release announcing second quarter 1999 financial results had been issued.  In its Report to the Audit Committee for the Second Quarter of 1999, KPMG indicated that "the Audit Committee has requested to be informed as to the results of the quarter <u>before</u> issuing the press release." (emphasis added).

288.     KPMG continually noted issues concerning the cash collection from the LDCs and revenues recognized from Korea (and elsewhere) to the Audit Committee.  For example, in a "Private and Confidential" letter to Erwin Vandendriessche, Chairman of the Audit Committee, dated November 17, 1999, KPMG stated with respect to these issues:

> All issues have been communicated to the management of the Company. We expressed our concern that the effect of certain described issues might have an adverse effect on the profits of the quarters if they are not resolved.  Please be advised that KPMG does not consider this limited review to be completed until the above mentioned issues have been fully resolved. (emphasis added).

Although KPMG did not consider the review complete, the Company apparently did.  "In this regard", L&H issued the press release announcing the 1999 third quarter financial results on October 27, 1999, even though KPMG had not yet resolved the serious issues found in the third quarter financial statements that it identified for the Audit Committee.  L&H's issuance of the financial statements before KPMG's issues were resolved was further evidence to KPMG concerning the integrity of L&H management and the falsity of L&H's financial statements.

289.     Toward the end of 1999, according to the L&H Action complaint, Dammekens requested that KPMG issue a management letter to the Company in connection with KPMG's audit of the 1998 financial statements.  In a Memorandum dated December 6, 1999 regarding "Your request for the December 31, 1998 Lernout & Hauspie Speech Products nv and subsidiaries management letter" Stefan Huysman stated:

> Dear Carl,
>
> I refer to our phone conversation of earlier today. KPMG has not issued a formal group management letter which is separate from the Audit Completion Memorandum.
>
> As explained to you, the Audit Completion Memorandum is a KPMG internal reporting document which is, in principal, not distributed to outside parties.

However, in order to accommodate your request, we can summarize the main issues from our audit on the December 31, 1998 financial statements to be the following:

$  Revenue recognition and timely availability of revenue contracts;

$ Cash collection of some receivables;

$ Timely availability of financial statements of some equity investees;

Thus, the internal control and audit issues identified in 1999, existed during 1998 as well.

## F.      ADDITIONAL ALLEGATIONS OF SCIENTER

### 1.      Massive Restatement

290.      The magnitude of the overstatement of L&H's financial statements further establishes the knowing or reckless conduct on the part of KPMG.  The following chart depicts the striking difference between revenues as originally reported and as actually determined in connection with the Audit Committee Investigation:

|  | (000s) Reported | (000s) Restated | (000s) $ Difference | % Difference |
|---|---|---|---|---|
| **1998** |  |  |  |  |
| **1Q** | $35,065 | $33,065 | $(2000) | 6% |
| **2Q** | 44,991 | 44,191 | (800) | 2% |
| **3Q** | 54,860 | 44,260 | (10,600) | 24% |
| **4Q** | 76,676 | 62,176 | (14,500) | 23% |
| **YTD** | 211,592 | 183,692 | (27,900) | 15% |
| **1999** |  |  |  |  |
|  | $70,708 | $46,008 |  | 54% |
| **1Q** | 76,015 | 32,315 | $(24,700) | 135% |
| **2Q** | 87,473 | 46,773 | (43,700) | 87% |
| **3Q** | 110,041 | 44,441 | (40,700) | 148% |

| | | | |
|---|---|---|---|
| **4Q**<br>**YTD** | 344,237 | 169,537 | (65,600)<br>(174,700) | 103% |
| **2000** | | | | |
| **1Q**<br>**2Q**<br>**YTD** | $110,694<br>154,906<br>265,600 | $52,294<br>94,206<br>146,500 | $(58,400)<br>(60,700)<br>(119,100) | 112%<br>64%<br>81% |
| **TOTAL** | $821,429 | $499,729 | ($321,700) | 64% |

The chart above is based, in part, on an analysis prepared in connection with the Audit Committee Investigation which was adjusted to account for the fact that the Company revealed that all revenues recorded by the Korean subsidiary were reversed.

291.    In its Form 8-K Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, dated April 27, 2001 and filed with the SEC on May 3, 2001, the Company revealed:

> [T]he Company has prepared restated financial statements for its revenues for 1998, 1999 and the first two quarters of 2000.  As a result of this exercise, <u>of $535 million of revenues reported by the Company</u> (excluding the Company's Mendez translation unit, the acquired Dragon Systems Inc. and subsidiaries business, the US transcription business and certain other less significant subsidiaries) during this period, <u>$373 million have been reversed</u>. A portion of the revenue reversed as a result of the restatement will be recognized in later periods.  <u>The revenues reversed included all revenues recorded by Company's Korean subsidiary during this period, since a substantial portion of such revenues could not be substantiated.</u>

(Emphasis added).

Although the quantification of the misstatement above is not exact and can only be determined through appropriate discovery, the Company has admitted that more than 65% of Class Period

revenues were false and or improperly recorded.

## 2.     Independence Violations

### a.     Receipt of Substantial Non-Audit Fees

292.     As alleged above, during the Class Period, KPMG served in a "dual role" to L&H; one as auditor and another as a consultant on many different business issues.  As a result of its dual role, it stood to earn far more than simply audit fees from L&H. Indeed, audit fees were just a fraction of the compensation it received from L&H.

293.     According to the L&H Proxy Statement for the Annual Meeting and the Extraordinary Meeting of Stockholders to be Held on May 21, 1999, filed with the SEC on Form 6-K on May 24, 1999 (the "1999 Proxy"), the Board of Directors recommended that KPMG Belgium be appointed the Company's "independent statutory auditor" for the prior three year period and noted that KPMG Belgium's fees for such audits "will amount to BEF 1,500,000 (approximately US$41,600)."

294.     The 1999 Proxy, however, did not disclose the extent to which KPMG was retained by L&H to perform non-audit services.  As noted in the L&H Action complaint, in a letter written to the Board of Directors by Hauspie dated April 25, 2001, he stated "[t]he services of KPMG were systematically hired both nationally and internationally, for auditing the accounts and to consult on a wide range of topics, covering most aspects of LHS. (emphasis added).

295.     For example, KPMG was hired by L&H to perform due diligence for the Company's acquisitions of Bumil, Dictaphone and Dragon Systems, among others.  KPMG was also retained to perform valuations for many of the companies acquired by L&H during the Class Period.  In particular, KPMG performed substantial valuation services for Dictation Consortium, Accent and Kurzweil.

296.     In his April 25 letter, Hauspie shed considerable light on the enormous fees paid to

KPMG, stating:

> The scope of this collaboration can be illustrated among others by the size of the fees
> charged to LHS by the KPMG organization. As an example, I would like to mention
> that KPMG Bedrijfsrevisoren (Belgium) alone billed LHS an amount of no less than
> BEF 273,445,389.

Under prevailing exchange rates in August of 2001, 273 million Belgian francs are equal to

approximately US $6 million.  Moreover, Lernout revealed that "[o]ther KPMG subsidiaries in

various locations in the world billed LHS for fees amounting to more than BEF 130,000,000." The

fees paid to other KPMG offices amounted to approximately US$3 million under prevailing exchange

rates.  Thus, although Behets had stated that the audit fees for L&H amounted only to $40,000,

KPMG received approximately $9 million in fees as a result of its relationship with L&H fees which

entirely dwarfed its audit fees and necessarily created a substantial motivation to participate in or

otherwise perpetuate the fraud.

### b.     Former KPMG Auditors Given Lucrative Positions

297.     Apart from the massive fees paid to KPMG for non-audit services, certain of the

KPMG employees responsible for the L&H audit benefited directly from its relationship with the

Company in the form of lucrative employment relationships with entities related to L&H.

298.     Indeed, one of the KPMG Belgium auditors responsible for the L&H audits, Chantal

Mestdagh, left KPMG Belgium to become the Chief Financial Officer of Lernout & Hauspie

Investment Co. ("LHIC"), a company formed by Hauspie in which L&H owned a controlling interest,

and which was an entity through which L&H secretly funded its supposedly unaffiliated customers.

299.     Moreover, Behets, the audit partner with chief responsibility for L&H audits from

1991 until July 1999, left KPMG Belgium to become the Chief Executive Officer of S.A.I.L. Trust, a

foundation created by Lernout and Hauspie. S.A.I.L. Trust holds a one-third interest in FLV Management, N.V. ("FLV Management"), and has the right to appoint five of its directors. FLV Management is the manager of the FLV Fund. Behets held that position throughout KPMG Belgium's audit of L&H's 1999 financial statements. In addition, KPMG Belgium was the FLV Fund's independent auditor.

## G.  <u>VIOLATIONS OF GAAS</u>

300.   GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), defines the conduct of auditors in performing and reporting on audit engagements. Statements on Auditing Standards ("SAS") are endorsed by the AICPA as the authoritative promulgation of GAAS.

301.   KPMG consistently represented that it performed its audits in a manner consistent with GAAS. Such representations were materially false and misleading, and without a reasonable basis.

302.   KPMG violated GAAS by, <u>inter alia</u>, failing to expand or otherwise properly conduct its audits with respect to revenue recognition, accounts receivable, cash and related-party transactions.

303.   Indeed, as alleged herein, KPMG's so-called "audits" amounted to no audit at all, in that they violated the most fundamental requirement of GAAS which requires an auditor to obtain personal knowledge of sufficient, competent evidence supporting the assertions in financial statements permitting reasonable assurance that such financial statements are free from material misstatements:

(a)   "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."  AU § 326.02.

121

(b)     "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly."  AU § 326.21.

(c)     Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU § 333.02.

(d)     "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted."  AU § 326.16.

304.     KPMG knowingly or recklessly failed to qualify, modify or abstain from issuing its materially false and misleading audit opinions on L&H's fiscal 1998 and 1999 financial statements when it knew or recklessly turned a blind eye to the numerous adverse facts and "red flags" set forth below.  KPMG violated at least the following provisions of GAAS:

(a)     General Standard No. 3, which standard requires that due professional care is to be exercised in the performance of the examination and in the preparation of the report.

As detailed above, KPMG failed to exercise due professional care in that it participated in the fraud by permitting L&H to backdate contracts and otherwise permitted the revenue to be recognized in clear violation of GAAP.

(b)     Standard Of Field Work No. 2, which standard requires that a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

As detailed above, KPMG knew that L&H's internal controls were inadequate or nonexistent but improperly placed reliance on such controls and otherwise failed to disclose the glaring internal control weaknesses.

(c)     Standard Of Field Work No. 3, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

As detailed above, KPMG consistently relied principally on management's representation for critical audit evidence, failed to ascertain whether product had actually been delivered to customers and improperly ceded to L&H's imposition of scope limitations on its procedures.  KPMG utterly failed to audit L&H's cash balances which were materially overstated by as much as $100 million during the Class Period.  In particular, KPMG failed to perform procedures sufficient to determine whether disclosures were necessary for restrictions on cash as required by Accounting Research Bulletin No. 43 and FASB No. 5.

(d)     Standard Of Reporting No. 3, which standard requires that informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

As detailed above, KPMG failed to disclose that the Company consistently recognized material amounts of revenue in violation of GAAP and failed to disclose that material amounts of revenue were derived from transactions with parties related to L&H.

(e)     Standard of Reporting No. 1 which standard requires the audit report to state whether the financial statements are presented in accordance with GAAP.

As detailed above, as a result of the Audit Committee Investigation, KPMG's audit reports were admittedly false and misleading in that they represented that L&H's 1998 and 1999 financial statements were presented in accordance with GAAP when they were not for the reasons stated herein.  Indeed, as announced by L&H, more than 65% of all Class Period revenues have been reversed and 100% of all Korean revenues have been reversed.

(f)     Standard of Reporting No. 4, which standard requires that, when an opinion on the financial statements taken as a whole cannot be expressed, the reasons therefore must be stated.

As detailed above, in light of KPMG's actual knowledge that L&H's financial statements included material amounts of false revenues and the scope limitations imposed on it by L&H, KPMG should have stated that no opinion could be issued by it on L&H's fiscal 1998 and 1999 financial statements or issued an adverse opinion stating that those financial statements were not fairly presented.

(g)     SAS No. 19, which standard requires that an auditor not substitute client representations for audit procedures necessary to form a reasonable basis as

to the opinion being given on financial statements.

(h)     General Standard No. 2 by failing to remain independent in fact and in appearance.  The absence of independence prevented KPMG from possessing the necessary professional skepticism regarding the unfounded representations of L&H's management. KPMG's independence violations are evident from: (1) KPMG's audits of amounts in the financial statements prepared by it; (2) its receipt of substantial non-audit fees for consulting and other services; and (3) the acceptance by certain KPMG auditors of employment offers at entities related to L&H.

As detailed above, KPMG consistently relied on representations of L&H management instead of corroborating all significant representations.

305.    KPMG also violated SAS No. 82, *Consideration of Fraud in a Financial Statement Audit*, which required KPMG to "specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed."  AU § 316. KPMG failed to consider obvious risk factors indicating the existence of fraud, including:

(a)     "an excessive interest by management in maintaining or increasing the entity's stock price or earnings trends through the use of unusually aggressive accounting practices."  AU § 316.17.

KPMG Belgium was involved in L&H's 1999 response to an SEC investigation of L&H's methods of accounting for acquisitions, and knew that the SEC had determined that L&H's methods were aggressive and improper.

(b)      "significant, unusual or highly complex transactions, especially those close to year end, that pose difficult 'substance over form' questions." AU § 316.17.

Nearly every contract discussed in the Audit Committee Report is dated within three days of the end of a fiscal quarter, and ten agreements are dated within the last three days of December 1998 or December 1999.

(c)      "unusually rapid growth or profitability, especially compared with that of other companies in the same industry."  AU § 316.17, KPMG Belgium knew from L&H's financial statements that L&H claimed revenue increases of 112% in 1998 and 63% in 1999.  The following chart depicts the explosive growth purportedly experienced by L&H during the Class Period:

| *Revenues by destination: ($000's)* | *1997* | *1998* | *1999* | *2000 Q1* | *2000 Q2* |
|---|---|---|---|---|---|
| **US** | *26,524* | *79,695* | *79,286* | *19,939* | *48,909* |
| **Belgium** | *40,375* | *58,930* | *34,343* | *9,178* | *8,562* |
| **Europe, other** | *25,709* | *63,315* | *79,079* | *19,748* | *27,342* |
| **Singapore** | *0* | *29* | *80,297* | *501* | *890* |
| **Korea** | *1,645* | *245* | *62,874* | *58,932* | *68,059* |
| **Far East, other** | *5,118* | *9,378* | *8,358* | *2,396* | *1,144* |
| **Total Revenue** | *$99,371* | *$211,592* | *$344,237* | *$110,694* | *$154,906* |

306.     GAAS, as set forth in AICPA Professional Standards Volume 1, U.S. Auditing Standards - June 1, 1997, ("AU"), in section AU 411, describes "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report."  Section AU 411 states in pertinent part:

> The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted

accounting principles should be based on his judgement as to whether (a) the accounting principles selected and applied have general acceptance; (b) the accounting principles are appropriate in the circumstances; (c) the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation . . . ; (d) the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed . . . ; and (e) the financial statements reflect the underlying events and transactions in a manner that presents the financial position, results of operations, and cash flows within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

307.     Had KPMG undertaken the performance of those audit procedures required by GAAS, it would have known that the fiscal 1998 and 1999 financial statements were materially false and misleading because (1) the financial statements were not presented in accordance with GAAP; (2) the accounting principles applied did not have general acceptance; (3) the accounting principles were not appropriate under the circumstances; and (4) the financial statements did not accurately reflect the underlying events and transactions within any acceptable limit.

308.     Throughout the Class Period, KPMG knew that the Company was in violation of SEC rules which (i) required L&H to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that its transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, and (ii) required it to make and keep books, records, and accounts which accurately and fairly reflected all of the transactions of the Company in reasonable detail..

309.     Given the fact that KPMG audited the Company's financial statements for approximately ten years and had a thorough knowledge of the Company's financial history, accounting practices, internal controls, and business operations, KPMG either failed to:

> a.     identify areas that needed special consideration or identified such areas and audited them in a manner that was so deficient it amounted to no audit at all;

b.    assess the conditions under which accounting data was produced, processed, reviewed, and accumulated within the organization;

c.    evaluate the reasonableness of management's representations and the Company's estimates or evaluated them in a manner which was so deficient that it amounted to no evaluation at all; or

d.    judge the appropriateness of the accounting principles applied and the adequacy of disclosures in the Company's financial statements.  In this regard, KPMG failed to "recognize that management's selection and application of significant accounting policies, particularly those related to revenue recognition, . . . may be misused."  (AU 316A.19)

310.    GAAS (AU 325.21) states that reportable conditions involve matters that relate to:

significant deficiencies in design or operation of the internal control structure that could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

Reportable conditions must be reported by the auditor to the audit committee or to individuals with a level of authority and responsibility within a company equivalent to an audit committee, such as the board of directors.

311.    Further, GAAS lists the following deficiencies, certain of which were present at the Company during fiscal years 1996 through 1999, among "examples of matters that may be reportable conditions":

<u>Deficiencies In Internal Structure Design</u>

$    Inadequate overall internal control structure design.

KPMG consistently documented that L&H had inadequate internal controls and needed an internal audit function. KPMG was aware throughout the Class Period that L&H did not improve controls or put an internal audit function in place.

$    Absence of appropriate reviews and approvals of transactions, accounting entries, or systems output.

KPMG was aware that the Audit Committee of L&H's Board of Directors was not fulfilling its duties in that the quarterly financial statements were issued without the

Audit Committee's approval and that L&H management otherwise issued financial results without first resolving the accounting issues relating to quarterly financial reports raised by KPMG.

$    Inadequate procedures for appropriately assessing and applying accounting principles.

KPMG was consistently aware that L&H personnel were not able to record transactions in accordance with GAAP or were otherwise unqualified to execute the duties required of the accounting department of a publicly traded company.

Failures In The Operation Of Internal Control

$    Evidence of intentional override of the internal control structure by those in authority to the detriment of the overall control objectives of the system.

$    Evidence of willful wrongdoing by employees or management.

$    Evidence of manipulation, falsification, or alteration of accounting records or supporting documents.

$    Evidence of intentional misapplication of accounting principles.

$    Evidence of misrepresentation by client personnel to the auditor.

KPMG was aware that L&H falsely classified obsolete inventory as accounts receivable to avoid writing off such inventory as required by KPMG. KPMG was aware of, and participated in, the backdating of contracts that created the appearance that material amounts of revenue recognition were appropriate when such recognition clearly violated GAAP. KPMG was also aware of many instances where L&H intentionally violated its own stated accounting policies.

$    Evidence that employees or management lack the qualifications and training to fulfill their assigned functions.

KPMG knew that L&H's CFO was woefully unqualified to carry out his assigned responsibilities.

312.    GAAS (AU 325.15) defines that "material weaknesses in internal control" as:

a reportable condition in which the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.

128

313.    During its audits, KPMG either recklessly failed to identify obvious reportable conditions or material weaknesses in internal controls (i.e., failure of controls to prevent or detect misstatements of accounting information), or identified and intentionally ignored the existence of such conditions in violation of GAAS.  All such material weaknesses should have been disclosed to investors by KPMG and/or L&H during the Class Period.

### 1.    KPMG Failed to Consider Fraud

314.    KPMG disregarded facts indicating heightened risk of fraud such as "significant pressure to obtain additional capital necessary to stay competitive, including the need for funds to finance major research and development expenditures."  AU § 316.17.

(a)    Lernout was quoted in December 1999 describing the Dictation Consortium and BTG transactions as impelled by L&H's research and development needs.  "If we didn't catch up [with competitors] we were cooked.  But we couldn't catch up because we didn't have enough R&D dollars."  KPMG was aware of all aspects of the Dictation Consortium and BTG transactions, having "carefully reviewed them at the time," according to the Audit Committee Report.  Moreover, KPMG Belgium audited the FLV Fund, and thus saw both sides of at least the Dictation Consortium transaction.

(b)    KPMG knew that L&H faced significant limitations on its ability to fund research and development in-house.

315.    KPMG disregarded facts indicating heightened risk of fraud categorized in GAAS as "significant related party transaction not in the ordinary course of business or with related entities not audited or audited by another firm."  AU § 316.17.  These include the following:

(a)    KPMG knew that in January, 2000, before it rendered an unqualified opinion on L&H's 1999 financial statements, the SEC had commenced an investigation into L&H's methods of accounting for revenue from thirty L&H customers that the SEC suspected were related parties.

(b)    KPMG Belgium was auditor for the FLV Fund, a related party whose ownership of at lease eight of the entities was the subject of the SEC

inquiry and funding of four others were not disclosed and required accounting treatment materially different than that applied by L&H. KPMG Belgium thus saw both sides of many of the fraudulent transactions.

(c)    L&H's financial statements contain a long list of "related parties" with little or no explanation of L&H's dealings with those parties.

## 2.    <u>Related Party Transactions</u>

316.    KPMG failed to consider the risk factor particular to related party transactions stated in AU § 334, Related Party Transactions, "large, unusual, or nonrecurring transactions or balances, . . . particular[ly] . . . transaction recognized at or near the end of the reporting period." The Audit Committee Report reveals that more than half of the revenue from related party transactions in 1998 and 1999 в $13 million in 1998 and $21 million in 1999 в was recognized in the fourth quarters of those years.

317.    KPMG failed to take the steps prescribed in AU §334 "to identify related party relationships and transactions and to satisfy [themselves] concerning the required financial statement accounting and disclosure." AU ' 334.01. To identify material transactions with related parties, the auditor should, among other things:

(a)    "review filings by the reporting entity with the Securities and Exchange Commission and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions."

KPMG could have learned that the CEO of Language Investment Co., the parent of four of the Belgian start-ups, was Willem Hardeman, an FLV Fund director and that an additional sixteen companies were owned by Mercator. Mercator's chairman, Louis Verbeke, was a name partner in L&H's outside law firm. Verbeke and the insurance company also separately owned stakes in L&H. A review of L&H's SEC filings, if it were necessary, would also have revealed two significant related parties were the subsequent employers of former KPMG Belgium auditors with responsibility for L&H audits.

(b)    "review proxy and other material filed with the Securities and Exchange

Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties."   AU ' 334.08(c).

The Wall Street Journal was easily able to determine from "regulatory filings" that the FLV Fund owned a 49% stake in eight of the Singapore start-ups, and gave cash to four others "which they used to pay their bills to L&H."  KPMG Belgium, as auditor of the FLV Fund, had access to both sides of the fraudulent transactions, and therefore, either failed to perform these basic procedures, or turned a blind eye to their results.

(c)     "[r]eview the extent and nature of business transacted with major customers, suppliers, borrowers and lenders for indications of previously undisclosed relationships." AU ' 334.08 (e).

As auditor of the FLV Fund, KPMG Belgium had unique access to both sides of L&H's transactions with major customers who were undisclosed related parties.

318.    KPMG was reckless in relying on management assertions about transactions with related parties.  "The risk associated with management assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU ' 334.18. Because L&H refused to permit KPMG to meet with the investors in the LDCs and CLDCs, KPMG should have considered this a "denial of access to information" that "constitute[d] a limitation on the scope of the audit that . . . require[d] the auditor to consider qualifying or disclaiming an opinion on the financial statements" as set forth in AU ' 508, Reports on Financial Statements.  AU ' 316.25 footnote 11.

319.    KPMG failed to consider an AICPA Audit Risk Alert emphasizing that:

Some of the more common audit issues identified in recent litigation related to fraudulent financial reporting included:

A willingness by the auditor to accept management's representations without

131

corroboration.

Allowing the client to unduly influence the scope of auditing procedures.

The failure to identify risky situations, or ignoring audit risks by not applying professional skepticism and revising auditing procedures appropriately.

AICPA Audit Risk Alert B 1999/2000 at 28.

320.    KPMG ignored AICPA Practice Risk Alert 95-3, which states that "it is incumbent upon the auditor to assess the propriety of the accounting for material related-party transactions in accordance with their substance" and warned that, "[i]n the hands of the unscrupulous, an undisclosed related party is a powerful tool.  Using controlled entities, principal shareholders or management can execute transactions that improperly inflate earnings by masking their economic substance or distort reported results through lack of disclosure, or can even defraud the company by transferring funds to a conduit related party and ultimately to perpetrators."  The Practice Risk Alert, at 2, warns auditors to look for "events that may indicate transactions with undisclosed related parties," including: "sales without substance, including funding the other party to the transaction so that the sales price is fully remitted," "sales with a commitment to repurchase that, if known, would preclude recognition of all or part of the revenue," "loans to parties that do not possess the ability to repay," and "payments for services never rendered or at inflated prices."

321.    Had KPMG performed the procedures required by AU '334, it would have discovered, as The Wall Street Journal easily did, of the fifteen firms that together paid L&H $57 million in 1999, or nearly 17% of its revenue, "there isn't any evidence of operation of the fifteen L&H customers" and they each operate from offices at the same address.  The fact that fifteen of L&H's customers had the same address in a country where revenues increased by more than 2,000% in one year was a major "red flag" for KPMG.  Notwithstanding this substantial red flag, KPMG

failed to perform any appropriate investigation, or tuned a blind eye to the results of their investigation.

### 3.  Improper Recognition of License Revenues

322.    KPMG failed to follow procedures sufficient to provide reasonable assurance that L&H recognized revenue properly in accordance with Statement of Position 97-2.  KPMG knew and disregarded the risk of material misstatement presented by the fact that material amounts of revenue were recognized at the end of each fiscal quarter.  Indeed, almost all of the contracts discussed in the Audit Committee Report are dated just a few days before the end of the quarter, and ten agreements giving rise to a total of more than $27 million in revenue are dated within the last three days of December 1998 or December 1999.  Unusual, complex or significant transactions which are recorded at or near the end of a financial reporting period is a "red flag" specifically described in the AICPA Audit Risk Alert -1999/2000 at 38: "Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period, along with a variety of other circumstances that may raise concerns about improper revenue recognition." Notwithstanding these red flags, KPMG knowingly or reckless failed to modify its audit procedures accordingly and turned a blind eye to the fraud.

### 4.  Inadequate Confirmation

323.    Auditors employ a number of procedures to determine whether revenue is properly recognized during the period under audit.  The most important procedure is to request customers of the company under audit to confirm in writing key terms of revenue-generating agreements, amounts outstanding, and whether goods shipped have been delivered.  In short, confirmations are utilized to ensure a company's financial statements are presented in accordance with GAAP.  According to Statement on Auditing Standards No. 67, the use of confirmations is a generally accepted auditing

procedure and must be used unless: (1) accounts receivable are immaterial; (2) the auditor is aware

from past experience that they will not be returned by customers; or (3) when the audit assesses the

risk of misstatement as low.

324.   KPMG was required to confirm L&H's accounts receivable because such amounts

were material, KPMG was not aware from past experience that they would not be returned, and

KPMG had assessed the risk of misstatement in L&H's revenues and receivables as high.

325.   While requests for confirmations are generally drafted on a company's own letterhead

to facilitate a customer's response, in order to be of value to an independent auditor, the requests must

be sent out by the auditor, and the customer must reply directly to the auditor. Absent the auditor's

control over the process, the integrity of this audit procedure is circumvented. In other words, it is as

if the procedure was not performed at all.

326.   According to the complaint in the L&H Action, shortly after the end of fiscal year

1999, L&H prepared letters seeking confirmation of the following items:

    a.    That the customer had sufficient financial means and was financially viable to enter into their recent license agreements;

    b.    That amounts owed under such agreements were non-refundable;

    c.    That no other arrangements, contracts, agreements or conditions were imposed on or dependent on the customer to enter in the agreement;

    d.    That L&H Korea was under no other obligation to perform, except as stated in the license agreement;

    e.    That the customer received all deliverables needed and specified under the contract;

    f.    That the customer accepts all such deliverables; and

    g.    The date that the deliverables were delivered to the customer.

327.   While the customer's responses would ordinarily be useful in an audit, L&H took

complete control over this confirmation process, thus defeating any benefit or assurance provided by the customer's response. Specifically, the Company prepared its customer's response in the affirmative, leaving to be completed only the date of delivery (although December and 1999 were already provided) and a line for the customer's signatures. Further, the letterhead directed the customer's reply to the attention of Philip Depacker of L&H's Legal Department.

328. The Company's recording of revenue and then its control over the confirmation process on the license agreements that purportedly generated the revenue, served as a scope limitation to KPMG. Further, as noted in the L&H Action complaint, L&H prepared affirmative responses, such as the amount under agreement being non-refundable, which served to insert terms not included in the license agreement itself. As such, the Company's prepared responses and control over the confirmation process sought to give the appearance that it had satisfied revenue recognition requirements under GAAP when in fact they had not. The following examples of confirmations that were returned directly to the Company were noted in the L&H Action complaint:

a. On January 11, 2000, a Mr. Park from Neo Information System faxed directly to Bastiaens his company's response to the Company's request. The attached response was signed by the customer and "31" was added to "December ___ 1999." No other modifications were made to L&H's prepared response.

b. The Company also received a confirmation directly from a H.Y. Son, President of EPC Corp. The response was dated as of January 9, 2000, the date which was selected by the Company. The response was signed by Mr. Son and "31" was added to "December в 1999." Similarly, no other modifications were made to L&H's prepared response.

c. On January 10, 2000, Jung Jin Cho and An Hee Choi from Zen Entertainment faxed directly to Bastiaens Digital Sei-Young Co., Ltd's response to the Company's request. The attached response included the customer's signature, but no additional information or modifications were added to the response, not even the date that the deliverables were delivered. Thus, not only was the confirmation inappropriately sent back to the Company, it was not even complete.

135

KPMG's failure to properly execute the confirmation process constituted a knowing violation of GAAS.

### H.    GAAP/COMPANY POLICY/SEC REGULATIONS VIOLATIONS

329.    As described below in ¶¶ 363-383, Artesia's direct participation allowed L&H to improperly book millions of dollars in false or otherwise improper revenues (which ultimately required a massive restatement) in flagrant violation of Generally Accepted Accounting Principles ("GAAP"). At all relevant times during the Class Period, KPMG and the Company falsely represented that L&H's financial statements were fairly presented in accordance with GAAP.

330.    The SEC requires that publicly-traded companies present their financial statements in accordance with GAAP. 17 C.F.R. ' 210.4-01(a)(1). GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to defined accepted accounting practice at a particular time.

331.    Financial statements filed with the SEC which are not prepared in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. ' 210.4-01(a)(1).

332.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts No. l, one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. l, 142, states:

> Financial reporting should provide information about an enterprises financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of enterprise performance.

333.   The representations by KPMG and the Company that L&H's financial statements were prepared in accordance with GAAP were materially false and misleading because, *inter alia*, L&H with the direct participation of Artesia: (1) engaged in fraudulent revenue recognition practices, thereby materially overstating reported revenues and accounts receivable; (2) improperly recorded revenue from, and failed to disclose, barter transactions; (3) failed to disclose the existence of material related party transactions; (4) failed to disclose material restrictions on cash balances reported as assets of the Company; (5) failed to write off obsolete inventory; and (6) failed to fully disclose the significant risks and uncertainties caused by the Company's lack of internal controls. Each of these accounting practices, misrepresentations and omissions, standing alone, was a material breach of GAAP, Company policy, and/or SEC regulations. In the aggregate, they amounted to a complete distortion of L&H's actual financial performance B a distortion that KPMG knowingly or recklessly perpetuated throughout the Class Period.

### 1.   Improper Revenue Recognition and Valuation of Accounts Receivable

334.   The realization principle requires that revenue be earned before it is recognized. Under GAAP, revenue is recognized when the earnings process is complete and an exchange has taken place (Statement of Financial Accounting Concepts ("FAC") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, && 83, 84).  The earnings process is not complete until collection of the sales price is reasonably assured. <u>Id.</u> The conditions for revenue recognition under GAAP ordinarily are met when products and services are exchanged for cash or claims to cash, and the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.  Generally, a transfer of risk must occur in order to effect an "exchange" for purposes of revenue recognition under GAAP.

335.     In 1997, the Accounting Standards Executive Committee of the American Institute of Certified Public Accountants issued Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2").  SOP 97-2 represents the standard on when revenue should be recognized for software transactions entered into in fiscal years beginning after December 15, 1997.  SOP 97-2 states, in pertinent part: Revenue should be recognized when all of the following criteria are met:

$     Persuasive evidence of an arrangement exists.

$     Delivery has occurred

$     The vendor's fee is fixed or determinable.

$     Collectibility is probable.

336.     L&H's Annual Report on Form 20-F for the fiscal year ended December 31, 1998 and Annual Report on Form 10-K for the fiscal year ended December 31, 1999 represented that:

> The Company recognizes revenue from the sale of its software licenses upon satisfaction of all of the following criteria: signing of the license agreement, shipment of the products, when no contractual terms remain unsatisfied and, if applicable, when a royalty report is received from the customer.  The Company generally receives, on a quarterly basis, royalty reports from each customer who has signed a license contract.  The reports detail the number of units or products that the customer shipped during that period.  The number of units multiplied by the applicable contractual rate per unit is the amount that the Company records as revenue.  Before recording this revenue, the Company determines that all significant obligations have been satisfied and that collection of the receivable is probable.  Generally, invoices under these arrangements are payable within 90 days.  Under certain contracts the Company allows distributors to return products subject to their replacement by the same amount of merchandise for stock balancing purposes.  Certain returns are allowed through distributors selling to the retail consumer markets, by their end users.  With respect to each distributor of the Company with return privileges, the Company's price to the distributor is fixed at the date of sale, the distributor is obligated to pay the Company within 90 days, the payment obligation is not contingent on resale of the product, title has passed to the distributor, the distributor has economic substance, the Company does not have significant obligations for future performance, and the amount of returns can be reasonably estimated.  End user returns are monitored monthly and a historic return rate is determined and applied as a reserve against revenues derived from end users at the time of revenue recognition.

The Company from time to time enters into nonrefundable minimum royalty agreements with customers.  Under these arrangements the Company delivers its technologies or products to the customer contemporaneously with the execution of the agreement.  Revenue from nonrefundable minimum royalty agreements is recognized upon satisfaction of all of the following criteria: signing of the license agreement; no additional significant production, modification or customization of the software is required; delivery has occurred; the fee is fixed and determinable and; collection is probable.  For arrangements that include multiple elements, the fee is allocated to the various elements based on vendor specific objective evidence of fair value.

Revenues from engineering fees and maintenance and support services are recognized as the services are performed.

Revenue derived from translation services is recognized as the work is performed.

Revenues related to software development contracts is recognized based on the percentage of completion method.

In all such cases, the Company only recognizes revenue when collection of the related receivable is probable.

337.     FASBs Statement of Financial Accounting Standards ("SFAS") No. 48 requires that where the right of return is granted to customers, either implicitly or explicitly, revenue should be deferred unless certain conditions exist, including:

    a.     the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

    b.     the seller does not have significant obligations for future performance to directly bring about resale of the product to the buyer; and

    c.     the amount of future returns can be reasonably estimated.

Even where the above conditions of SFAS No. 48 are met, an entity is required to accrue adequately and timely reserves for returns and allowances for bad debts. SFAS No. 5, Accounting for Contingencies, && 22-23.

338.     As detailed herein, the Company (with the direct participation of Artesia) improperly

recorded hundreds of millions of dollars of revenue because:

    a.     revenue recorded by L&H was not supported by "persuasive evidence" that an agreement existed;

    b.     delivery of software had, in many instances, not occurred;

    c.     L&H's fees for software sold were not fixed because customers could return product;

    d.     collectibility was not probable; and

    e.     contract terms were not yet fixed.

339.   As noted above, L&H granted certain of its customers undisclosed "side letters" permitting customers to return product which had previously been recorded as final and complete sales.  The existence of such side letters dictated that the earnings process was not complete with respect to such transactions and, therefore, revenue recognition was not permitted under GAAP.

340.   The Company's revenue recognition practices also violated its own stated revenue recognition policy.

341.   The recording of revenues in violation of GAAP necessarily renders the related accounts receivable also inflated in violation of GAAP. Accounting Research Bulletin No. 43 and SFAS No. 5, Accounting for Contingencies require that entities report accounts receivable at "net realizable value."

342.   SFAS No. 5 "Accounting for Contingencies" requires that an estimated loss from a loss contingency shall be recognized by a charge to income if both of the following conditions are met:

    a.     Information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and

    b.     The amount of the loss can be reasonably estimated.

343.     Under SFAS No. 5 & 3a "probable" means that the "future event or events are likely to occur."

344.     By recording false or otherwise improper transactions as <u>bona fide</u> sales, L&H (with the direct participation of Artesia) materially overstated its reported accounts receivable during the Class Period.  Moreover, as detailed herein, many customers were not paying for software sold by L&H and it was more than probable that such customers would not pay amounts owed.  As a result, L&H was required to recognize the occurrence of such non-payment by consistently writing down the value of its accounts receivable each quarter, which it failed to do.

345.     The Company also violated GAAP in that it (with the direct participation of Artesia) recorded as revenue certain so-called "barter transactions" which are essentially nothing more than a "swap" of L&H's product or service for that of another company.  According to Accounting Principles Board Opinion ("APB") No. 29, Accounting for Non-Monetary Transactions, "an exchange of product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange" does not culminate in an earnings process.

346.     As alleged herein, in several transactions in 1998 and 1999, L&H exchanged products or services with other companies and recognized material amounts of revenue in violation of APB No. 29.

### 2.     Related Party Transactions

347.     Article 4 of Regulation S-X and GAAP, in FASB's SFAS No. 57, required L&H to disclose in its financial statements during the Class Period relevant information regarding related parties and related party transactions.  Nonetheless, in violation of these required rules and

procedures, L&H's financial statements failed to disclose all such parties and transactions.

348.    Article 1 of Regulation S-X refers to the term "related parties" as defined

in SFAS 57. SFAS 57 defines "related parties" as follows:

> Related parties.  Affiliates of the enterprise; entities for which investments are
> accounted for by the equity method by the enterprise; trusts for the benefit of
> employees, such as pension and profit sharing trusts that are managed by or under the
> trusteeship of management; principal owners of the enterprise; its management;
> members of the immediate families of principal owners of the enterprise and its
> management; and other parties with which the enterprise may deal if one party
> controls or can significantly influence the management or operating policies of the
> other to an extent that one of the transaction parties might be prevented from fully
> pursuing its own separate interest. Another party also is a related party if it can
> significantly influence the management operating policies of the transacting parties
> or if it has an ownership interest in one of the transacting parties and can
> significantly influence the other to an extent that one or more of the transacting
> parties might be prevented from fully pursuing its own separate interests.  SFAS 57
> &[24.

349.    SFAS 57 requires financial statements to include disclosures of material related party

transactions, other than compensation arrangements, expense allowances, and other similar items in

the ordinary course of business. (&2)  Specifically, these disclosures shall include:

a.    The nature of the relationship(s) involved;

b.    A description of the transactions, including transactions to which no

amounts or nominal amounts were ascribed, for each of the periods

for which income statements are presented, and such other

information deemed necessary to an understanding of the effects of

the transactions of the financial statements;

c.    The dollar amounts of transactions for each of the periods for which

income statements are presented and the effects of any change in the

method of establishing the terms from that used in the preceding

period; and

d.      Amounts due from or to related parties as of the date of each balance

sheet presented and, if not otherwise apparent the terms and manner

of settlement. SFAS 57 &2.

350.    SFAS 57 addresses why related party disclosures are relevant, specifically:

> Relationships between parties may enable one of the parties to exercise a degree of influence over the other such that the influenced party may be favored or caused to subordinate its independent interests.  Related party transactions may be controlled entirely by one of the parties so that those transactions may be affected significantly by considerations other than those in arm's length transactions with unrelated parties.  Some related party transactions may be the result of the related party relationship and without the relationship may not have occurred or may have occurred on different terms.  SFAS 57 &13.

Likewise, SFAS 57 illustrates the necessity of related party disclosures, and in absence of such

disclosures, states that the reliability of financial information is weakened:

> Without disclosure to the contrary, there is a general presumption that transactions reflected in financial statements have been consummated on an arm's-length basis between independent parties.  However, that presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist.  Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent.  Reduced representational faithfulness and verifiability of amounts used to measure transactions with related parties weaken the reliability of those amounts.  That weakness cannot always be cured by reference to market measures because in many cases there may be no arm's-length market in the goods and services that are the subject of the related party transactions. SFAS 57 &15.

351.    As alleged herein, during the Class Period, L&H recorded as revenue many

transactions with parties related to L&H without disclosing the nature of the relationships and a

description of the transactions.  Artesia played a direct role in concealing loans L&H officers

guaranteed for several LDCs for the express purpose of hiding the financial reality and the related-

party nature of the transactions from investors.  Such disclosures would have informed investors

regarding the improper transactions and would have influenced investors significantly in making investment decisions regarding L&H, which was unable to record significant sales absent such related party relationships.

### 3.   Restrictions on Cash Balances

352.   Accounting Research Bulletin No. 43 Ch. 3A & 6 and SFAS No. 5 & 18 require separate disclose of any restrictions placed on the use of cash.

353.   As alleged herein, L&H had significant amounts of cash held under restriction by certain Korean banks during the Class Period.  The existence of such restrictions precluded L&H from using this cash for operations.  This failure to disclose caused the investing public to believe that all cash received and held by L&H was in the ordinary course of business and fully available to fund the Company's operations.

354.   GAAP, as stated in Accounting Research Bulletin No. 43, Chapter 4, && 7-8, provides that:

> Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as market.

355.   By failing to require timely write down of the value of L&H's inventory, KPMG and the Company violated the dictates of GAAP and, consequently, materially overstated, inter alia, L&H's total assets, net income, and earnings per share.  Moreover, KPMG and the Company knew or recklessly disregarded that L&H also violated, and thereby misrepresented, its stated policy of accounting for its inventory at the lower of cost or market as disclosed in its 1998 and 1999 audited financial statements.

### 4.   Internal Control Weaknesses

356.    Article 11 of Regulation S-X and GAAP, in FASB's SFAS No. 5, required L&H to disclose in the footnotes of its financial statements during the Class Period that the aforementioned internal control weaknesses could reasonably cause the Company's financial statements to be materially misstated.   Nonetheless, in violation of GAAP, L&H's financial statements failed to disclose that such internal control weaknesses were reasonably likely to have a material adverse effect on L&H's operating results.

357.    In addition, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303].   In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.

358.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34 26831, has indicated that registrants should employ the following two-step analysis determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations.

359.    KPMG and the Company knew or recklessly disregarded that Item 303 of Regulation S-K required L&H to disclose that the weaknesses in (or absence of) its internal control system were

reasonably likely to have a material adverse effect on L&H's operating results.  Nonetheless, L&H's Form 10-Ks, Form 6-Ks and Form 10-Qs issued during the Class Period failed to disclose such information, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

### 5.   Additional Violations of GAAP

360.     In addition to the accounting violations noted above, KPMG permitted L&H (with the direct participation of Artesia) to present its financial statements in a manner which also violated at least the following provisions of GAAP:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. l, & 34);

b.    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. l,  & 40);

c.    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. l, & 50);

d.    The concept that financial reporting should provide information about an

146

enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, & 42);

e.   The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, && 58-59);

f.   The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, & 79); and

g.   The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, && 95, 97).

361.   GAAP provides that previously issued financial statements which are misstated as a result of an oversight or a misuse of facts that existed at the time are to be retroactively restated. See, e.g., APB Opinion No. 20, APB Opinion No. 9 and the AICPA's Statement on Auditing Standards No. 53.

362.   L&H ultimately admitted that its financial statements for, at least fiscal years 1998

and 1999 and the first two quarters of fiscal year 2000 were materially false and misleading due to a misuse of facts that existed during such years.

## VIII.   ARTESIA'S CENTRAL ROLE IN THE FRAUD

363.   On June 24, 2003, Dexia announced that the Belgian prosecutor investigating the L&H fraud indicted Dexia for actions taken by Artesia in connection with L&H in 1998 through 2000. According to an article in the Belgian press cited below, the Belgian Justice Department investigators have determined that Artesia was "an exceptionally important banker to [L&H] . . . involved in just about everything surrounding [L&H]."

364.   According to a June 25, 2003 article in <u>De Financieel Economische Tijd</u> (a/k/a/ the "<u>Belgian Financial Times</u>") entitled "Artesia Knew [L&H] Was Playing With Fire," Belgian prosecutors secretly seized records from Artesia in February 2001 which "contained a treasure of information" regarding the L&H fraud.  According to these records, Artesia issued three separate loans in 1998 and 1999, totaling more than $20 million, which were used to artificially inflate L&H's revenues as part of the strategic partners aspect of L&H's fraudulent scheme. According to the article, the Belgian Justice Department's investigation has revealed that Artesia "knew that the top management of [L&H] was involved in practices that would not be tolerated by the American SEC."

365.   The June 25, 2003 article notes that it was Artesia that devised a method for concealing the fact that Lernout, Hauspie, and Willaert all guaranteed financing to certain LDCs and CLDCs.  Artesia employed risk-shifting transactional devices known as "credit default swaps" in lieu of the personal guarantees of Lernout and Hauspie that would have to be revealed in the LDC and CLDC loan paperwork.

366.   Following the model established by the Dictation and BTG transactions, Artesia provided L&H and the Senior Officers with funding for the LDCs and CLDCs in order to expand

148

L&H's generation of fictitious revenue.  As noted above, instead of creating <u>one</u> shell company (*i.e.*, Dictation Consortium or BTG) to funnel false revenues to L&H, Artesia and L&H agreed that L&H would create a series of holding companies financed by Artesia.  These holding companies, in turn, were used to finance multiple LDCs and allowed L&H to book even more fictitious revenue.

367.    One such holding company was named Radial Belgium N.V. ("Radial").  On September 29, 1998, pursuant to its fraudulent scheme with the Senior Officers, Artesia loaned approximately $6 million to Radial, which wired this money, in $2 million installments, to three LDCs: (a) the Slavic Development Company N.V., (b) the Farsi Development Company N.V., and (c) the Bahassa Development Company N.V. These LDCs were supposed to develop speech recognition products in Slavic, Farsi and Bahassa (an Indonesian dialect), respectively.  As Dexia and the Senior Officers knew, however, those LDCs lacked the financial resources and technical knowledge necessary to develop L&H's software for use with additional languages. As a result, Dexia refused to lend any money to these LDC's unless Lernout, Hauspie and Willaert guaranteed these loans by means of credit default swaps. The Slavic, Farsi and Bahassa LDCs used all $2 million loaned to them to pay L&H licensing fees. L&H then booked the entire $6 million as revenue in the third quarter of 1998. None of these LDCs had bona fide offices or any operations that would have enabled them to develop speech recognition products.

368.    Internal Artesia documents quoted in the Report demonstrate that Artesia knowingly entered into this transaction in furtherance of the fraud. These documents show that Artesia knew that its loan was to be used by Radial to finance the three LDCs (all of which had the same business address), that the LDCs and Radial had been created by L&H, and that all of the money loaned by Artesia would be used by the LDCs to pay licensing fees to L&H, thereby leaving the LDCs with no money to perform their supposed task of developing L&H's software. The documents also show that

Artesia insisted that the loans be guaranteed by Lernout, Willaert, and Hauspie.  In addition, Dexia and the Senior Officers agreed to structure these guarantees in a manner designed to enable L&H to fraudulently conceal the guarantees, and thus the true nature of the "licensing" deals, from the SEC and the investing public.

369.    As internal e-mails and other Artesia documents uncovered in the Dexia Action reveal, Artesia recognized from the outset 01that these LDCs had no equity investors and no funds with which to develop L&H software for commercial uses.  They were mere shell companies located at the same address, and Artesia was well aware of that.  Indeed, according to one internal e-mail dated September 21, 1999, P. Rabaey stated that "The private guarantees, however, were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] so as to avoid possible problems with the SEC. We have therefore no security and look for a solution via credit default swaps."

370.    The June 25, 2003 article in the <u>Belgian Financial Times</u> confirms that Artesia knowingly issued the Radial loan in furtherance of L&H's fraudulent scheme:

> On September 29, 1998, Artesia issued a loan to a Belgian company known as Radial in the amount of approximately $6 million. Artesia's own documents reveal that Radial was a "special purpose entity" created by senior officers of L&H for the express purpose of creating and funding LDC's. These same bank documents also show that Artesia was aware that Lernout, Hauspie and Willaert did not want to sign the required personal guarantees to obtain this and other LDC and CLDC loans "in order to avoid possible problems with the SEC." As a result, Artesia devised a scheme to have Lemout, Hauspie and Willaert guarantee the Radial loan using "credit default swaps." Unlike personal guarantees, however, these swaps do not have to be revealed in the loan letters of credit. However, the sale of credit default swaps to individual investors is highly unusual, demonstrating the degree to which Artesia was willing to go to participate in L&H's massive accounting fraud.

371.    After setting up Radial to manufacture revenues for L&H in the third quarter of 1998, L&H and Artesia replicated this scheme in the fourth quarter. The name of the holding company this time was Language Investment Co. ("LIC").  Artesia made a loan on December 22, 1998 to LIC for

approximately $6 million. LIC then sent the funds in four installments of $1.5 million to four separate LDCs: the (1) Greek, (2) Hungarian, (3) Polish, and (4) Czech development companies. These LDCs then immediately paid these funds to L&H as "licensing" fees so that L&H could book this "revenue" prior to year-end.

372.    The June 25, 2003 article in the <u>Belgian Financial Times</u> also confirmed that Artesia issued this loan to LIC in furtherance of the fraudulent scheme perpetrated by Artesia and the Senior Officers:

> Artesia engaged in a similar fraudulent transaction on December 22, 1998, issuing a loan to the Language Investment Company for the purpose of creating 4 LDCs so that L&H could recognize revenues from these LDCs in the fourth quarter of 1998. Again, Artesia used credit default swaps to conceal the fact that the principals of L&H had secretly guaranteed the loans used to set up the 4 LDCs in question.

373.    L&H and Artesia continued to perpetuate this fraudulent scheme in 1999. On March 31, 1999, L&H setup the Language Development Fund ("LDF") and transferred $12 million that same day to the bank accounts of seven LDCs at Artesia. The Greek, Czech, Hungarian and Polish Development Companies received $1.5 million each, and the Tamil, Thai and Hindi Development Companies received $2 million each. This time, the $12 million came from Mercator & Noordstar in the form of a $2 million capital contribution and a $10 million loan to LDF. All of these funds made their way into L&H's financial statements as revenue.  Internal Artesia documents leave no question that it knew that these LDCs were merely shell entities created for the purpose of fraudulently inflating L&H's revenue.

374.    In the second quarter of 1999, L&H requested that Artesia provide a $20 million loan to LDF.  Artesia's internal documents demonstrate that it was fully aware that the loan was an integral part of the fraud being perpetrated at L&H.  Indeed, according to an e-mail from B. Ferrand on June 21, 1999:

> In view of the fact that [L&H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L&H]. Therefore, [L&H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing. A credit default swap with Messrs. Lernout, Hauspie, and Willaert is however possible.

375.     Although the loan to LDF was ultimately withdrawn before it was finalized, on June 25, 1999, Artesia granted a personal $20 million line of credit to Lernout, Hauspie and Willaert to take the place of the LDF loan. Artesia agreed to make this loan in furtherance of the fraudulent scheme to inflate L&H's revenue and earnings. This time, however, Artesia demanded that the three individuals pledge 650,000 registered shares of L&H as collateral for the loan. As was the plan with the proposed LDF loan, the vast majority of this $20 million was used to fund six new LDCs (Malay, Vietnamese, and four other Indian languages not specified at the time), and this money was ultimately booked as revenue on L&H's financial statements. L&H did not reveal the source of the funds received by these LDCs in L&H's SEC Form 10-Q for the quarter ended June 30, 1999, or in its SEC Form 10-K for the year ended December 31, 1999.

376.     By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. The loans to Radial and LIC were due June 30, 1999, and the $20 million personal loan to Lernout, Hauspie and Willaert was due in October 1999. Artesia nonetheless extended the loans to December 15, 1999. Artesia subsequently had multiple discussions with Hauspie, Lernout and Willaert to closely track their progress in attracting potential new investors in the LDCs, whose funds would be used by L&H to repay Artesia. L&H and Artesia were effectively seeking to "rob Peter to pay Paul," and creating a quintessential Ponzi scheme in which funds from new investors were used to pay old investors.

377.     On or about January 5, 2000, a Lebanese-Armenian businessman, Harout Katchadourian, wired $36 million at the request of Lernout, Hauspie and Willaert to the Singapore

bank account of Velstra, a Singapore company owned by Mercator. This money was then used to pay off the $20 million line of credit, and the two $6 million loans to Radial and LIC, thereby consummating the classic Ponzi scheme.

378.    An example of Artesia's direct participation in L&H's improper revenue recognition scheme concerned an Illinois company known as Vasco Data Security International ("Vasco"). Artesia participated in this aspect of the fraud after it had already begun funding L&H's fraudulent LDC operations through Radial.

379.    On March 25, 1998, Vasco, a Burlington customer, purportedly licensed $800,000 of L&H software.  At or around the same time, L&H loaned Vasco $3 million, in exchange for a note convertible into Vasco shares. The loan agreement included extended payment terms providing that repayment was not due until January 4, 1999. According to L&H's financial statements, Vasco entered into a second licensing agreement with L&H, this one priced at $900,000, on December 31, 1998. However, according to Vasco's former Chief Technology Officer, this second agreement was actually entered into in January 1999, but backdated at the demand of defendant Hauspie, who threatened to cut off L&H's funding of Vasco if Vasco's management refused to alter the date of the licensing agreement.  Furthermore, the technology covered by both of the L&H licenses was useless to Vasco -- L&H did not have an application that Vasco could use for any product development. L&H nonetheless recorded $900,000 in revenue for the back-dated contract in 1998.

380.    With the second licensing agreement backdated to December 1998, L&H came through with further funding, allowing Vasco to repay its $3 million loan from L&H in the second quarter of 1999.  This time, Vasco was ultimately bailed out by a consortium of L&H-related entities organized by Artesia, including LHIC, a company formed by Lemout and Hauspie to invest in companies that specialize in speech and language based products, and run by a member of L&H's

Board of Directors, Defendant Francis Vanderhoydonck. At the behest of Lernout and Hauspie, defendant Artesia organized and managed a private placement of Vasco stock which raised $11.5 million. LHIC invested $5 million in Vasco through this private placement, resulting in LHIC's ownership of 7% of Vasco and a seat on the company's board of directors. That seat was filled by defendant Hauspie. Other top investors in Vasco included Mercator (the ultimate owner of 16 of the sham LDCs) and Sofinim N.V. (represented by L&H Director and Audit Committee member Defendant Marc DePauw), which each purchased approximately $1 million of Vasco stock through the private placement managed by Artesia.

381.    On April 15, 1999, Artesia wired approximately $11.5 million to Vasco's account in the United States, constituting the proceeds of the private placement of Vasco stock, including LHIC's $5 million investment and Mercator's $1 million investment.

382.    L&H's stated policy was to defer recognition of any revenue not due within 90 days. L&H violated this policy when it recognized revenue from the Vasco transactions in the amounts of $800,000 and $900,000 in the first and fourth quarters of 1998, respectively. Furthermore, the fact that the $3 million loan from L&H to Vasco contained "extended payment terms" beyond 90 days, and that the loan far exceeded the total license fees from both agreements, strongly indicated that the collectibility of the licensing fees was neither probable nor fixed and determinable at the signing of the agreements. The revenue from these transactions was not recognizable until at least the second quarter of 1999, when Vasco paid off the $3 million loan. Given the circumstances of the repayment of the loan, described above, even recognition of the revenue in the second quarter of 1999 was inappropriate.

383.    As was contemplated by the fraudulent scheme agreed upon by L&H and Artesia, and as pled herein at ¶¶ 363-382, L&H made a number of materially false and misleading disclosures

during the Class Period concerning L&H's financial results. These results were materially inflated as a result of fictitious revenue "generated" by means of the fraudulent scheme agreed upon by L&H and Artesia.

## IX.   THE DIRECTOR DEFENDANTS AND THE AUDIT COMMITTEE'S KNOWLEDGE OF L&H'S SERIOUS ACCOUNTING PROBLEMS

### A.   THE AUDIT COMMITTEE DEFENDANTS' ROLE

384.   During the Class Period, L&H's audit committee consisted of defendants Cauwelier, DePauw, and Vandendriessche.

385.   Prior to, and during the Class Period, as noted in the L&H Action complaint, members of the Audit Committee met with Paul Behets, and other auditors from KPMG, to discuss revenue recognition policies and accounts receivable at L&H.   On several occasions, the Audit Committee, KPMG and the entire Board discussed the serious need for internal controls at L&H and that the Company's internal audit function had to be strengthened.   As early as May 1998, KPMG informed the Audit Committee that "the internal audit and internal control functions of the Company [needed to] be strengthened."   KPMG also recommended that, "with the increasing complexity of the Company, there was a need for improved reporting for the purpose of consolidation."   The Audit Committee, in turn, conveyed these warnings to the entire Board of Directors.   Nevertheless, throughout the Class Period no actions were taken to strengthen the Company's weak internal accounting controls.

386.   Also at the May 4, 1998 Board meeting, Vandendriessche reported that the Audit Committee met with Behets and Dammekens, and that KPMG "recommended that the internal audit and internal control functions of the Company be strengthened, noting "a need for improved reporting for the purpose of consolidation."

387.     At the August 30, 1999 meeting of the Board of Directors, the Audit Committee reported that it was reviewing the need for an internal auditor.

388.     On April 12, 1999, Behets reported to the Director Defendants regarding various discussions with the Audit Committee, and defendant Vandendriessche, on behalf of the Audit Committee, advised the Defendant Directors that the Company "intend[ed] to establish an internal audit function due to the growing complexity of the Company's business."  But again, no action to that end was taken, and the fraud at L&H only grew.

389.     On August 30, 1999, the Audit Committee reported to the Board of Directors that KPMG had again advised of the need to increase the Company's internal control staff.  The Audit Committee indicated that it was "review[ing] the need for an internal auditor."  Again, no action was taken.

390.     At the January 17, 2000 Board Meeting, De Pauw reported that the Audit Committee had met to review the L&H's financial statements, had met with KPMG, and that the Audit Committee would take the same action and review each quarterly financial statement before the release of each financial statement.

391.     Despite the continued warnings during 1998 and 1999, as late as May 22, 2000, neither the Audit Committee nor the Board took steps to require L&H to hire an internal auditor. In fact, L&H did not hire an internal auditor until the summer of 2000.  Nevertheless, KPMG and the Audit Committee continued to sign off on the Company's financial statements that contained and admitted inflation of revenue by $373 million or over 60%.

## B.      THE DIRECTOR DEFENDANTS' ROLE

392.    Throughout the Class Period, as noted in the L&H Action complaint, the Board of Directors were informed of KPMG's and the Audit Committee's grave concerns about L&H's internal controls, as well as issues related to related party transaction, the LDC concept and L&H's activities in Korea.

393.    Early in the Class Period the Board became aware of L&H's reliance on related party transactions, and the Company's need to monitor such transactions.  At a May 4, 1998 meeting of the Board of Directors, the Director Defendants acknowledged that there was a "potential conflict of interest" arising from the relationship between the Company and FLV "given the active involvement of Mr. Lernout and Mr. Hauspie in the management of the Company as well as in the activities of the Flanders Language Valley."  The Director Defendants concluded, however, that Athe benefits of the relationship clearly outweigh[ed] the potential conflicts of interest, but that procedures should be established to resolve any conflicts of interest when they arise."  Hauspie and Bastiaens also discussed with the directors the need to explain "the nature of the relationship" to the investment community, "so that there is not the perception of a problem."  The directors agreed that "discussions should be held with the Company's auditors, KPMG, to discuss any issues that could arise from this relationship."

394.    Also at the May 4, 1998 Board meeting, Vandendriessche reported on his meeting Behets and Dammekens, described above.  Specifically, Vandendriessche conveyed KPMG's recommendation that L&H's internal audit and control functions be strengthened. Despite the fact that L&H did not hire an internal auditor until the summer of 2000, the Directors Defendants continued to sign off on L&H's 1998 and 1999 financial statements.

395.    Throughout the Class Period, as noted in the L&H Action complaint, Philip

Vermeulen (a former director of L&H and Manger of the FLV Fund), Bastiaens or Hauspie routinely provided the Board of Directors with updates on FLV investments.  Further, Hauspie would often update the Board on the actions of the S.A.I.L. Trust (a.k.a. FLV Foundation).  Vanderhoydonck also provided periodic updates on the activities of LHIC, including investments in L&H customers, such as Vasco.

396.    Throughout the Class Period, as noted in the L&H Action complaint, the Director Defendants had numerous meetings with representatives of KPMG, primarily Behets, regarding the Company's financial statements.  Additionally, the Audit Committee regularly submitted to and discussed with the Director Defendants issues relating to the Company's financial statements and the need to strengthen the internal audit and internal control functions of the Company.  As a regular agenda item at each meeting of the Board of Directors, the Audit Committee issued a report to the Director Defendants. At some of these meetings, the Audit Committee or KPMG advised the Director Defendants as to accounting issues that had arisen and that had to be resolved by KPMG

397.    On several occasions, the Individual Defendants discussed with the Director Defendants issues relating to the Company's operations in Korea and relating to the LDCs.  For example, on January 18, 1999, Bastiaens discussed L&H plans for expanding the Dictation Consortium concept, to allow L&H to avoid research and development costs.  Specifically, as noted in the L&H Action complaint, the minutes reveal:

> . . . Bastiaens indicates that the Company is taking steps to ensure the availability of long-term research and development activities, while at the same time maintaining its ongoing research and development efforts for its current and near term projects. Mr. Bastiaens indicates that the Company has currently been spending approximately 10%-20% of revenues for ongoing research and development.  There is also a need to spend an additional 10%-12% for long-term research and development.  However, if this were done within the context of the Company's current structure, the research and development budget would be increased to approximately 22%, which would not be feasible in the context of the Company's operations.  In order to accomplish its

objective, the Company proposes to establish an independent company to conduct long-term research and development.  The Company [L&H] will own approximately 19.9% of this company. The company will be privately funded, and the balance of the company will be owned by unaffiliated parties.  The Company will license its current technology to the research and development company, and will have a right of first refusal, on market terms, for technology developed by the long-term research and development company in the software area.

398.    At the May 14, 1999 board meeting, Bastiaens expanded on the "strategic partner" plan, remarking about the acquisition of BTG that, "because [BTG] is a service company, there will be no in process write-off of research and development, and amortize the good will over a period of 20 years."

399.    On May 21, 1999, defendant Willaert reported to the Board of Directors that L&H had entered into relationships with a number of start-up LDC's for the development of twelve languages.

400.    On August 30, 1999, the Director Defendants discussed the acquisition of Bumil and on September 6, 1999, the Board approved the acquisition.

401.    At the August 30, 1999 Board meeting, Lernout explained the concept of the LDCs. At that meeting, the Audit Committee also advised the Director Defendants that KPMG had conducted an extensive review at the end of the second quarter of 1999 and had issued recommendations to the Company to increase its internal audit staff.

402.    On December 13, 1999, defendant Willaert provided the Director Defendants with an update on L&H's LDC activities, noting that the LDCs contributed a substantial part of L&H's revenues.  At that meeting, Willaert and the Board also discussed the possibility of combining LHIC and the FLV Fund into one entity.  Defendant Bastiaens reported to the Director Defendants regarding the activities of the Company in Korea.

403.    At a meeting of the Director Defendants on January 17, 2000, the Board of Directors

voted to advance the earn-out payment to Seo based on L&H Korea's purported performance.

404.    On September 7, 2000 the Board of Directors met in the wake of the initial The Wall Street Journal articles.  As noted in the L&H Action complaint, the minutes reveal "a discussion of the language development companies, and the fact that the identity of the investors has not been revealed.  The lack of transparency has lead to suspicions that there might be relationships between the investors in the language development company and the Company that could cause these transactions to be viewed as related party transactions."  At this same meeting, Fernand Cloet resigned as a director.

405.    Subsequently, each member of the Board of Directors, with the exception of the Audit Committee Members, resigned their seats on the Board.

## X.        THE TRUTH BEGINS TO BE REVEALED

406.    In May of 2000, L&H acquired Dictaphone Corporation for $425 million in cash and $510.6 million in inflated L&H common stock. As a result of this acquisition, L&H became subject to more stringent SEC reporting requirements.  Certain first-time disclosures in L&H's first quarterly report filed on SEC Farm 10-Q on June 30, 2000, disclosed new information about L&H's purported financial success during the previous few quarters.

407.    For the first time, L&H publicly disclosed the geographic breakdown of its sales providing surprising revelations.  First, the new financial reporting revealed that a significant portion of the Company's total revenues were from two countries in Asia:  Singapore and Korea. In 1999, L&H's revenue totaled $344.2 million.  Of that amount, Korea contributed $62.9 million and Singapore contributed $80.3 million in revenue, while in 1998, those two countries only contributed less than $300,000 in sales.  While European sales had fallen, and U.S. sales remained stagnant, Singapore sales skyrocketed from a mere $29,000 in 1998 to $80.3 million in 1999, a jump of over

<u>276,796</u> percent.  During the first quarter of 2000, total sales in the United States, Europe and the rest of Asia declined by 27% to $518 million.  At the same time, Korean sales accounted for $58.9 million, up from $97,000 a year earlier, and approximately 54% of L&H's worldwide sales of $110.7 million.

408.    On July 6, 2000, <u>The Wall Street Journal</u> reported on L&H's incredible growth in Asia, noting that the Company attributed L&H's unprecedented Asian growth to a new shift in company strategy.  Specifically, Bastiaens stated that rather than license its underlying technology to companies that would then develop applications for specific markets, L&H decided in 1999 to pursue a "new strategy" of building its own applications, allowing it to gain more revenue over time.  Bastiaens also attributed the "strong" Asian sales to L&H's early market presence and lack of strong competition.  As for Singapore, Bastiaens stated that the 1999 revenue figures were from licensing L&H technology to companies that were building local language versions of L&H's systems for languages such as Hindi and Tamil.  According to Bastiaens, the licenses were sold for $2 to $4 million each, but that sales dropped off after the major language licenses were sold. As for Korea, Bastiaens attributed the surge in sales to the synergies realized from the combination of L&H technology with Bumil's large client base.

409.    In response to stock market analyst concerns and L&H denials, reporters from <u>The Wall Street Journal</u> commenced an investigation concerning certain transactions to verify the Company's sales.

### A.    <u>The August 8th *Wall Street Journal* Story</u>

410.    On August 8, 2000, <u>The Wall Street Journal</u> began reporting the results of its investigation.  As would be revealed over the coming months, merely by asking a few questions of purported "customers," the <u>Journal's</u> reporters (who were based in Boston) were able to reveal a

wide-spread fraud that had been concealed by L&H and KPMG.  The August 8, 2000 article

disclosed that the revenues, and the resulting net income and earnings per share, that L&H had

reported in the fourth quarter of 1999 and first quarter of 2000, were overstated, specifically in the

Korean geographic region.  The August 8, article reported that:

> . . . [Some companies that L&H has identified as Korean customers say they do no
> business at all with L&H.  Others say their purchases have been smaller than L&H
> says.  L&H officials now acknowledge they made some mistaken initial
> representations about customers.  But the company disputes other accounts given by
> some of the Korean companies, and it insists its Korean revenue figures are accurate.

> \*   \*   \*

> In Korea, Mr. Bastiaens says L&H sells a range of products, including software
> licenses and automated phone switchboards that recognize voice commands.  In
> May, while being questioned about the Asian sales by a reporter, he volunteered the
> names of about a dozen Korean customers.  Later, the CEO provided ranges of the
> dollar amount of business done with those and some other customers. Subsequently,
> the company disclosed more names.  In all, this newspaper contacted 18 of about 30
> companies claimed by L&H as customers were contacted by this newspaper.

> \*   \*   \*

> Three of the companies say they aren't, in fact, L&H customers. L&H says one of
> those was a former Bumil customer, and was mistakenly put on its list. Three more
> companies say their purchases from L&H over the past three quarters were smaller
> than figures provided by Mr. Bastiaens or Sam Cho vice president of L&H Korea.
> One additional company says it is in a joint business with L&H that produces
> considerably less revenue than L&H claims. Officials from an eighth company
> initially said it had formed a joint venture with L&H and that the joint venture, not
> the company itself, had purchased products from L&H. Later, the company retracted
> this initial version.

> Of the other 10 companies, three confirm they are customers but wouldn't give the
> size or timing of their purchases.  Officials at another six confirm total purchases
> totaling $450,000 to $5.5 million in the period since L&H took over Bumil.  One
> company, Artlab Co., says it signed a $10 million contract with L&H and paid in
> May, a figure that was within the revenue range provided by Mr. Bastiaens.
> Meanwhile, Hanwha Securities Co. ordered nearly $2 million of gear, says an
> official, adding that L&H "is highly recognized" for its technology.

> All told, of the 13 companies that responded to inquiries about their purchases from

L&H in the period since it acquired Bumil, the revenue tallies roughly $32 million. From all of its customers in Korea, in 1999 and the first quarter of 2000, L&H posted $121.8 million of Korea sales, and it has said that it expects second-quarter revenue from that country to exceed the first quarter's $58.9 million.  The company is expected to report second-quarter results today.

Among the companies that L&H boasts as customers:  Korea Securities Computer Corp., or Koscom, a government-regulated clearinghouse for stock trades.  Mr. Bastiaens initially says L&H received revenue in the range of $5 million to $10 million (he wouldn't be more specific) from Koscom in the three quarters ended June 30.  According to two Koscom officials, whose names were provided by L&H. Koscom and L&H are partners in an automated phone stock quote service.  Korea Telecom collects the per-call payment, keeps 10% and splits the rest between Koscom and L&H.

One of the Koscom officials estimated L&H and Bumil's share of the revenue at roughly $1.5 million in 1999.  Told of the discrepancy, L&H contradicts Mr. Bastiaens and puts the Koscom revenue in the range of $1 million to $5 million.

In a Dec. 28, 1999, press release, L&H said Samsung Securities, a big Korean brokerage, together with more than 14 other securities firms, had "selected L&H to develop client server solutions for online trading and automated dialogue systems." But two Samsung officials, including spokesman Shin Dong, Woo, say their firm never made any purchases from L&H, although they discussed some.

Asked about the discrepancy, Mr. Bastiaens says Samsung isn't a "direct customer" but an "indirect customer."  Pressed on what "indirect" means, L&H Korea's Mr. Cho says some Samsung customers also conduct trades over the Koscom-L&H phone-quotation system, and Samsung remits a portion of the trading fee to Koscom, which shares it with L&H.

L&H also claims LG Electronics as a customer.  But Yu Won Uk, a senior research engineer at LG Electronics - a contact provided by L&H в says his company never bought products or licenses from L&H.  Instead, he says the two firms briefly worked on joint project for applying voice recognition to television, but stopped because there "was no progress."  LG Electronics paid L&H only "engineer charges," he says, akin to labor costs for L&H's share of the work on the failed project.

Another Korean company with which L&H says it has a significant relationship is Hung Chang Co., a maker of communications equipment.  Mr. Bastiaens put revenue from Hung Chang in the range of $5 million and $10 million over the past three quarters.

However, Kim Ho Kyun, a Hung Chang official whom L&H identified as its contact,

says Hung Chang wasn't using L&H products internally and that L&H's $5 million bill was paid by a joint venture called Spia, "not Hung Chang." Another Hung Chang official, Choi Sang Hyun, who was reached independently of L&H says Spia Co. was founded May 2, with Hung Chang as the largest shareholder, but June 28 L&H Korea became its largest, with Hung Chang holding 27.49%. Mr. Choi says Spia makes products based on L&H's voice-recognition technology, and says Hung Chang is only a passive shareholder.

\* \* \*

Mr. Bastiaens also identified Hyundai Securities and Hanvit Bank as providing revenue totaling between $5 million and $10 million. But at Hyundai Securities, two officials, including a contact provided by L&H, say their purchases amounted to just over $1 million. At Hanvit Bank, Lee Jae Bong, manager of network management, says the only contract signed by its intuition tallied $150,000.

[Emphasis added.]

411. On this news, the Company's common stock declined dramatically by 19% from the previous day's close of $37 per share to $29 13/16 per share, trading as low as $26 3/4 per share.

412. The Senior Officers acted quickly to strongly deny the veracity of <u>The Wall Street Journal</u> story and emphatically defended its accounting practices and the accuracy of L&H's previous financial statements. On August 8, 2000, L&H issued a press release to "categorically" deny the charges concerning discrepancies with L&H Korean sales figures, stating, "L&H executives firmly believe that statements attributed to L&H Korean customers are misquoted or factually incorrect and that other information appearing in the article, including its customer roster is distorted." Bastiaens was quoted as adamantly stating: "L&H has recently had tremendous success in the Korean market based on its unique ability to bring advanced speech and language solutions to the fast growing telephony and enterprise market there. We have attained these results through strategic alliances and the development of unique, industry leading solutions. We are quite pleased with our results in Korea and intend to implement the business structure we have developed there throughout our operations worldwide."

164

413.    L&H's denials in the July 6, 2000 article and August 8, 2000 Press Release were false and misleading when made, because the Senior Officers knew or recklessly disregarded the fact that because of the fraudulent schemes described above, L&H had overstated its revenues for 1998 through June 30, 2000 by approximately $373 million.   Further, the Senior Officers knew or recklessly disregarded the fact that all of L&H's Korean revenue was fictitious, based on sham customers and bank schemes.

414.    Despite the Company's assertion that all Korean revenues were accurate, on August 15, 2000, The Wall Street Journal reported that L&H had commissioned a mid-year interim audit of the company by KPMG, the Company's regular auditors.   The goal of the audit was to "allay concerns about the financial results of [L&H's] South Korean division."   Despite inherent conflict in KPMG re-auditing its own work, L&H selected KPMG to perform this "interim audit" because L&H management was confident that KPMG would continue to cooperate in concealing or willfully and recklessly ignoring the underlying fraud.

415.    In announcing the "interim audit," L&H spokesman Ron Schuermans proclaimed, "we're doing this to send a positive signal to the market.   We're confident that, when the audit is completed, all our revenue figures as we have reported them will be confirmed."   Further, defendant Bastiaens stated, in an August 13, 2000 press release, "We have no doubt that the auditors will confirm that during the first two quarters of 2000 L&H Korea had strong revenues and a very solid business base, as already publicly reported. . . .   We have commissioned this audit because we're determined to remove any possible uncertainty about the integrity of our financial results."   However, Bastiaens and the Senior Officers knew of the massive underlying fraud.   Further, they knew or recklessly disregarded the fact that the only way that the audit could validate the prior inflated-figures was if KPMG continued with its complicit audit practices and KPMG, like L&H, was highly

165

motivated to conceal the massive accounting fraud at L&H.

416.    On August 18, 2000, <u>The Wall Street Journal</u> reported that on July 27, 2000, Bastiaens purchased 625,000 shares of L&H stock for $40.00 per share from an entity through which Lernout and Hauspie controlled L&H.  That price represented a premium of 34% above the stock's closing price of $29.88 per share and, according to an L&H spokesperson, reflected Bastiaens' "bullish" stance.  Bastiaens allegedly borrowed the entire $25 million from Artesia Banking Corporation to pay for the stock.  According to an L&H spokesman, Lernout and Hauspie retained the voting rights for the 625,000 shares.  This suspicious transaction was intended to give the appearance of insider confidence in the Company, to artificially inflate the price of L&H stock and to distract investors from concerns over L&H's financial condition.

417.    On August 25, 2000, still maintaining that the Company's accounting practices were proper and just eight days after trumpeting his "bullish" stance, L&H announced that Bastiaens resigned from his position as president and CEO of L&H.  Bastiaens was replaced by John Duerden, the former CEO of Dictaphone.  Bastiaens remained a director of L&H.  Also, Spooren resigned from her post as Senior Vice President of Marketing and Corporate Communications without comment.

418.    On September 21, 2000, L&H issued a press release announcing an SEC investigation into the company, and purporting to fully cooperate with the SEC and also announced that its Audit Committee had initiated its own investigation of the Company's prior financial statements, on the request of L&H's Board of Directors.

419.    On September 22, 2000, <u>The Wall Street Journal</u> reported that L&H had confirmed that the SEC commenced a formal investigation into L&H's accounting practices.  As was later revealed in October 18, 2000 and February 5, 2001 <u>Wall Street Journal</u> articles, the SEC originally began an informal investigation of L&H in January of 2000.  In April of 2000, the SEC sent a letter to

KPMG Belgium requesting information about L&H's accounting practices.  This informal probe involved a number of questions concerning possible related-party transactions. The Company, however, was uncooperative and did not provide all necessary information to the SEC.  As a result, the SEC began a formal investigation, with subpoena power, in late August or early September of 2000.

420.    In reaction to these announcements L&H's stock tumbled to $15.13 by the close of trading on September 21, 2000.

421.    On September 22 and 26, 2000, The Wall Street Journal also raised significant questions about L&H's Asian revenue, specifically about 30 Singapore and Belgian start-up companies that accounted for nearly all of L&H's Asian revenues reported in 1998 and 1999.  The articles also raised concerns that the FLV Fund had financial connections to eight start-ups with close links to L&H, and that those start-ups accounted for a large portion of L&H's 1998 and 1999 revenues.  One of the series of transactions questioned involved four Singapore entities (I-Merge Pte., I-Office Pte., I-Mail Pte. And 1 News Pte.) that each became an L&H licensee in the first quarter of 1999, paying $10 million in license fees to L&H.  Less than six months later, the FLV Fund invested $8 million for a 49% stake in each of the four entities.  These transactions were never disclosed either by L&H or FLV Fund as being "related party transactions," despite the fact that L&H had previously conceded that FLV Fund was a related party.  The Wall Street Journal article raised similar questions about another group of four Singapore start-ups that executed licenses with L&H in the third quarter of 1999.  This group agreed to pay $16 million to L&H for software rights.  At or around the same time, the FLV Fund invested $10 million in the group, $8 million of which was used to pay L&H.  Again, these transactions were not disclosed as a "related party transaction."

422.    In light of the ongoing disclosures and denials, on September 26, 2000, The Wall

Street Journal reported that the Brussels-based EASDAQ stock exchange had launched a formal investigation into L&H. On the same date, Bloomberg News reported that the EASDAQ would also investigate the FLV Fund. Eventually, the EASDAQ investigation was suspended due to the criminal investigation by Belgian authorities.

423.    On September 26, 2000, Bloomberg News interviewed Lernout about the accounting allegations surrounding L&H. In the interview, Lernout stated that he "Couldn`t be more confident of the outlook" for L&H. Despite this fact, the next day, on September 27, 2000, L&H issued a press release warning that the Company expected to report a net loss for the third quarter of 2000, and that revenues would fall short of report a net loss for analyst expectations.

424.    Also on September 28, 2000, The Wall Street Journal reported that Lernout attended a news conference and issued a strongly worded denial of allegations that L&H's surge in Asian revenues was generated by related-party transactions, stating: "We have been more Catholic than the Pope."

425.    The market did not share Lernout's confidence and faith. In response to L&H's third quarter warning, and ongoing disclosures through The Wall Street Journal, L&H shares plunged 30% to close at $9.75 per share B a three year low.

426.    On October 18, 2000, The Wall Street Journal reported that L&H was refusing to provide the SEC with the names of the investors behind the thirty corporate customers that were the focus of the SEC investigation, and who accounted for approximately 25% of the 1999 revenues and 10% of 1998 revenues. While L&H acknowledged that it helped start the 30 companies and initially financed their operations, the Company maintained that the firms are owned by unnamed independent investors interested in developing new applications for L&H speech software. To quell the circulating allegations, L&H released new details about the operations of the 30 companies. The new

information, however, only raised further questions about their viability and independence from L&H. For example, of the 17 companies L&H agreed to discuss, none has any direct employees. Seven companies are relying on L&H employees to do work for them and have agreed to repay L&H for its services.  The other 10 have not started developing software, though they have paid hefty licensing fees to L&H.  According to the article, the 30 companies are all registered at several addresses in Belgium and Singapore, and many have common officers and nominee shareholders. The article quoted Paul R. Brown, chairman of the accounting department at NYU's Stern School of Business as sating that it appears the start-ups and L&H are "under common management," especially in the case where L&H is paying employee salaries for the start-ups under oral contracts. Professor Brown stated, "I'd be hard-pressed to define those as independent revenues."

427.    On October 26, 2000, <u>The Wall Street Journal</u> issued a follow-up story concerning the related, start-up companies responsible for a significant portion of L&H's revenues.  The article noted:

> [L&H's] claim that it received multimillion-dollar license payments from four Belgian start-up companies isn't supported by financial statements the ventures have filed with Belgium's central bank.  L&H booked $3 million in license payments from each of the four companies in later 1998, according to an accounting document the maker of speech-recognition software provided to <u>The Wall Street Journal</u> in response to a request for substantiation of its revenues.  But the July central-bank filings of the four start-ups show no expenditures close to being that big, nor do their balance sheets list assets as large as the purported value of the licenses.

428.    Shortly after the October 26, 2000 story was published, the four companies filed corrective financial statements with the Belgian authorities.  In fact, on November 6, 2000, <u>The Wall Street Journal</u> reported that the original parent company of the four Belgian start-ups said the companies paid only $6 million to L&H during 1998 and 1999, not the $12 million recorded by L&H in 1998.  According to <u>The Wall Street Journal</u>, this amount is consistent with the corrective filings of

the four start-ups.

## B.  ADMISSION OF ACCOUNTING IRREGULARITIES

429.   After months of vehement denials, on November 9, 2000, L&H issued a press release announcing that as a result of past accounting "errors and irregularities" the Company would need to restate the most recent 2-1/2 years of financial statements. Specifically, the Company announced:

> As a result of certain errors and irregularities identified in the audit committee inquiry, the Company expects to restate its financial statements for the periods 1998, 1999 and for the first half of 2000.  Although the audit committee is working diligently to determine the impact of these discrepancies on L&H's financial statements for these periods, L&H does not expect the audit and necessary restatements to be completed by November 14, 2000.  Accordingly, the Company does not believe that its Form 10-Q for the third quarter ended September 30, 2000 will be filed in a timely manner.

The Company also warned that its third quarter 2000 revenues would "be at least $40 million below its previously published range of $165 to $185 million."  The Company also announced a major corporate shake-up, including: (1) that Lernout and Hauspie both resigned their posts as executive co-chairmen, but intended to remain on L&H's Board of Directors; (2) that John Duerden, the newly appointed CEO was appointed the sole Managing Director; (3) that Roel Pieper was appointed Chairman of the Board; (4) that a new CFO would be appointed by Duerden; and (5) that Willaert would step down as managing director.  The Company announced that KPMG's mid-term audit would not be completed by November 14, 2000.

430.   L&H's announcement of "accounting irregularities" is, in accounting terms, tantamount to an admission of fraud.  Statement of Auditing Standards No. 53 issued by the American Institute of Certified Public Accountants defines "irregularities" as "intentional misstatements or omissions" in financials statements including "fraudulent financial reporting undertaken to render financial statements misleading, sometimes called management fraud."

170

431.    In reaction, on November 9, 2000, both NASDAQ and EASDAQ suspended trading. Prior to the suspension, the price of L&H on the NASDAQ market fell as low as $6.2188 and the price of the commons stock on the EASDAQ fell to as low as $ 3.70.  After trading finally resumed on December 8, 2000, the stock plummeted to $1.40 per share and continued its free fall to trade below $1 per share from December 12 to December 15, 2000.

432.    On November 13, 2000, The Wall Street Journal reported that Paul Behets, a KPMG partner in charge of auditing L&H for many years, joined an L&H affiliate in 1999, shortly after KPMG issued its clean audit opinion concerning L&H's fraudulent 1998 financial statements. According to the article, Behets had been responsible for auditing L&H's books at KPMG Belgium from 1991 until July 1, 1999.  In July 1999, Behets left KPMG to become CEO of S.A.I.L. Trust Foundation (formerly FLV Foundation), created by Lernout and Hauspie to promote speech and language technology.  L&H acknowledged the S.A.I.L. Trust as a related party in the Company's SEC filings.

433.    The November 13, 2000 The Wall Street Journal article also noted that another former senior manager at KPMG Belgium, Chantal Mestdagh, left the accounting 1998 to become the CFO of defendant LHIC.

434.    On November 17, 2000, following months of allegations, investigations and admissions of irregularities, The Wall Street Journal reported that KPMG finally withdrew its audit report of the L&H 1998 and 1999 results, stating that its prior audit opinions "should no longer be relied upon."

## C.    THE AUDIT COMMITTEE REPORT

435.    On December 19, 2000, L&H publicly revealed the findings of the Audit Committee Report that had previously been finalized and presented to the L&H Board of Directors on November

20, 2000. The Audit Committee Report contained a strong rebuke to L&H and the Senior Officers, stating:

> The combination of the rapid growth experienced by L&H and the market pressure to meet expectations appear to have resulted in a loss of focus on the rules and regulations governing public companies, and a failure to appreciate the need for increasing and stronger controls.

The report listed a host of accounting irregularities, related to the Company's 1998 and 1999 revenues.  For example:

(a) the Audit Committee Report concluded that sales practices in L&H's Burlington, Massachusetts office were "unacceptable," and included improper and/or premature recording of revenue on certain transactions, including "barter transactions, right to return products, transactions where the customers' ability to pay depended on the receipt of an investment from L&H, and the separation of one agreement into two contracts B a license agreement and a development agreement B so that more revenue could be booked in an earlier quarter than might otherwise occur." The Audit Committee Report also criticized L&H's practice of "charging a 'finders fee' in the form of the purchase of a license from L&H in exchange for L&H arranging for an investment in the customer by" an undisclosed, related investor.  Based upon information and belief, as articulated above, the undisclosed, related investor is the FLV Fund.

(b) the Audit Committee Report concluded that several transactions stemming from L&H's Belgium office required restatement because "the revenue was recorded sooner than it should have been."  Specifically, the Audit Committee Report found that "[I]n some instances, it appears that the customer did not have the ability to pay for the product, and was not even invoiced for it."  The Audit Report noted that problematic transaction included "backdating of contracts, one side letter, several instances of late delivery of product, a promise to deliver an additional language at no extra charge 'when and if available,' and an understanding that the cost of certain options would be reimbursed through a subsequent arrangement."

(c) the Audit Committee Report also reported the difficulty in obtain correct and/or supporting information concerning several of the LDCs, CLDCs and IACs, concluding, "[B]ased on our review of certain internal documents and outside marketing material and limited discussions with the investors or their representatives, that the investors anticipated, in substance, that they were buying the future rights to a product (language) to be developed by L&H and thus were effectively funding the Company's research and development efforts to build that language."  Thus, the Audit Committee Report concluded that because these investors were funding research and development, the proper accounting would depend upon whether or not

the investors were related parties.  If the investors were independent, "accounting for such transactions would require deferral of all the revenue and recognition over the development period."  If, however, the investors were related parties, "the relevant accounting literature presumes that the related party investors will be repaid and the funded amounts are recognized as a liability."  The drafters of the Audit Committee Report, however, had insufficient information on the purported investors Β the majority of whom were the FLV Fund and Mercator.

(d) The Audit Committee Report provided that it was "unable to reach any conclusions with respect to the issues in Korea," including matters related to the "difficulties or inability to obtain over $100 million in cash purportedly being held in L&H accounts at Korean banks," and payment of $25 million to Seo in early 2000.  The inability to reach a conclusion on the Korean issues was due, in part, to the unavailability of information from Korean sources and KPMG.  Accordingly, the Audit Committee Report recommended, "that the entire matter be referred to the authorities for further investigation."

436.    The Audit Committee Report concluded, in part, that: (a) L&H had improperly recorded as much as $277 million in revenue during 1998, 1999 and the first half of 2000; (b) that the Company should reverse all of its Korean revenues recorded during 1999 and 2000, amounting to approximately $182 million; and (c) that software license revenues from twenty-four of the thirty start-up companies were incorrectly booked because those companies were not buying software from L&H, but rather, were paying L&H employees to develop future products Β in effect, funding L&H's research and development.

437.    As a result of the rampant and pervasive fraud across all sector of L&H, the drafters of the Audit Committee Report also recommended increased accountability and controls and disciplinary action against certain employees.  The Audit Committee Report expressly recommended that the Board consider disciplinary action against Willaert, Bastiaens, Hauspie, Lernout, and Dammekens.

438.    The Audit Committee Report did not, however, examine the Dictation Consortium and BTG transactions "because of the age of the transactions and our understanding that KPMG

173

carefully reviewed these transactions at the time."  Notwithstanding the fact that KPMG presumably "careful[ly] reviewed" all transactions as L&H's auditors, the Audit Committee Report did conclude that revenues from 24 of 30 new companies B modeled on the Dictation Consortium and BTG - were incorrectly booked.

### D.     POST-AUDIT COMMITTEE REPORT NEWS

439.    On November 21, 2000, <u>The Wall Street Journal</u> reported that the EASDAQ had suspended trading of FLV Fund.  The article described the FLV Fund as an investment vehicle which Jo Lernout and Pol Hauspie "exercise considerable influence over its affairs," with "a story of investing in L&H customers, typically small companies that pay license fees to L&H."

440.    On November 22, 2000, L&H announced the resignation of three directors, including Hauspie.  L&H also announced, "Seo has been suspended as president and general manager of Lernout& Hauspie Korea and has been relieved of all responsibilities and access and is no longer director of Lernout & Hauspie Korea."

441.    On November 24, 2000, <u>The Wall Street Journal</u> reported that FLV Fund claimed that an L&H Korea executive misused $30 million of FLV Fund's money.  According to the LV Fund, Seo improperly pledged $30 million as collateral to a Korea bank "in favor of" himself.

442.    On November 29, 2000, L&H filed with for Chapter 11 bankruptcy the U.S. Bankruptcy Court for the District of Delaware.  According to a November 30, 2000 <u>Wall Street Journal</u> article, the decision to file for bankruptcy protection came after L&H executives discovered about $100 million was missing from the Company's South Korean unit.

443.    A November 30, 2000 <u>Bloomberg News</u> article on the L&H debacle quoted Lernout. Gone were Lernout's vehement denials of accounting improprieties and references to the Pope.  In their place, were more somber admissions:

174

> The audit will show where we lost control B the audit will show the nature and substance of it. . . . One of the classical errors is entrepreneurs have too strong a hold on the steering wheel B entrepreneurs are not necessarily good managers B when you go fast you make errors. We were not the best managers for this size company. I should have insisted earlier on a more professional level of management suited for the kind of company that we were already two years ago. I should have insisted on a less entrepreneurial style of management.

444.    On December 1, 2000, The Wall Street Journal reported on John Duerden's attempts, as L&H's new CEO, to distance himself and the Company from prior management. According to Lanny Davis, L&H outside counsel, Duerden "came to questionable financial reporting and conduct of prior management the conclusion that could not be accepted any longer, and the only way to save the company was by seeking protection to be able to rebuild the assets."  One day earlier, on November 30, 2000, an article in eWeek quoted Davis on the same theme: "John Duerden and [General Counsel] Daniel Hart made the determination . . . with the new leadership of the board that . . . the company was to correct all previous problems of accounting and financial misstatements to clean house. They blew the whistle and insisted on the honesty and integrity of the company."

445.    On December 7, 2000, The Wall Street Journal issued a lengthy article on the rise and fall of L&H, entitled, "How High-Tech Dream Shattered In Scandal at Lernout & Hauspie."  The article provided a detailed history of L&H, the Company's ties to the FLV Fund and the ongoing accounting scandal, noting:

> New management named in August believes it has strong evidence of a pattern of deceptive and questionable accounting practices stretching across many of L&H's operations, according to people close to the Belgian company.  The company . . . appears to have improperly reported revenue from barter deals with other software firms in which no cash changed hands; immediately recognized revenue for sales that were contingent on L&H later performing development work for the customer; and sometimes reported sales before contracts were signed, when it was unclear the customer had the ability to pay or when the customer's ability to pay depended on investment from L&H.

The article also quoted L&H's new CEO as stating that certain officials at L&H Korea "had been

misrepresenting the revenue and financial statements of the subsidiary," noting that certain purported customers "either didn't exist or weren't able to pay."  This article also noted that John Duerden had concluded that $100 million on the book of L&H's Korean unit was missing.

446.    On December 14, 2000, The Wall Street Journal reported on the thirty start-up companies that comprised a significant portion of L&H's revenues.  The article revealed that Mercator was the ultimate owner of 16 of the 30 start-up firms that were purportedly responsible for a major amount of the Company's 1998 and 1999 revenues.  The article noted that FLV Fund had funded, at least in part, 8 of the remaining 14 start-ups.

447.    On January 5, 2001, the Associated Press reported that the Belgian judge presiding over L&H's Belgium bankruptcy proceeding acknowledged that there is "no doubt there was fraud" at L&H.

448.    On March 2, 2001, L&H announced that co-founder Lernout was forced to step down as chief technology officer.  Lernout had been the last remaining senior executive from the time the accounting scandal erupted.

### E.        CANCELLATION OF KOREAN REVENUE

449.    As a result of the above-referenced Korean schemes, L&H was able to report incredibly strong revenue growth between September 1999 and June 2000.  All of this revenue was fictitious and/or unsupportable.  By the close of the Class Period, the Company admitted that over $100 million in revenue was effectively gone.  Then, in April 2001, L&H revealed that 70% of the almost $160 million in Korean revenue was entirely fictitious.  Finally, on May 3, 2001, the Company admitted that all of the Korean revenue from September 1999 through June 30, 2000 would be restated and removed.

450.    In November 2000, L&H cancelled 47 of the purported licensing and maintenance

agreements entered into between September 30, 1999 through June 30, 2000 that generated all of the

Korean "revenue," as demonstrated by the following chart:

| Sale Date | License Sales Amount in U.S. Dollars | Cancellation Date | Improper Revenue Scheme |
|---|---|---|---|
| **4Q 1999** | | | |
| 9/30/1999 | 4,000,000 | 11/16/2000 | Factored |
| 12/08/1999 | 8,000,000 | 11/16/2000 | Factored |
| 12/15/1999 | 6,329,000 | 11/14/2000 | Factored |
| 12/17/1999 | 422,000 | 11/16/2000 | No Collection |
| 12/21/1999 | 476,000 | 11/14/2000 | No Collection |
| 12/24/1999 | 563,000 | 11/16/2000 | No Collection |
| 12/24/1999 | 673,000 | 11/16/2000 | No Collection |
| 12/30/1999 | 8,000,000 | 11/14/2000 | Transferred |
| **1Q 2000** | | | |
| 2/29/2000 | 700,000 | 11/14/2000 | Factored |
| 2/29/2000 | 300,000 | 11/14/2000 | Factored |
| 3/23/2000 | 7,300,000 | 11/14/2000 | Factored |
| 3/23/2000 | 7,300,000 | 11/14/2000 | Factored |
| 3/29/2000 | 5,000,000 | 11/16/2000 | Factored |
| 3/30/2000 | 1,000,000 | 11/14/2000 | Transferred |
| 3/30/2000 | 1,000,000 | 11/14/2000 | Other |
| 3/31/2000 | 4,000,000 | 11/16/2000 | Factored |
| 3/31/2000 | 40,000 | 11/14/2000 | Factored |
| 3/31/2000 | 7,200,000 | 11/14/2000 | Factored |
| **2Q 2000** | | | |
| 6/22/2000 | 8,000,000 | 11/14/2000 | Factored |
| 6/26/2000 | 6,000,000 | 11/14/2000 | Factored |

| | | | |
|---|---|---|---|
| 6/27/2000 | 800,000 | 11/14/2000 | Factored |
| 6/27/2000 | 500,000 | 11/15/2000 | No Collection |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 6,800,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,000,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,300,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 2,500,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 3,000,000 | 11/14/2000 | Factored |
| 6/30/2000 | 1,000,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 1,400,000 | 11/15/2000 | Transferred |
| 6/30/2000 | 1,300,000 | 11/15/2000 | Transferred |
| 6/30/2000 | 1,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 1,000,000 | 11/14/2000 | No Collection |
| 6/30/2000 | 1,200,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 3,000,000 | 11/15/2000 | Factored |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| 6/30/2000 | 2,000,000 | 11/14/2000 | Transferred |
| **Undated** | | | |
| | 8,000 | 11/16/2000 | No Collection |
| | 202,000 | 11/16/2000 | No Collection |
| | 44,000 | 11/16/2000 | No Collection |
| | 75,000 | 11/16/2000 | No Collection |
| | 25,000 | 11/16/2000 | No Collection |

| | 4,000,000 | 11/16/2000 | Other |
|---|---|---|---|
| **TOTAL** | $120,457,000 | | |

451.    The effect of the cancellation was staggering. Prior to the cancellation, L&H Korea's accounting records reported available cash of $97.5 million ─ after, the amount was a mere $2.3 million.

452.    Finally, in a document dated April 27, 2001, and filed with the SEC on May 3, 2001, L&H reported its sales in 1998, 1999 and the first half of 2000 were overstated by $373 million, nearly $100 million more than the preliminary overstatement identified by the Audit Committee.

## F.    THE SENIOR OFFICERS RESIGN AND ARE CHARGED WITH OR ARRESTED FOR FRAUD

453.    In addition to the bankruptcy petitions and civil lawsuits, numerous criminal allegations, spanning three continents, have resulted from L&H's financial irregularities.  To date, at least four former top executives, including the Company's two founders, have been arrested.

454.    On or about April 27, 2001, Lernout and Hauspie, and Willaert were arrested in Belgium and charged with forgery and stock manipulation.

455.    In late April 2001, South Korean authorities began investigating allegations against former L&H Korea executives and employees, among them Ju Chul Seo, Sam Cho, Henry Oh, and J.H. Kim and against four South Korean banks, Chohung Bank, Hana Bank, Hanvit Bank and Shinhan Bank.

456.    On May 26, 2001, Bastiaens was arrested by United States officials in Winchester, Massachusetts, in response to a Belgian warrant. Bastiaens was subsequently extradited to Belgium, where he was charged with fraud, insider trading, stock market manipulation and accounting law violations.

457.   During the fall of 2000 and early 2001, as a result of, or related to the ongoing fraud investigation, following individuals resigned their post on L&H's Board: Pol Hauspic, Jo Lernout, Nico Willaert, Gaston Bastiaens, Fernand Cloet, John Duerden, Albert J. Fitzgibbons III, and Roel Pieper.  In addition, the following executives have resigned from L&H or one its subsidiaries:  Seo, Dammekens and Spooren.

458.   On September 11, 2001, <u>The New York Times</u> reported on L&H's filing of new restructuring plan, largely for the benefit of L&H creditors.  In discussing the plan, and future of L&H, CEO Bodson stated; "Shareholders will get nothing.  They are the victims."

## G.   INSIDER SALES

459.   Notwithstanding their duty to refrain from trading L&H stock under these circumstances, or to disclose the insider information prior to selling such stock, several Defendants and corporate insiders sold, shares of L&H stock at prices that had been artificially inflated by Defendants' materially false representations detailed above.  In the aggregate, certain defendants and other insiders collectively sold more than 1.558 million share of L&H common stock for proceeds of approximately $60.96 million during the Class Period.

460.   In August and September 1998, while the price of L&H stock was artificially inflated as a result of L&H's improper accounting and other practices, defendants Bastiaens, Dammekens and Vandendriessche and other L&H insiders sold approximately 217,850 shares of L&H common stock for gross proceeds exceeding $10.4 million as follows:

| Insider | Transaction Date[1] | Shares Sold | Transaction Price | Gross Sale Proceeds |
|---|---|---|---|---|
| Bastiaens, | 09/15/98 | 20,000 | $45.250 | $905,000.00 |

| | | | | |
|---|---|---|---|---|
| Gaston | | | | |
| Bouwers, Koen | 08/19/98 | 40,000 | $48.500 | $1,940,000.00 |
| Calabrese, Gerald S. | 08/19/98 | 29,600 | $48.500 | $1,435,600.00 |
| Dammekens, Carl | 08/18/98 | 27,000 | $48.500 | $1,309,500.00 |
| Doherty, Thomas | 08/19/98 | 40,000 | $48.500 | $1,940,000.00 |
| Kutnick Robert | 08/19/98 | 40,000 | $48.500 | $1940,000.00 |
| Van Compernolle, Dirk | 08/18/98 | 20,250 | $48.500 | $982,125.00 |
| Vandendriessche, Erwin | 08/14/98 | 1,000 | $42.750 | $42,750.00 |
| | | | | |
| **Totals:** | | **217,850** | | **$10,494,975.000** |
| [1] The transaction date is the approximate date of sale as reflected on Form 144. | | | | |

461.    The August and September sales were suspicious, in part, because they closely followed L&H's August 11, 1998 filing of the Form 6-K with the SEC that contained that artificially inflated revenue and earnings for the second quarter of 1998.

462.    In November of 1998, Defendants and other L&H insiders sold approximately 271,826 shares of L&H common stock for gross proceeds exceeding $11 million as follows:

| *Insider* | *Transaction Date* | *Shares Sold* | *Transaction Price* | *Gross Sale Proceeds* |
|---|---|---|---|---|
| | | | | |
| Bouwers, Koen | 11/18/98 | 110,326 | 40.4629 | $4,464,109.90 |
| Calabrese, Gerald S. | 11/23/98 | 15,000 | 41.3125 | $619,687.50 |
| Doherty, Thomas | 11/23/98 | 20,000 | 41.3125 | $826,250.00 |

| | | | | |
|---|---|---|---|---|
| Kutnick, Robert | 11/24/98 | 20,000 | 41.3125 | $826,250.00 |
| | 11/24/98 | 5,000 | 40.6250 | $203,125.00 |
| Mendez, Florita | 11/18/98 | 51,500 | 40.0312 | $2,061,606.80 |
| Spooren, Ellen | 11/23/98 | 33,500 | $41.3124 | $1,383,965.40 |
| | 11/30/98 | 16,550 | $40.9547 | $677,800.28 |
| | | | | |
| **Totals:** | | **271876** | | $11,062,794.89 |

[1] The transaction date is the approximate date of sale as reflected on Form 144.

463.    The November 1998 sales were suspicious, in part, because they closely followed L&H's October 27, 1997 press release and October 29, 1997 filing of the Form 6-K with the SEC that contained that artificially inflated revenue and earnings for the third quarter of 1998.

464.    In November of 1999, Florita sold approximately 49,000 shares of L&H common stock for gross proceeds exceeding $1.6 million as follows:

| *Insider* | *Transaction Date*[1] | *Shares Sold* | *Transaction Price* | *Gross Sale Proceeds* |
|---|---|---|---|---|
| Mendez Florita | 11/02/99 | 49,000 | 32.8010 | $1,607,249.00 |

[1] The transaction date is the approximate date of sale as reflected on Form 144.

465.    Mendez's November 1999 sales were suspicious, in part, because they closely followed L&H's October 27, 1999 announcement of artificially inflated revenue and earnings for the third quarter of 1999.   These sales also occurred as L&H was beginning its fraudulent Korean scheme, following the September 1999 acquisition of Bumil.

466.    Between May 15 and May 31, 2000, the defendants Spooren and Vanderhoydonck, and other L&H insiders, sold approximately 394,394 shares of L&H common stock for gross proceeds of exceeding $12.7 million as follows:

| Insider | Transaction Date | Shares Sold | Transaction Price | Gross Sale Proceeds[1] | Shares Remaining (at Month End)[2] | % of Holdings Sold |
|---|---|---|---|---|---|---|
| Calabrese, Gerald S.[3] | 05/16/00 | 80,000 | $46.5218 | $3,721,744.00 | | |
| | | | | | | |
| **Calabrese Totals:** | | **80,000** | | **$3,721,744.00** | | |
| Mendez, Florita | 05/16/00 | 10,000 | $46.91 | $440,000.00 | | |
| | 05/18/00 | 2,000 | $45.27 | $84,720.00 | | |
| | 05/22/00 | 15,000 | $39.36 | $546,750.00 | | |
| | 05/25/00 | 10,620 | $41.19 | $406,533.60 | | |
| | 05/26/00 | 5,000 | $38.50 | $177,950.00 | 175,530 | |
| | | | | | | |
| **Mendez Totals:** | | **50,620** | | **$1,955,793.60** | **175,530** | **22.383%** |
| Spooren, Ellen | 05/15/00 | 4,000 | $46.91 | $176,000.00 | | |
| | 05/22/00 | 15,000 | $39.36 | $546,750.00 | | |
| | 05/23/00 | 20,000 | $39.75 | $736,800.00 | | |
| | 05/25/00 | 11,000 | $41.19 | $421,080.00 | 0 | |
| **Spooren Totals:** | | **50,000** | | **$1,880,630.00** | | **100%** |
| Van Coile, Bert | 05/15/00 | 1,460 | $46.00 | $65,437.20 | | |
| | 05/18/00 | 4,028 | $46.91 | $184,200.44 | | |
| | 05/22/00 | 15,000 | $39.36 | $572,700.00 | | |

183

| | 05/31/00 | 29,512 | $41.62 | $1,193,465.28 | 30,020 | |
| **Van Coile Totals:** | | **50,000** | | **$2,015,802.92** | **30,020** | **62.484%** |

| Vanderhoy donck, Francis | 05/16/00 | 41,000 | $46.91 | $954,480.00 | | |
| | 05/18/00 | 32,000 | $45.27 | $692,480.00 | | |
| | 05/18/00 | 9,000 | $45.00 | $192,330.00 | | |
| | 05/23/00 | 20,000 | $40.62 | $339,800.00 | | |
| | 05/25/00 | 5,000 | $42.50 | $94,350.00 | | |
| | 05/30/00 | 56,774 | $40.39 | $951,532.24 | 0 | |
| | | | | | | |
| **Vanderhoy donck Totals:** | | **163,774** | | **$3,224,972.24** | | **100.%** |
| | | | | | | |
| **Totals:** | | **394,394** | | **$12,798,942.76** | | |

[1]Gross proceeds for Mendez, Spooren, Van Coile and Vanderhoydonck are calculated by the number of shares sold multiplied by the sales price minus the number of shares multiplied by the option price per share.

[2] For defendants Mendez and Van Coile, the number of shares held at month end reflects the 2:1 stock split of 5/12/2000.

[3] This is a proposed sale pursuant to Form 144 and the transaction date is the approximate date of sale as reflected on the Form 144.

467.    Defendants Spooren and Vanderhoydonck's and other insiders' stock sales during the Class Period were unusual and suspicious in timing and amount.  The majority of the above insiders did not sell any stock in 1999 or any prior period in 2000. Moreover, the stock sales represented substantial portions or all of their total holdings.  For example, in May 2000, Van Coile sold almost

two-thirds of his total holdings, or 62%, and, defendants Spooren and Vanderhoydonck each sold 100% of their total holdings.

468.    Moreover, the timing of the May 2000 sales was highly suspicious because, as alleged above, defendants Spooren and Vanderhoydonck, and the fraudulent practices as L&H to improperly record revenue, as well that lack of proper internal controls over the company.  Further, the sales occurred while the defendants and senior officers were fully aware of the SEC investigation into L&H's fraudulent practices that began in January 2000.  In fact, in April 2000, the SEC had expanded its investigation, requesting documents from KPMG.   Despite this knowledge, the above-referenced individuals took advantage of the share price of L&H in the wake of the Company's May 9, 2000 press release announcing record results for the first quarter of 2000 (due largely to the recording of fictitious revenue from Korean).  Further, the insiders were aware or reckless in not knowing that L&H's acquisition of Dictaphone, also in May 2000, would necessitate the filing of Forms 10-Q and 10-K with the SEC.  The insiders sought to dump their shares prior to the release of those SEC forms that would - for the first time - detail L&H's finances and raise suspicions among analysts and commentators.

469.    Finally, in July 2000, defendant Lernout sold 625,000 shares of L&H stock reaping proceeds of $25 million as follows:

| Insider | Transaction Date | Shares Sold[1] | Transaction | Gross Sale Proceeds | Shares Remaining (At Month End) | % Holdings Sold |
|---------|-----------------|-----------|-------------|---------------------|-------------------------------|----------------|
| Lernout, Jo | 07/27/00 | 625,000 | 40.00 | $25,000,000.00 | 12,199,000 | 4.904% |
| [1] These securities are beneficially owned by L&H Holdings N.V. | | | | | | |

470.    Lernout was not the only defendant to profit from the July 27, 2000 sales.  L&H

Holdings N.V. was owned, in large part, by Lernout and Hauspie.  However, Mercator owned 6.9%

of L&H Holding and Verbeke personally owned an 8.9% interest Holding.

471.    Defendant Lernout's L&H Holding sale was unusual and suspicious for several

reasons:  (a) the sale occurred <u>after</u> Lernout had knowledge of the SEC's investigation into L&H's

accounting practices and document request to KPMG, but <u>before</u> that investigation was disclosed to

the market; (b) the sale occurred <u>after</u> analysts and reporters began investigating L&H's suspicious

sales, but <u>before</u> the Company's admission of "accounting irregularities."  In fact, at the time Lernout

dumped the above referenced shares, journalists were requesting information on L&H's purported

Korean and Singapore customers.  For example, on June 6, 2000, Spooren sent and urgent e-mail to

Bastiaens and Soo Am Cho noting that <u>The Wall Street Journal</u> was inquiring about L&H's Korean

practices, noting "[t]hey want to write a article and it DOES NO[T] LOOK good."  Spooren also

referenced a May 1999 <u>Wall Street Journal</u> article and investigation, stating, "this situation is as

serious as the Matthew Rose situation. [Rose is another <u>Wall Street Journal</u> reporter.] We controlled

it as we sat on top of him.  This is new and we desperately need the active help of Asia Pacific and

Korea."  Further, on July 6, 2000, <u>The Wall Street Journal</u> published its first article noting the

"unusual surge in orders from Korea and Singapore."  The preliminarily results of the <u>Journal</u>'s

investigations, however, would begin to hit light on August 9, 2000; only two weeks <u>after</u> Lernout

sold his shares reaping $25 million in proceeds.

## H.    THE AFTERMATH

472.    In early August, 2000, the first class action complaints for violation of federal

securities laws were filed on behalf of all purchasers of L&H securities against certain officers

and directors of L&H, KPMG and other defendants involved in the securities fraud at the

Company.  Notice of the pendency of these actions and the claims asserted was published

pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3) and these

actions were ultimately consolidated.  On October 13, 2004, Notice of Proposed Settlement as to

certain defendants [the KPMG defendants] was publicly issued providing for "a Settlement Fund

of $115,000,000 ($115 million) to pay claims of investors who purchased the common stock of

L&H on the *NASDAQ* Stock Market, purchased L&H call options, or sold L&H put options on

any *United States-based options exchange* between April 28, 1998 and November 9, 2000,

inclusive." (Emphasis added).  By its very terms, that settlement excluded the Class members on

whose behalf the instant claims are brought.  Settlement with other defendants in the consolidated

actions followed in March 2005.  In addition, in the Dexia Action, following the denial of Dexia's

motion to dismiss the Second Amended Complaint, as well as an interlocutory appeal taken by

Dexia, the plaintiffs in that action filed their Third Amended Complaint on or about February 22,

2006.

473.    On October 10, 2002, the SEC announced the filing of a civil injunctive action in

United States District Court for the District of Columbia against L&H, alleging that, from 1996

through the second quarter of 2000, while its common stock was listed on NASDAQ and

EASDAQ, L&H engaged in a variety of fraudulent schemes to inflate its reported revenue and

income.  On February 28, 2003, Judge Paul Friedman of the United States District Court for the

District of Columbia entered a permanent injunction against L&H.  The court's Order

permanently enjoined L&H from violating the anti-fraud, reporting, books and records and

internal controls provisions of the federal securities laws.

474.    In a related matter, on March 4, 2003 L&H consented to the entry of an SEC

order revoking the registration of its common stock. In its Order, the SEC found that L&H

included materially false and misleading information in its financial statements and its Annual

Reports on Form 20-F and Form 10-K for the calendar years ended December 31, 1996, 1997, 1998 and 1999, and in its Quarterly Reports on Form 6-K or Form 10-Q for the first two quarters of 2000. The Commission also found that Lernout & Hauspie failed to file annual or quarterly reports for any fiscal period subsequent to its fiscal quarter ending June 30, 2000.

## XII.   CLASS ACTION ALLEGATIONS

475.   Lead Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of Lead Plaintiffs and all other persons or entities who purchased the common stock and call options or sold put options only on EASDAQ, of L&H during the period April 28, 1998 through November 9, 2000, inclusive (the "Class"). Excluded from the Class are the defendants herein, and the officers and directors of L&H and the members of their immediate families, any entity in which any defendant has a controlling interest or is a parent or subsidiary or is controlled by the any defendant, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the excluded persons or entities.

476.   The Class is so numerous that joinder of all members is impracticable. As of June 27, 2000, approximately 143 million shares of L&H common stock were outstanding in an actively traded and efficient market on the EASDAQ. Thus, there are believed to be thousands of persons who purchased L&H securities during the Class Period. During the Class Period, L&H stock was listed and traded on the EASDAQ under the symbol "LHSP."

477.   Lead Plaintiffs' claims are typical of the claims of the other members of the Class, as Lead Plaintiffs and all members of the Class sustained damages arising out of defendants' conduct in violation of federal law and state law as complained of herein.

478.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class action and securities litigation.

479.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

480.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements disseminated by defendants to the investing public and to Class members during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects and financial condition of the Company;

(c)    whether defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting such material facts;

(d)    whether defendants' non-disclosures and/or misrepresentations constituted a fraud on the market by artificially inflating the market prices of L&H common stock during the Class Period; and

(e)    whether the members of the Class have sustained damages and, if so, what is the proper measure of such damages.

### XIII.   FRAUD ON THE MARKET PRESUMPTION

481.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts regarding L&H financial results during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The common stock of the Company traded on the EASDAQ, an efficient and open market;

(d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock;

(e)    Lead Plaintiffs and the members of the Class purchased their L&H stock between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented facts; and

(f)    L&H traded on the EASDAQ and was followed by analysts, including, inter alia, Auerbach Grayson, Branch Cabell & Co., Ladenburg, Thalmann & Co., SG Cowen Sec. Corp. and Deutsche Bank. The price of L&H's stock reflected the effect of news disseminated in the market.

Based on the foregoing, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## XIV.    THE SAFE HARBOR PROVISION IS INAPPLICABLE

482.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

### COUNT I

**Violation of ' 10(b) of the 1934 Act and
Rule 10b-5 as Promulgated by the SEC
Against Defendants Lernout, Hauspie,
Dammekens, Bastiaens and Willaert**

483.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

484.    This Count is asserted against defendants Lernout, Hauspie, Dammekens, Bastiaens and Willaert for violations of ' 10(b) of the 1934 Act, 15 U.S.C. ' 78j(b), and Rule l0b-5, as promulgated thereunder.

485.    During the Class Period, defendants, Lernout, Hauspie, Dammekens, Bastiaens and Willaert, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

486.   During the Class Period, these defendants, pursuant to said scheme, plan and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of each of the deceptive and materially false and misleading statements to the investing public alleged herein.

487.   As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

488.   Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

489.   By reason of the foregoing, defendants Lernout, Hauspie, Dammekens, Bastiaens and Willaert directly violated ' 10(b) of the 1934 Act and Rule l0b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of connection with their purchases of L&H common stock during the Class Period.

## COUNT II

### Violation of ' 10(b) of the 1934 Act and

**Rule 10b-5 as Promulgated by the SEC**
**Against Defendants Vandendriessche, De Pauw and Cauwelier**

490.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

491.    This Count is asserted against defendants Vandendriessche, De Pauw and Cauwelier for violations of '10(b) of the 1934 Act, 15 U.S.C. '78j(b), and Rule 10b-5, as promulgated thereunder.

492.    During the Class Period, defendants, Vandendriessche, De Pauw and Cauwelier, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

493.    During the Class Period, these defendants, as members of the L&H Audit Committee, either knew of, or recklessly disregarded, the issuance of materially false and misleading financial statements issued by L&H for the reasons set forth above.  These defendants, pursuant to a scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of each of the deceptive and materially

false and misleading statements alleged herein.

494.     As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

495.     Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

496.     By reason of the foregoing, defendants Vandendriessche, De Pauw and Cauwelier, directly violated ' 10(b) of the 1934 Act and Rule l0b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and practices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

**COUNT III**

**Violation of ' 20(a) of the 1934 Act**
**Against the Senior Officers**
**and the Audit Committee Defendants**

497.    Lead Plaintiffs repeats and re-alleges each and every proceeding allegation as if set forth fully herein.

498.    During the Class Period, defendants Lernout, Hauspie, Dammekens, Bastiaens, Willaert, Cauwelier, De Pauw, and Vandendriessche by virtue of their positions, stock ownership an/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons of L&H within the meaning of ' 20(a) of the 1934 Act.

499.    The Individual Defendants had the power to control and influence the conduct, acts and practices of L&H.

500.    By reason of the conduct alleged in the Complaint, each of the defendants named in this Count III are liable for the violations of the federal securities laws by L&H and are liable to Lead Plaintiffs and the members of the Class for the substantial damages which they suffered in connection with their purchases of L&H common stock during the Class Period at artificially inflated prices.

**COUNT IV**

**Violation of ' 10(b) of the 1934 Act and**
**Rule 10b-5 as Promulgated by the SEC**
**Against Defendants Vanderhoydonck, and Spooren**

501.    Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if fully set forth herein.

502.    This Count is asserted against defendants Vanderhoydonck and Spooren for violations of ' 10(b) of the 1934 Act, 15 U.S.C. ' 78j(b), and Rule 10b-5, as promulgated thereunder.

503.    During the Class Period, defendants Vanderhoydonck, and Spooren  singly and in

concert with defendants Lernout, Hauspie, Dammekens, Bastiaens and Willaert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H stock during the Class Period at artificially inflated prices.

504.   During the Class Period, Vanderhoydonck, and Spooren sold millions of dollars of L&H common stock for their own personal benefit while in possession of material non-public information concerning L&H as alleged above**.**  In addition, Vanderhoydonck engaged in acts, practices, and a course of business and employed devices, schemes, and artifices to defraud which operated as a fraud on plaintiff and the Class by investing funds in companies for the purpose of those companies purchasing products from L&H for the sole purpose of L&H publicly reporting artificially inflated revenues and earnings.  Vanderhoydonck knowingly, or in reckless disregard for the truth, engaged in these acts, practices, and a course of business and employed devices, schemes, and artifices to defraud.

505.   As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by these defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in

purchasing L&H common stock.  Had plaintiff and the other members of the Class know the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

506.     Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

507.     By reason of the foregoing, defendants Vanderhoydonck and Spooren directly violated ' 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class in connection with their purchases of L&H common stock during the Class Period. In addition, Spooren made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## COUNT V

### Violation of ' 10(b) of the 1934 Act and
### Rule 10b-5 as Promulgated by the SEC
### Against Defendants KPMG US and KPMG Belgium

508.     Lead Plaintiffs repeats and re-alleges each and every proceeding allegation as if fully set forth herein.

509.     This Count is asserted against defendants KPMG US and KPMG Belgium for violations of ' 10(b) of the 1934 Act, 15 U.S.C. ' 78j(b), and Rule 10b-5, as promulgated thereunder.

510.     During the Class Period, KPMG US and KPMG Belgium singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transaction, practices, and course of  business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various

197

deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase L&H common stock during the Class Period at artificially inflated prices.

511.   During the Class Period, these defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of each of the deceptive and materially false and misleading statements to the investing public as alleged herein.

512.   As a result of the dissemination of the false and misleading statements set forth above, the market price of L&H common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing L&H common stock.  Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

513.   Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

514.   By reason of the foregoing, defendants KPMG US and KPMG Belgium directly violated ' 10(b) of the 1934 Act Rule 10b-5, as promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which

198

they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H common stock during the Class Period.

## COUNT VI

### Violation of '20(a) of the 1934 Act
### Against KPMG US

515.     Lead Plaintiffs repeat and re-allege each and every proceeding allegation as if set forth fully herein.

516.     During the Class Period, defendant KPMG US by virtue of KPMG Belgium's reliance on it to review L&H's financial statements for compliance with U.S. GAAP, had the power to control and influence KPMG Belgium with regard to KPMG Belgium's audits of L&H and KPMG Belgium's issuance of its materially false and misleading audit opinions concerning L&H.  As such, KPMG US was, at the time of the wrongs alleged herein, a controlling person of KPMG Belgium within the meaning of '20(a) of the 1934 Act.

517.     By reason of the conduct alleged herein, KPMG US is liable for the violations of the federal securities laws by KPMG Belgium and is liable to Lead Plaintiffs and the members of the Class for the substantial damages which they suffered in connection with their purchases of L&H common stock during the Class Period at artificially inflated prices.

## COUNT VII

### Violation of § 10(b) of the 1934 Act and Rule 10b-5 as Promulgated by the SEC Against Dexia, S.A. and Dexia Bank Belgium.

518.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

519.     This Count is asserted against Dexia S.A. and Dexia Bank Belgium for violations of

§10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule l0b-5, as promulgated thereunder.

520.    Dexia S.A., and/or Dexia Bank Belgium as the acquirer of Artesia, is liable to plaintiff for Artesia's wrongful conduct as set forth herein.

521.    During the Class Period, Dexia and the Senior Officers and others engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to enable L&H to falsely inflate its financial results throughout the Class Period and to induce plaintiff and other members of the Class to purchase L&H securities during such period at artificially inflated prices.

522.    During the Class Period, Dexia engaged in acts, practices, and a course of business and employed devices, schemes, and artifices which operated as a fraud on plaintiff and the Class. In particular, pursuant to the scheme alleged herein, Dexia provided millions of dollars to shell companies that it intended to be utilized to artificially inflate L&H's reported financial results. Without Dexia's knowing participation in the fraudulent scheme that plaintiff alleges, defendants and L&H could not have perpetrated the fraud as alleged herein.  Dexia knowingly, or in reckless disregard for the truth, engaged in these acts, practices, and course of business and employed devices, schemes, and artifices to defraud.

523.    As a result of the dissemination of the false and misleading statements set forth above and Dexia's knowing participation in the fraudulent scheme plaintiff alleges, the market price of L&H securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Dexia, plaintiff and the other members of the Class relied, to their

detriment, on the integrity of the market price of L&H securities in purchasing those securities. Had plaintiff and the other members of the Class known the truth, they would not have purchased those securities or would not have purchased them at the inflated prices that were paid.

524.    Lead Plaintiffs and the other members of the Class have suffered substantial damages as a direct and proximate result of the wrongs committed by Dexia as alleged herein in an amount to be proved at trial.

525.    By reason of the foregoing, Dexia directly violated § 10(b) of the 1934 Act and Rule 10b-5, as promulgated thereunder in that it: (a) employed devices, schemes, and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of L&H securities during the Class Period.

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.    Declaring this action to be proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against the defendants for the damages sustained as a result of the wrongdoings of the defendants, together with interest thereon;

C.    Awarding Lead Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Lead Plaintiffs' attorneys, and experts;

D.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity

and federal and state statutory provisions sued on hereunder, including attaching, impounding,

imposing a constructive trust upon or otherwise restricting the proceeds of defendants' trading

activities or their other assets so as to assure that plaintiff has an effective remedy; and

      E.     Granting such other and further relief as the Court may deem just and proper.

## LEAD PLAINTIFFS DEMAND A TRIAL BY JURY


Dated: May 15, 2006                      By:  **/s/ Thomas M. Sobol**

                                                    Thomas M. Sobol
  David S. Nalven
  HAGENS BERMAN SOBOL SHAPIRO LLP
  One Main Street
  4th Floor
  Cambridge, MA 02142
  Telephone: (617) 482-3700
  Facsimile: (617) 482-3003

  Steve W. Berman
  HAGENS BERMAN SOBOL SHAPIRO LLP
  1301 5th Avenue
  Suite 2900
  Seattle, WA 98101
  Telephone: (206) 623-7292
  Facsimile: (206) 623-0594

  Steven J. Toll
  Mark S. Willis
  Matthew K. Handley
  COHEN, MILSTEIN, HAUSFELD & TOLL P.L.L.C.
  1100 New York Avenue, N.W.
  Suite 500, West Tower
  Washington, DC  20005
  Telephone:   (202) 408-4600
  Facsimile:   (202) 408-4699

Robert M. Roseman
Andrew D. Abramowitz
Rachel E Kopp
SPECTOR, ROSEMAN, &
KODROFF, P.C.
Suite 2500
1818 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611

**Attorneys for Lead Plaintiffs**

## CERTIFICATE OF SERVICE

I, David S. Nalven, hereby certify that I am one of the attorneys for the plaintiffs herein

and that on May 15, 2006, I caused copies of Plaintiffs' Amended Class Action Complaint for

Violations of the Federal Securities Laws to be served by Electronic Case Filing upon counsel of

record for defendants who have appeared by counsel, and by Global Express Guaranteed upon

defendants who have not appeared, as listed below.

**/s/ David S. Nalven_____**
David S. Nalven

George A. Salter
Hoa T.T. Hoang
Nicholas W.C. Corson
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
T: (212) 918-3000
F: (212) 918-3100
gasalter@hhlaw.com
htthoang@hhlaw.com
ncorson@hhlaw.com

Michael J. Stone
Michael J. Cedrone
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA 02110
T: 617-951-2100
F: 617-951-2125
mstone@peabodyarnold.com
mcedrone@peabodyarnold.com

*Counsel for Klunveld Peat Marwick*
*Goerdeler Bedrijfsrevisoren*

Michael P. Carroll
Michael S. Flynn
Sean C. Knowles
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
T: (212) 450-4547
F: (212) 450-4800
michael.carroll@dpw.com
michael.flynn@dpw.com
knowles@dpw.com

Kevin J. Lesinski
Kristin G. McGurn
Seyfarth Shaw, LLP
Two Seaport Lane
Suite 300
Boston, MA 02210
T: (617) 946-4800
F: (617) 946-4801
klesinski@seyfarth.com
kmcgurn@seyfarth.com

*Counsel for KPMG LLP*

Breton T. Leone-Quick
Peter M. Saparoff
Mintz, Levin, Cohn, Ferris, Glovsky &
Popeo, PC
One Financial Center
Boston, MA 02111
T: (617) 542-6000
F: (617) 542-2241
bleone-quick@mintz.com
psaparoff@mintz.com

James B. Weidner
Jeff E. Butler
Kara Morrow
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019-6131
T: (212) 878-8000
F: (212) 878-8375
jeff.butler@cliffordchance.com
kara.morrow@cliffordchance.com

*Counsel for Dexia, S.A. & Dexia Bank
Belguin*

Ada Fernandez Johnson
John B. Missing
Debevoise & Plimpton
555 13th Street N.W.
Washington, DC 20004
T: (202) 383-8036
 F: (202) 383-8118
afjohnso@debevoise.com
jmissing@debevoise.com

Thomas J. Gallitano
Jacob A. Labovitz
Conn, Kavanaugh, Rosentha, Peisch &
Ford LLP
Ten Post Office Square
Boston, MA 02109
T: (617) 482-8200
F: (617) 482-6444
tgallitano@ckrpf.com
jlabovitz@ckrpf.com

*Counsel for Erwin Vandendriessche,*
*Dirk Cauwelier & Marc G.H. De Pauw*

Brian E. Pastuszenski
Anita Bapooji Ryan
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
T: (617) 570-1094
F: (617) 523-1231
bpastuszenski@goodwinprocter.com
abapooji@goodwinprocter.com

*Counsel for Francis Vanderhoydonck*

Jozef Albert Lernout
Dynastielann, 36/206
B-8660 De Panne
Belgium

Pol Lucien Corneel Hauspie
Zeedijk (Kok), 388/303
B-8670 Koksijde
Belgium

Nico Camillus Maria Willaert
Lage Kaart, 1
B-2930 Brasschaat
Belgium

Carel Victor Marcel Dammekens
Zeedijk-Heist, 145/52
B-8301 Knokke-Heist
Belgium

Ellen Spooren
Tuurkesweg 5
Weert
The Netherlands